DISTRICT OF MASSACHUSETTS

NO.

CHRISTOPHER ELLEN
Petitioner

**05 10538 WGY**

v.

DONALD LEVESQUE,
Respondent

---

MEMORANDUM AND APPENDIX IN SUPPORT OF
PETITION FOR HABEAS CORPUS RELIEF

---

DAVID J. BAREND
ATTORNEY FOR PETITIONER
2 Stonewood Circle
North Attleboro, MA 02760
(508) 316-1171
BBO #564032

March 17, 2005

## STATEMENT OF THE CASE

An Essex County, Massachusetts Grand Jury indicted Christopher Ellen on the charges of assault with intent to murder, assault with intent to rape, burglary - assault on occupant and assault and battery by means of a dangerous weapon. Mr. Ellen's jury trial commenced on October 10, 2000 in Essex County Superior Court. [1]  (Tr.V.1).

Judge Merrick granted Mr. Ellen's motion for required finding of not guilty for the assault with intent to rape charge. (Tr.VII.9). On October 16, 2000, the jury found Mr. Ellen guilty on the three remaining indictments. (Tr.IX.120). The judge sentenced Mr. Ellen that same day to an 18-25 year commitment at MCI Cedar Junction on the burglary assault conviction. (Tr.IX.134). She ordered a concurrent sentence of 8-10 years on the assault and battery with a dangerous weapon conviction. (Tr.IX.134). On the assault with intent to murder conviction, Mr. Ellen received five years of probation to be run from and after his burglary assault sentence. (Tr.IX.134).

---

[1] The trial transcript will be cited as (Tr.  ) and the Appendix as (A.  )

2

Trial counsel timely filed a Notice of Appeal.  The case was entered in the Appeals Court on May 28, 2002.  On October 28, 2003, the Appeals Court affirmed the judgments. (A.1).  An Application for Further Appellate Review was filed on November 19, 2003 with the Supreme Judicial Court. On December 29, 2003, the SJC denied that application. (A.7).

## STATEMENT OF FACTS

Mr. Ellen's jury trial began with Adair Rowland testifying that in May of 1999, she moved to 72 Highland Street in Amesbury, Massachusetts. (Tr.V.40). At 9:00 p.m. on Friday, July 23, 1999, Ms. Rowland locked her doors and left her home. (Tr.V.43,130). She testified that the bulkhead basement door had an "ineffectual" bolt. (Tr.V.47). She returned home shortly after midnight. (Tr.V.46).

The following morning she noticed a tie knotted to a pipe in her dining room. (Tr.V.48). This tie had previously been in a box in her third floor attic. (Tr.V.48). At that point she believed that one of two her sons, who had been at camp the whole month of July, might have been responsible for placing the tie around the pipe. (Tr.V.136). Ms. Rowland untied the tie and put it on a bench. (Tr.V.49).

The next day, Sunday July 25, 1999, at 5:00 p.m., she dressed in a red shift and walked three doors down to a party at Joan Blankenau's house. (Tr.V.42,53). She did not lock the back door when she departed. (Tr.VIII.57). While walking down the street with a bottle of wine, Ms.

4

Rowland noticed some men holding glasses. (Tr.V.53,54).
One called out, "Don't think we didn't see you walking with
that bottle of wine." Ms. Rowland glanced up and said, "I
think you've already got it covered." (Tr.V.54). She did
not recognize any of those men. (Tr.V.55).

At a little before 10:00 p.m., Ms. Rowland left the
party. (Tr.V.57). Upon entering her house, she locked the
back door and proceeded up stairs. (Tr.V.59). While in
her bedroom she discovered that two of her lights did not
work. (Tr.V.63). Ms. Rowland then noticed her yellow
sweater tied to a bedpost of her headboard under the box
spring. (Tr.V.68). Although startled, she managed to
untie the sweater. (Tr.V.68). Ms. Rowland subsequently
called Ms. Blankenau. (Tr.V.70,71).

While waiting in her kitchen, Ms. Rowland saw a man
stagger towards her. (Tr.V.76). He wore only a pair of
shorts and had tube socks on his hands. (Tr.V.76).
Although she testified that she had never seen this man
before, Ms. Rowland identified Mr. Ellen during the trial
as the intruder. (Tr.V.76,81).

Mr. Ellen began hitting Ms. Rowland in the face.
(Tr.V.77,79,172). When Ms. Rowland told him that she had

called her neighbor, he threw her against the counter, and locked the back door. (Tr.V.80,163). Upon Mr. Ellen's re-entry into the kitchen, Ms. Rowland threw a cordless phone and swung a saucepan at him. (Tr.V.84).

Ms. Rowland testified that after Mr. Ellen threw her to the floor, she heard Ms. Blankenau's voice. (Tr.V.86). Ms. Rowland claimed that Mr. Ellen ordered her tell her friend to go home. (Tr.V.87). Ms. Rowland told Mr. Ellen that he could have her money. (Tr.V.87). Mr. Ellen's reply of "What, four bucks?" revealed to Ms. Rowland that he had been through her purse which she did not bring with her to the party. (Tr.V.87). She then offered him her car. (Tr.V.87). Mr. Ellen responded, "Adair, I don't want your car." (Tr.V.87). Ms. Rowland then yelled, "Joan, go away." (Tr.V.88,212). Ms. Blankenau yelled back that she was going to call the police. (Tr.V.88,213,236).

The next thing Ms. Rowland saw was a purple sash that had been in the same box as the tie that she discovered on Saturday. (Tr.V.88). Mr. Ellen looped the sash over her head and pulled it tight. (Tr.V.89). Mr. Ellen loosened the sash and then jerked it tight again. (Tr.V.90). Suddenly, Mr. Ellen released the sash and said, "This is

6

stupid, this is stupid.  I'm a dead man."  (Tr.V.91).  Ms.

Rowland testified that she did not take Mr. Ellen's hand

when he offered to assist her to her feet.  (Tr.V.92).  She

remembered asking Mr. Ellen, "Who are you?"  (Tr.V.92).

Mr. Ellen said, "I'm an insane individual and you're a

victim and I'm a victim."  (Tr.V.92).

After her ten to fifteen second conversation with Mr.

Ellen, Ms. Rowland saw police cruisers at her house.

(Tr.V.92,186).  Ms. Rowland testified that the entire

episode lasted four or five minutes.  (Tr.V.183).

Sergeant William Scholtz testified that he arrived at

72 Highland Street within two minutes of receiving a

dispatch.  (Tr.VI.10,40).  Officers Kevin Ouellet and Mark

Valli also came to the scene.  (Tr.VI.80).  Both Officers

Valli and Ouellet testified that after departing Ms.

Rowland's house, Mr. Ellen admitted that he had struck Ms.

Rowland.  (Tr.VI.75,86).  Officer Ouellet claimed that he

smelled a slight odor of alcohol.  (Tr.VI.91).

At different points throughout the evening, a number

of officers searched Ms. Rowland's house. (Tr.V.95).  Their

discoveries included: (1) two sashes on the floor of the

foyer, (Tr.V.99, VI.155), (2) a ripped and knotted

sleeveless blouse at the bottom of the back stairway,
(Tr.V.96), (3) a pair of slacks tied to a bedpost at the
foot of Ms. Rowland's bed, (Tr.VI.175), (4) another pair of
knotted slacks tied to the right head post of Ms. Rowland's
bed. (Tr.V.103, VI.175).

Additionally, Ms. Rowland claimed that she and
Detective Pare noticed that the bulkhead door to her
basement had been wedged open. (Tr.V.47). She also
testified that they saw a belt which had been in the box on
her third floor attic, amongst a stream of clothing coming
out of her bedroom closet. (Tr.V.104). Ms. Rowland
testified that she generally changed her clothes in that
closet. (Tr.VIII.58). Although there was a window in that
closet, Ms. Rowland claimed that the area beyond that point
was the only spot in her bedroom with privacy.
(Tr.VIII.58). The prosecutor showed her a photograph
which, according to Ms. Rowland, depicted the view of Mr.
Ellen's house from her closet window. (Tr.VIII.59).

During his investigation of Ms. Rowland's bedroom
Sergeant Scholtz saw that a telephone cord had been
unplugged from the wall. (Tr.VI.28). Detective Wile
testified that upon opening a closet near the back stairs,

8

he discovered the tie that Ms. Rowland had claimed to have previously seen knotted to her steam pipe. (Tr.VI.178).

While the searches of Ms. Rowland's house were taking place, Mr. Ellen had been brought to the police station. (Tr.VI.89). Officer Ouellet claimed that during the booking, he discovered a condom packet near Mr. Ellen's feet. (Tr.VI.119). The officer conducted a search Mr. Ellen's waistband which revealed a second condom packet. (Tr.VI.120).

Officer Ouellet was also asked during direct examination, "In your opinion, did [Mr. Ellen] seem confused by any of [the booking questions]?" (Tr.VI.95). The judge then overruled defense counsel's objection and allowed the officer to respond, "He didn't seem confused, no." (Tr.VI.95). The next eleven questions that the prosecutor asked, and received answers to, all concerned Mr. Ellen's hearing, reading, and understanding of the Miranda warnings. (Tr.VI.95-97).

The prosecutor then asked Officer Ouellet, "At the conclusion of giving him his Miranda warning, what if anything, did you say or do with him?" (Tr.VI.97). Officer Ouellet responded, "On the bottom of the card is,

you know, 'Do you wish to speak to me now, is on the bottom of it.'  And on that when, I asked him to sign it he printed the word "no" and signed the card."  (Tr.VI.97).

After defense counsel objected, he was granted a request to be heard at sidebar.  (Tr.VI.97).  He then argued that the comment on Mr. Ellen's right to remain silent mandated that a mistrial be ordered.  (Tr.VI.97). At that point the judge ordered the jury to take a fifteen to twenty minute recess.  After the jury departed, the prosecutor and defense counsel debated the admissibility of the evidence.  (Tr.VI.98-105).

The prosecutor contended that due to the defense of "mental impairment" the testimony was admissible. (Tr.VI.99).  The judge then indicated that this issue was analogous to a previously discussed issue regarding fingernail scrapings.  (Tr.VI.100).[2]  According to the

---

[2] Eight days before the trial started, Judge Merrick considered a motion in limne concerning Mr. Ellen's refusal to provide fingernail scrapings to the police.  (Tr.I.128). The prosecutor asserted that if the defense called an expert to testify that Mr. Ellen was not criminally responsible, he would submit evidence that Mr. Ellen refused to turn over the fingernail scrapings.  (Tr.I.130). He would also enter evidence that Mr. Ellen made an intelligent waiver of his Miranda rights.  (Tr.I.130). After confirming the prosecutor's intention not to make any

judge, the Commonwealth had agreed not to delve into that topic until after the defense had put on its case. (Tr.VI.100). She then confirmed that the prosecutor believed that Officer Ouellet's answer was relevant to the lack of criminal responsibility issue. (Tr.VI.101). The sidebar discussion concluded with the judge stating that she wanted to take "another fifteen or twenty minutes" to review relevant cases. (Tr.VI.104-105).

When the judge subsequently re-took the bench a second lengthy debate ensued. (Tr.VI.105-114). The judge, eventually, decided to deny the motion for a mistrial and provide a jury instruction. (Tr.VI.113,114). Defense counsel immediately objected asserting that such an instruction would underline the error. (Tr.VI.114). The judge, however, maintained her ruling. (Tr.VI.114).

When the jurors returned, the judge apologized to them for the long delay. (Tr.VI.114). She then reminded the jurors of Officer Ouellet's testimony concerning Mr. Ellen invocation of his Miranda rights. She went on to tell the jurors that a person who is arrested has the right to

---

mention of this in his case in chief, the judge decided to reserve her ruling until the issue arose. (Tr.I.130).

remain silent. (Tr.VI.116). She further instructed that "when someone chooses to avail themselves" of that right it should never be used against that person. (Tr.VI.116).

When the judge completed her instruction, defense counsel renewed his motion for a mistrial contending that the instruction "made things worse." (Tr.VI.118). The judge denied the motion and Officer Ouellet resumed his testimony. (Tr.VI.119).

When the Commonwealth rested, defense counsel moved for required findings of not guilty. (Tr.VI.204,208). The judge only agreed to enter a finding of not guilty on the assault with intent to rape indictment. (Tr.VII.9).

Christopher and Denise Ellen provided testimony as part of the case for the defense. (Tr.VII). Mr. Ellen testified that his mother physically abused him and that his father abandoned him when he was two. (Tr.VII.102). While in kindergarten, his mother was admitted to a mental institution which led to his placement into a foster home. (Tr.VII.101). Mr. Ellen suffered mental, physical and sexual abuse by his foster family. (Tr.VII.103). In fits of anger his foster mother would strangle him.

(Tr.VII.136).  Mr. Ellen also testified that while in high school a student strangled him.  (Tr.VII.136).

Mr. Ellen eventually enlisted in the Marine Corps and became stationed in the Philippines.  (Tr.VII.118).  During a non-sanctioned patrol in search of insurgents, Mr. Ellen was garroted.  (Tr.VII.124).  He displayed his scars to the jury.  (Tr.VII.126).

Mr. Ellen also recalled that while stationed on Thailand-Cambodia border he saw an unexploded mortar shell. (Tr.VII.134).  He testified that he became mesmerized by the burning and smoking white fuse.  (Tr.VII.134).  Members of his unit had to wrestle him away from the shell. (Tr.VII.135).

After obtaining his discharge from the military, Mr. Ellen met and later married Denise.  (Tr.VII.138, VI.24). Both Mr. and Mrs. Ellen testified that over time he became depressed.  (Tr.VII.148).  At some point Mr. Ellen stopped sleeping with his wife.  (Tr.VII.140).  He sought treatment for this depression for a couple of months at the Veteran's Outreach Center in Haverhill.  (Tr.VII.28,29,149).

From about 1995 through 1999, Mr. Ellen had a well-paid job at Varian Corporation (Tr.VII.194).  On

Wednesday, July 14, 1999, Mr. Ellen engaged in a heated argument with a man in Varian's parking lot. (Tr.VII.143). Later that morning, Mr. Ellen received notification that he would be suspended without pay for the next three days. (Tr.VII.145).

At that time Mr. and Mrs. Ellen lived in a second floor apartment with their two young boys, at 2 Carver Street in Amesbury. (Tr.VII.24,141). Mrs. Ellen testified that it would be possible to see a part of Ms. Rowland's house from two of the windows in her apartment. (Tr.VII.I.61). On Saturday July 17, 1999, the family embarked for a vacation. (Tr.VII.147). At approximately 3:00 p.m. on Friday July 23, 1999 the Ellens arrived back at their apartment. (Tr.VII.35,154). Mr. Ellen stayed home that entire evening. (Tr.VII.154). Mrs. Ellen stated that Mr. Ellen came into their bedroom shortly after 11:00 p.m. (Tr.VII.38).

In the afternoon of Sunday, July 25, 1999, Mr. Ellen drove to a liquor store and purchased a bottle of whisky. (Tr.VII.161). He claimed that he bought the alcohol to cope with the depression he felt from his anticipated

14

return to Varian Corporation. (Tr.VII.161). He asserted
that he drank throughout the afternoon. (Tr.VII.164).

At some point the Ellens walked to a neighbor's house.
(Tr.VII.164). While standing outside, Mr. and Mrs. Ellen
saw a woman walking down the street. (Tr.VII.56,165). Mr.
Ellen testified that he had never seen this woman before.
(Tr.VII.56,166). Mr. Ellen's neighbor mentioned that she
had just moved into the house on the corner of Carver
Street and Highland Street. (Tr.VII.166, VIII.38). With a
drink in his hand, Mr. Ellen jokingly said, "Don't think we
don't see you with that bottle of wine." (Tr.VII.166).
Mr. Ellen did not see where this woman went. (Tr.VII.207).

When Mr. Ellen returned to his apartment, he mixed
another drink. (Tr.VII.60,167). He had yet another drink
once the children went to bed. (Tr.VII.170). He then went
into his bedroom, grabbed two condoms from a box and put
them in his pocket with intentions on having relations with
his wife that evening. (Tr.VII.171).

Mrs. Ellen testified that later that evening she and
her husband began to argue. (Tr.VII.62). After a short
period of time, Mrs. Ellen asked Mr. Ellen if he wanted her
to set the clock that he used when he slept on the couch.

(Tr.VII.64,172).  Mr. Ellen understood this to mean that
Mrs. Ellen wanted him to sleep on the couch instead of with
her.  (Tr.VII.172).  Mrs. Ellen testified that he then left
their apartment at some point between 9:00 p.m. and 9:15
p.m.  (Tr.VII.65).

Mr. Ellen testified that he had a memory lapse that
commenced after his wife's comment about the clock.
(Tr.VII.172).  Mr. Ellen's next memory was coming into the
light in a kitchen.  (Tr.VII.173).  He claimed that he
heard no sounds and had no intentions or thought patterns.
(Tr.VII.174,181).  Mr. Ellen further stated that he felt
nothing and the experience was just visual.  (Tr.VII.175).

As he walked forward his hands met those of a woman in
a blue dress.  (Tr.VII.174).  He pulled a hand away and saw
a "slow body motion of an uppercut."  (Tr.VII.179).  The
woman swung a big blue frying pan at him and he deflected
it with his left hand.  (Tr.VII.175).  Mr. Ellen then
knocked the pan and the woman to the floor.  (Tr.VII.175).
He testified that "the next thing I know I was like slowly
pulling the reins of a horse."  (Tr.VII.175).

After a period of time, Mr. Ellen realized that
something was actually happening.  (Tr.VII.175).  From this

point on Mr. Ellen's recollection of the events did not

substantially differ from the testimony of the

Commonwealth's witnesses. (Tr.VII.176). He, however,

testified that Ms. Rowland took his hand when he offered to

help her up. (Tr.VII.176). He also stated that three or

four minutes had passed from the time he regained control

until the police arrived. (Tr.VII.49). He further

testified that he told Detective Pare that he had been

drinking. (Tr.VII.180). Finally, he maintained that

before July 25, 1999, he had never been inside Ms.

Rowland's house at 72 Highland Street. (Tr.VII.153).

After Mr. Ellen completed his testimony, the defense

called Dr. David Rosemarin as its expert witness.

(Tr.VIII.69). Dr. Rosemarin found significance in Mr.

Ellen's "dissociation" episode that took place when he sat

next to the burning mortar. (Tr.VIII.107). The doctor

explained that dissociation involves the lack of

integration of the senses, memory and consciousness.

(Tr.VIII.109). He asserted that dissociation is most

common during warfare due to the immense stress.

(Tr.VIII.110). He also claimed that people who have

suffered extreme abuse are prone to dissociation.

(Tr.VIII.110). Dr. Rosemarin believed that Mr. Ellen's experience with the bomb was his first dissociation. (Tr.VIII.110).

Mr. Ellen's next disassociation occurred when he inexplicably found himself in Boston. (Tr.VIII.112). Mr. and Mrs. Ellen had described an incident to Dr. Rosemarin when Mr. Ellen called his wife to tell her that he was in Boston, but he had no idea how he got there. (Tr.VIII.112). Dr. Rosemarin testified that the loss of time and memory had the hallmarks of a dissociation. (Tr.VIII.113).

Dr. Rosemarin believed that Mr. Ellen's third dissociation occurred on the evening of July 25, 1999. (Tr.VIII.129). He asserted that the stress of having to go back to work compelled Mr. Ellen to drink three-fourths of a bottle of whisky. (Tr.VIII.128,168). Dr. Rosemarin emphasized that stress and intoxication are causes of dissociation. (Tr.VIII.130). While inebriated, Mr. Ellen faced another stressor - the rejection by his wife. (Tr.VIII.129). This was Mr. Ellen's last memory and the commencement of his dissociation. (Tr.VIII.129).

Mr. Ellen's recollection of hearing no sound, having no intentions, and seeing things in slow motion fit Dr. Rosemarin's understanding of the symptoms of dissociation. (Tr.VIII.130). According to Dr. Rosemarin, the fact that Mr. Ellen did not know Ms. Rowland and had no motive to try to kill her is further evidence of a dissociation. (Tr.VIII.133). Dr. Rosemarin also opined that the knotted clothes discovered throughout Ms. Rowland's house evidenced non-sensible, non-goal directed behavior consistent with a dissociation. (Tr.VIII.134).

The doctor also placed importance on Mr. Ellen's reports of being strangled by his foster mother, a high school student and a Philippine insurgent. (Tr.VIII.106,107). According to Dr. Rosemarin, when Mr. Ellen said the name Adair, that did not mean that he understood whom he was attacking. (Tr.VIII.139,145). Dr. Rosemarin inferred that Mr. Ellen thought that he was strangling some combination of the people who had tried to strangle him in the past. (Tr.VIII.139). The doctor testified "that this is a man who suffered a mental illness that was of relatively short-lived duration that was brought on by acute intoxication, and in the midst of that

19

was in mortal combat, but not with the woman next door, in his appreciation and understanding." (Tr.VIII.196).

Based on the above analysis, Dr. Rosemarin concluded that unless the jury determined that Mr. Ellen had been in Ms. Rowland's home prior to July 25, 1999, he should be found not criminally responsible. (Tr.VIII.141). He opined that on July 25, 1999, Mr. Ellen lacked substantial capacity to conform his conduct to the requirements of the law and to appreciate the wrongfulness and criminality of his conduct. (Tr.VIII.145).

Once Dr. Rosemarin finished testifying, the Commonwealth called Dr. Malcolm Rogers as its expert witness. (Tr.VIII.213). Dr. Rogers found that Mr. Ellen was able to conform his conduct to the requirements of the law and had the ability to appreciate the wrongfulness of his actions. (Tr.VIII.251,252). Although he conceded that alcohol may have had some debilitating effect on Mr. Ellen, Dr. Rogers did not believe that it substantially removed his capacity to form the intent to rape or murder. (Tr.VIII.253).

Dr. Rogers did, however, testify that "at some level, Mr. Ellen probably didn't appreciate the difficulty he was

in and the problems he would face until the very end of the
process." (Tr.VIII.247,249). He also admitted that if
everything that Mr. Ellen said was believed it could be
concluded that he had suffered dissociation on July 25,
1999. (Tr.VIII.278).

<u>ARGUMENT</u>

<u>THE REFERENCES TO MR. ELLEN'S POST-MIRANDA SILENCE DURING
THE STATE'S CASE CONSITUTED A DUE PROCESS VIOLATION THAT
HAD SUBSTANTIAL INFLUENCE IN DETERMINING THE JURY'S VERDICT
WHERE AMONGST THE SEQUENCE OF EVENTS WAS A JURY INSTRUCTION
THAT WAS NEITHER IMMEDIATE NOR PROPER.</u>

A. <u>The State Court's Rejection Of Mr. Ellen's Contention
That A Violation Of The Mandates Of Doyle V. Ohio, 426 U.S.
610 (1976), Occurred During His Trial Was Both "Contrary
To" And Involved An "Unreasonable Application" Of, Clearly
Established Federal Law.</u>

According to 28 U.S.C. §2254(d)(1), habeas relief may

be granted to a state prisoner only if the state court

adjudication resulted in a decision that was contrary to,

or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court

of the United States.  A state court decision is "contrary

to" clearly established Federal law if it applies a legal

rule that contradicts an established Supreme Court

precedent.  <u>Williams v. Taylor</u>, 529 U.S. 362, 405-406

(2000).  A state court decision involves an "unreasonable

application" of Federal law when the state court identifies

the correct legal principle, but unreasonably applies that

principle to the facts of the prisoner's case.  <u>Id</u>. at 407-

408.

The Massachusetts Supreme Judicial Court rejected Mr. Ellen's contention that a violation of the mandates of Doyle v. Ohio, 426 U.S. 610 (1976) occurred during his trial. The record reveals that the SJC's decision was both "contrary to" and involved an "unreasonable application" of, clearly established federal law.

The United States Supreme Court in Doyle v. Ohio, 426 U.S. at 619, held that "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving Miranda warnings, violated the Due Process Clause of the Fourteenth Amendment." The Court found that Miranda warnings contain an implicit assurance "that silence will carry no penalty." Id. at 618. It, therefore, "does not comport with due process to permit the prosecution during the trial to call attention to [the defendant's] silence at the time of arrest and to insist that because he did not speak about the facts of the case at that time, as he was told he need not do, an unfavorable inference might be drawn as to the truth of his trial testimony." Id. at 619.

In Wainwright v. Greenfield, 474 U.S. 284, 294 (1986) the Court held that it is equally unfair to promise an arrested person that his silence will not be used against

23

him and thereafter to breach that promise by using the
silence to overcome a defendant's plea of insanity.  "The
implicit promise, the breach, and the consequent penalty
are identical in both situations."  Id.

During the direct examination of Officer Ouellet, the
prosecutor asked, "In your opinion, did [Mr. Ellen] seem
confused by any of [the booking questions]?"  (Tr.VI.95).
The judge then overruled defense counsel's objection and
allowed the officer to respond, "He didn't seem confused,
no."  (Tr.VI.95).  The next eleven questions that the
prosecutor asked and received answers to all concerned Mr.
Ellen's hearing, reading, and understanding of the Miranda
warnings.  (Tr.VI.95-97).

There was no justifiable reason for the Commonwealth
to mention that Mr. Ellen received Miranda warnings.  Such
evidence would only be relevant to contest a defense
argument that statements made to the police were not given
voluntarily.  The prosecutor knew, however, that the jury
would eventually learn that Mr. Ellen made no post-Miranda
statements.

When combined with the fact that he made no
statements, the fact that Mr. Ellen received Miranda rights

24

allowed the jury to conclude that he made a conscious decision to invoke his right not to speak. The jury could then conclude that such a decision would be inconsistent with his defenses of diminished capacity, lack of criminal responsibility as well as his assertion of innocence. This negative impact on the jury caused by Mr. Ellen's invocation of his right to remain silent was specifically prohibited by Wainwright v. Greenfield, 474 U.S. at 294 and Doyle v. Ohio, 426 U.S. at 619.

Immediately following the above-mentioned eleven questions concerning the Miranda warnings, the prosecutor asked, "At the conclusion of giving him his Miranda warning, what, if anything did you say or do with him?" (Tr.VI.97). Officer Ouellet responded, "On the bottom of the card is, you know 'Do you wish to speak with me now', is on the bottom of it. And on that, when I asked him to sign it, he printed the word 'no' and signed the card." (Tr.VI.97). There can be no doubt that this answer by Officer Ouellet (the final answer in the string of twelve) directly referenced Mr. Ellen's invocation of his right to remain silent in contravention with the holdings of

Wainwright v. Greenfield, 474 U.S. at 294 and Doyle v.
Ohio, 426 U.S. at 619.

In Greer v. Miller, 483 U.S. 756, 763 (1987), however,
the Supreme Court provided more specifics concerning what
constitutes impermissible use of a defendant's post-Miranda
silence. The defendant in that case testified that he had
taken no part in the alleged offense. Id. at 758. On
cross-examination the prosecutor asked him, "Why didn't you
tell this story to anybody when you got arrested?" Id. at
759. The trial judge immediately sustained defense
counsel's objection and instructed the jury to "ignore the
question for the time being." Id.

The Supreme Court found that the judge "explicitly
sustained an objection to the only question that touched
upon Miller's postarrest silence." Id. at 764. The Court
then held "that the sequence of events at the trial,
beginning with the single comment -- but including
particularly the proper and immediate action by the trial
court, and the failure by defense counsel to request more
specific instructions -- indicates that Miller's postarrest
silence was not used against him within the meaning of
Doyle." Id. at 765.

26

The facts of Mr. Ellen's case evidence a "<u>Doyle</u>" violation that does not fall within the limited exception that the Supreme Court announced in <u>Greer v. Miller</u>, 483 U.S. 756. As opposed to <u>Greer v. Miller</u> where only one question touched upon the defendant's post-arrest silence, the prosecutor here conducted a direct examination that contained a series of twelve questions and answers that impermissibly referenced Mr. Ellen's invocation of his right to remain silent.

Although the first eleven questions did not as blatantly refer to Mr. Ellen's silence as the twelfth, that should not diminish their erroneous nature. According to <u>U.S. v. Elkins</u>, 774 F.2d 530, 537 (1st Cir. 1985), "A <u>Doyle</u> violation occurs not only when the objectionable comments explicitly refer to a defendant's failure to answer questions put to him or her, but when the reference to defendant's silence is more oblique."[3]

---

[3] Although 28 U.S.C. § 2254(d) requires that the relevant legal rule be clearly established in a Supreme Court holding, the First Circuit Court of Appeals has not interpreted this to mean that other federal court decisions are wholly irrelevant to the reasonableness determination. "To the extent that inferior federal courts have decided factually similar cases, reference to those decisions is appropriate in assessing the reasonableness vel non of the

In addition, those eleven prior questions established a context, within which the jury could place Officer Ouellet's subsequent undeniably explicit comment on Mr. Ellen's decision not to speak. This was not the situation in Greer v. Miller, 483 U.S. at 759 where the only question the prosecutor asked before the objectionable inquiry was "Mr. Miller, how old are you?"

Here, an entire line of questioning created a progression that began with establishing that Mr. Ellen understood his Miranda rights and culminated with the fact that he invoked one of those rights - his right to remain silent. (Tr.VI.95-97). The testimony concerning Mr. Ellen's silence, therefore, bore a logical relationship to the previous eleven questions. This logical link between the prior line of questioning and Officer Ouellet's final comment is additional evidence that instead of disregarding the reference to Mr. Ellen's silence, the jury used it against him. See Morgan v. Hall, 569 F.2d 1161,1166 (1st

---

state court's treatment of the contested issue." O'Brien v. Dubois, 145 F.3d 16, 25 (1st Cir. 1998). "Reference to such cases may be especially helpful when the governing Supreme Court precedent articulates a broad principle that applies to a wide variety of factual patterns." Ouber v. Guarimo, 293 F.3d 19, 21 (1st Cir. 2002).

Cir. 1978), ("[H]owever innocent-appearing the first two questions, they seem designed only to set the stage for interrogation about Morgan's post-arrest silence.")

Even if this Court decides to only place significance on Officer Ouellet's explicit reference to Mr. Ellen's silence, that single comment suffices for a finding that a violation of Doyle v. Ohio occurred. According to Greer v. Miller, 483 U.S. at 756, n.5, a single comment can constitute a Doyle error. See also U.S. v. Moreno, 185 F.3d 465 (5th Cir. 1999). The Court in Greer v. Miller, 483 U.S. at 765, noted, however, that the one objectionable question, "Why didn't you tell this story to anybody when you got arrested?" merely "touched upon" the defendant's post-arrest silence. In contrast, Officer Ouellet specifically indicated that Mr. Ellen decided to invoke his right to remain silent after having been provided his Miranda warnings. (Tr.VI.97). Thus, as opposed to the comment in Greer v. Miller, 483 U.S. at 765, Officer Ouellet's comment cannot be said to have just "touched upon" Mr. Ellen's silence.

As mentioned above, the Court in Greer v. Miller, 483 U.S. at 756, n.5, also limited its holding to the specific

sequence of events at the trial in that case.  Those events
included an unanswered question by the prosecutor.  The
Fifth Circuit Court of Appeals has "interpreted Greer as
limited to situations in which no answer is given to the
improper question."  U.S. v. Moreno, 185 F.3d at 474.
Here, the prosecutor's question was in fact answered.

In addition, the prosecutors' question in Greer v.
Miller 483 U.S. at 756, was posed during cross-examination
of the defendant.  The improper inquiry in Mr. Ellen's
case, however, took place during the prosecutor's direct
examination of an officer.  The decision in U.S. v. Moreno,
185 F.3d at 473, suggested that a comment made during the
State's direct examination may be more egregious and more
indicative of erroneous use of post-Miranda silence.  The
Moreno Court reasoned that "the substantive use of a
defendant's invocation of counsel or silence before the
defendant has the opportunity to offer her exculpatory
story places her in an untenable position.  If she does not
take the stand, an inference of guilt by the jury is a
possible inference; if she does take the stand, her
credibility will already be in question and the jury might
simply discount as fabricated a story. . ."  Id.

30

The Fifth Circuit Court of Appeals went on to quote
Anderson v. Charles, 447 U.S. 404, 409 (1980), to support
its assertion that "Doyle governs where the "comments are
'designed to draw meaning from silence.' That was the case
here. The timing of the question and answer regarding her
silence, specifically related to her exculpatory story and
challenged Moreno's credibility." Id. at 473. As in U.S.
v. Moreno, the "natural consequence, if not purpose" of the
prosecutor's question and Officer Ouellet's answer, was "to
rebut the defense". Id. at 474.

Also included amongst the "sequence of events at the
trial" that the Court in Greer v. Miller, 483 U.S. at 756,
n.5, listed as impacting its decision of no error was that
the judge immediately provided an instruction. The
importance of an immediate instruction has been emphasized
in numerous post-Greer v. Miller cases such as U.S. v.
Kallin, 50 F.3d 689 (9th Cir. 1995) and U.S. v. Johnson, 302
F.3d 139, 147-148 (3rd Cir. 2002). The timing of the
instruction in the case at hand, can in no way be labeled
"immediate".

After defense counsel objected, he was granted a
request to be heard at sidebar. He then argued that the

31

comment on Mr. Ellen's right to remain silent mandated that

a mistrial be ordered. (Tr.VI.97). At that point the

judge ordered the jury to take a fifteen to twenty minute

recess. After the jury departed, the prosecutor and

defense counsel debated the admissibility of the evidence.

(Tr.VI.98-105). The sidebar discussion concluded with the

judge stating that she wanted to take "another fifteen or

twenty minutes" to review relevant cases. (Tr.VI.104-105).

When the judge subsequently re-took the bench a second

lengthy debate ensued. (Tr.VI.105-114). After finally

deciding to deny the motion for a mistrial and provide an

instruction, the judge ordered the jurors to return and

apologized to them for the long delay. (Tr.VI.114). Thus,

the judge's less than prompt instruction is yet another

fact that differentiates this case from the limited

circumstances announced in Greer v. Miller where a

reference to post-Miranda silence would not be erroneous.

Further, the instruction itself, as opposed to the one

in Greer v. Miller, 483 U.S. at 756, was far from "proper".

What constitutes a proper instruction has been addressed by

the Ninth, Eleventh and Fifth Circuit Courts of Appeals.

In U.S. v. Kallin, 50 F.3d at 694 the Court refused to find

evidences that, contrary to the "sequence of events" in Greer v. Miller, 483 U.S. at 756, that led to a finding of no error, the judge here did not give a "proper" instruction.

The Massachusetts Appeals Court, however, simply opined: "In the case at hand no evidence pertaining to the defendant's wish to remain silent was ever admitted. In response to an objection which was sustained, the trial judge gave a curative instruction. There was no error." This clearly indicates that, in contravention with the mandates of Greer v. Miller, 483 U.S. at 756 the state court gave no consideration to the fact that the instruction was neither prompt nor proper.

The Massachusetts Courts have actually employed this same flawed reasoning in at least two prior published decisions. In Commonwealth v. Morgan, 369 Mass. 332 (1975) the Supreme Judicial Court found no error where the judge after sustaining an objection to a comment on the defendant's post-Miranda silence provided a curative instruction. The First Circuit Court of Appeals in Morgan v. Hall, 560 F.2d 1161 (1st Cir. 1978) overruled that decision and held that a prompt and forceful instruction

34

alone is insufficient to vitiate the use of post-arrest
silence.

Twenty-two years later the Massachusetts Appeals Court
in Commonwealth v. DeLarosa, 50 Mass. App. Ct. 623, 631
(2000) cited to the previously overruled Commonwealth v.
Morgan, 369 Mass. 332 (1975), in holding that prompt and
forceful instructions can eliminate any basis for a
mistrial due to the use of post-arrest silence.  It,
therefore, appears that Appeals Court's decision in Mr.
Ellen's case is an another example of the state court's
refusal to accept the rule concerning the effect that an
instruction has on a reference to post-Miranda silence.

Finally, the Court in Greer v. Miller, 483 U.S. at
756, also included "the failure by defense counsel to
request more specific instructions" within the "sequence of
events" allowing a finding of no Doyle violation.  The
Court has, therefore, placed importance on a defense
counsel's contentment with a judge's instruction in
determining whether post-arrest silence was used against
the defendnat.  Although Mr. Ellen's attorney did not
request more specifics, the record reveals that he was by
no means content with the judge's instruction.

After the judge denied the motion for a mistrial and stated that she would give a curative instruction, defense counsel objected asserting that the instruction would simply underline the error. (Tr.VI.114). Judge Merrick ignored defense counsel's wishes and provided her instruction. (Tr.V.I114). Contrast <u>U.S. v. Oliver</u>, 278 F.3d 1035, 1039-1040 (10th Cir. 2001), (No <u>Doyle</u> violation where judge complied with counsel's request for no instruction.) Once the judge completed providing the instruction that defense did not want the jury to hear, he renewed his motion for a mistrial. (Tr.VI.117). He averred that the instruction not only did not cure the error but actually made it worse. (Tr.VI.117-118). Thus, defense counsel's clearly expressed lack of contentment with the judge's strategy for dealing with Officer Ouellet's improper comment should be included amongst the facts distinguishing this case from the aforementioned "sequence of events" in <u>Greer v. Miller</u>, 483 U.S. at 756.

An examination of the above-cited cases reveals that the Massachusetts Appeals Court's decision that Mr. Ellen's post-Miranda silence was not used against him constituted an unreasonable application of federal law. The Appeals

36

Court's reliance on the sole fact that the trial judge gave

an instruction in its finding of no error was not

reasonable in light of the principles set forth in the

federal cases.  In addition, the Appeals Court's failure to

assess whether that instruction was proper and prompt

before determining that it prevented any error was

"contrary to" the Supreme Court's mandate in Greer v.

Miller, 483 U.S. at 756.  This Court should, therefore,

conclude that Mr. Ellen has met his burden under 28 U.S.C.

§2254(d)(1).

B. The References To Mr. Ellen's Post-Miranda Silence Had A
"Substantial Or Injurious Effect Or Influence In
Determining The Jury's Verdict".

According to Brecht v. Abrahamson, 507 U.S. 619

(1993), however, not only must the references to Mr.

Ellen's post-Miranda silence have been erroneous, but in

order for his petition to be granted they had to have had a

"substantial or injurious effect or influence in

determining the jury's verdict" necessary to warrant

federal habeas corpus relief.  In deciding whether

references to post-Miranda silence were sufficiently

harmful to meet the "substantial or injurious effect or

influence" standard, the United States Supreme Court assessed the following three factors: (1) the frequency of the references, (2) whether the references were cumulative of other evidence, and (3) whether the State had entered weighty evidence of guilt on the principal issue before the jury.  Id. at 639.

As stated above, the prosecutor asked twelve consecutive questions that elicited testimony that at least arguably concerned Mr. Ellen's post-Miranda silence.  In contrast with Brecht v. Abrahmson the numerity of those references can not be labeled "infrequent".  Even if this court concludes that only the last comment by Officer Ouellet constituted Doyle error, that should not be dispositive in determining whether they "had a substantial or injurious effect or influence in determining the jury's verdict".  The proverbial elephant need only enter the courtroom for a moment to leave a lasting impression on the jury.  See e.g. Willey v. Ketterer, 869 F.2d 648, 652 (1st Cir. 1989); Commonwealth v. Flebotte, 34 Mass. App. Ct. 676, 680 (1993).

A more compelling factor in assessing the harm caused by improper comments on post-Miranda silence is whether the

references were merely cumulative of other admissible evidence.  In <u>Brecht v. Abrahmason</u>, 507 U.S. at 639, the Court stated, "in view of the State's extensive and permissible references to petitioner's pre-Miranda silence . . . its references to petitioner's post-Miranda silence were, in effect, cumulative."  No such comments on Mr. Ellen's pre-Miranda silence were entered in his trial that would have minimized the erroneous references.

More importantly, in <u>Brecht v. Abrahmson</u>, 507 U.S. at 639, the primary issue was whether the defendant acted accidentally.  The Court found that there was "certainly weighty" evidence of guilt on that issue.  <u>Id</u>.  Here, the primary issue was whether Mr. Ellen was criminally responsible.  The State's evidence on that issue did not certainly outweigh that presented by the defense.

The defense called an expert who testified that Mr. Ellen had experienced two dissociation episodes prior to July 25, 1999.  The defense expert went on to opine that on July 25, 1999, Mr. Ellen experienced dissociation and lacked substantial capacity to conform his conduct to the requirements of the law and to appreciate the wrongfulness and criminality of his conduct.  The Commonwealth then

called an expert who admitted that if everything that Mr.

Ellen said was believed it could be concluded that he had

suffered dissociation on July 25, 1999.  This Court should,

therefore, find that on the primary issue of criminal

responsibility the Commonwealth's evidence did not outweigh

that entered by the defense.

Similarly, cases from the third and tenth circuits

indicated that the degree of harm caused by post-Mirnada

silence references was dependant on whether they attacked

the heart of the defense.  U.S. v. Cummiskey, 728 F.2d 200,

204 (3rd Cir. 1984); U.S. v. Massey, 687 F.2d 1348, 1353-

1354 (10th Cir. 1982).  Not only did Officer Ouellet's

testimony strike at the heart of the defense, but it did so

in multiple ways.

Officer Ouellet's testimony allowed the jury to

believe that Mr. Ellen had the wherewithal to avoid

speaking to the police.  A juror could have found this

inconsistent with both Mr. Ellen's claim of having been

intoxicated and his diminished capacity defense.  This same

reasoning applies to Mr. Ellen's assertion of lack of

criminal responsibility.  A juror would have difficulty

reconciling Mr. Ellen's contention that he had been in a

40

dissociative state a very short while before he exhibited
sound decision making abilities at the police station.

Another solid basis supporting the argument that the
inadmissible evidence caused severe damage to the defense
centers on Mr. Ellen's memory loss.  Dr. Rosemarin
testified that a hallmark of dissociation is a lack of
memory.  (Tr.VIII.8).  Hearing that Mr. Ellen invoked his
right to remain silent may, however, have prompted the
jurors to find that he did, in fact, recall what had
happened and had not actually experienced dissociation.

In addition to arguing diminished capacity and lack
of criminal responsibility, Mr. Ellen also maintained that
he did not commit the crimes for which he was accused.  Mr.
Ellen testified that he had no intention of entering Ms.
Rowland's home or carrying out any plan.  (Tr.VIII.25).  He
specifically stated that he did not intend to murder Ms.
Rowland.  (Tr.VIII.26).  At numerous points, Mr. Ellen
testified that he did not know how he obtained entry into
Ms. Rowland's home and, therefore, never admitted
"breaking" into her house.  (Tr.VII.214-215).  Mr. Ellen
also never admitted that he used a sash or any other object
as a dangerous weapon on Ms. Rowland.  (Tr.VII.175).  Thus,

by hearing that Mr. Ellen had invoked his right to remain

silent, the jury may have been less inclined to believe his

assertions of innocence.  The improper testimony,

therefore, struck at the heart of Mr. Ellen's innocence

defense.

Finally, case law from a number of the circuit courts

of appeals also indicates that a prosecutor's intent should

be considered in assessing the level of harm caused by a

comment on a defendant's post-Miranda silence.  In Hill v.

Turpin, 135 F.3d at 1517-1418, the fact that the prosecutor

elicited references to the defendant's post-Miranda silence

after the judge had issued a pre-trial order forbidding

such comments.  The Eleventh Circuit Court of Appeals

placed significant weight on this evidence of the

prosecutor's intent and deliberate conduct in concluding

that the Doyle errors met the standard announced in Brecht

v. Abrahamson.  Id.

In the case at hand a the judge heard a motion in

limne prior to the commencement of the trial concerning

whether the Commonwealth could comment on Mr. Ellen's

refusal to submit finger nail scrapings.  (Tr.I.130).

During the discussions concerning Officer Ouellet's

42

improper comments, Judge Merrick intimated that her decision to hold her ruling on that pre-trial motion should have provided the prosecutor sufficient notice to avoid all related topics.  (Tr.VI.100).  This Court should, therefore, find that by ignoring the obvious implications of the judge's pre-trail ruling, the prosecutor displayed an intent to use Mr. Ellen's post-Miranda silence against him.  Based on the reasoning of Hill v. Turpin, 135 F.3d at 1517-1418, this constitutes further evidence that the errors "had a substantial or injurious effect or influence in determining the jury's verdict".

In addition, the prosecutor's statements on the record plainly reveal that he intended to use Mr. Ellen's silence to contradict the defense of temporary insanity.  During the pre-trial discussion on the motion in limne, the prosecutor clearly expressed his desire to enter evidence that Mr. Ellen made a knowing and intelligent waiver of his Miranda rights.  (Tr.I.130).  Further, after the judge excused the jury to discuss the ramifications of Officer Ouellet's improper testimony, the prosecutor did not apologize for the officer's testimony or concede that it should be stricken.  He instead argued, in direct

opposition to the holding of <u>Wainwright v. Greenfield</u>, 474
U.S. 284, 294 (1986), that the evidence was admissible to
show criminal responsibility.  (Tr.VI.101); see also,
<u>Matire v. Wainwright</u>, 811 F.2d 1430, 1435 (11th Cir. 1987).

It is, therefore, obvious that Officer Ouellet's
improper comments were not unexpected, but were the direct
result of a "calculated" plan by the prosecutor.  See
<u>Morgan v. Hall</u>, 569 F.2d at 1167; <u>U.S. v. Kallin</u>, 50 F.3d
at 694.  Thus, when the prosecutor's intent is assessed in
conjunction with the factors listed in <u>Brecht v.
Abrahamson</u>, this Court should find that the improper
references to Mr. Ellen's post-Miranda silence "had a
substantial or injurious effect or influence in determining
the jury's verdict".[4]

---

[4] It should be noted that the First Circuit Court of Appeals
has never expressly held that that the <u>Brecht</u> standard
applies in situations, as in the case at hand, where the
state court has not engaged in any harmless error analysis.
See <u>Sanna v. Dipaolo</u>, 265 F.3d 1, 32 (1st Cir. 2001).  Thus,
even if this Court finds that Mr. Ellen cannot meet the
<u>Brecht</u> standard, it could still grant this petition by
applying the substantially less demanding harmless error
analysis set out in <u>Chapman v. California</u>, 386 U.S. 18
(1967).

72

# Commonwealth of Massachusetts

Appeals Court for the Commonwealth

At Boston,

In the case no. 02-P-803

COMMONWEALTH

_vs._

CHRISTOPHER ELLEN.

Pending in the Superior

Court for the County of Essex        # CR99016 47

Ordered, that the following entry be made in the docket:

Judgments affirmed.

By the Court,

_Ashley Ahean_        , Clerk

Date October 28, 2003

A1

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

02-P-803

COMMONWEALTH

vs.

CHRISTOPHER ELLEN.

MEMORANDUM AND ORDER PURSUANT TO RULE 1:28

The defendant was convicted, by a jury, of assault with the
intent to murder, assault and battery by means of a dangerous
weapon, and burglary. He appeals, alleging that the prosecutor
improperly commented on the defendant's right to remain silent
and made numerous missteps in his closing argument. He also
claims that the Commonwealth did not prove that the incident
occurred at night as mandated by the burglary charge. We affirm.

Comment on exercise of Miranda rights. Commonwealth v.
Mahdi, 388 Mass. 679 (1983), and its progeny discuss postarrest
post-Miranda silence. "[E]vidence of a criminal defendant's
postarrest, post-Miranda silence cannot be used for the
substantive purpose of permitting an inference of guilt . . . ."
Id. at 694. In Mahdi, after eliciting from the arresting police
officer that, after being advised of his Miranda rights, the
defendant chose "to remain mute," the prosecutor used that
testimony to the defendant's detriment during closing argument.
Ibid. In the case at hand, no evidence pertaining to the

A2

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

02-P-803

COMMONWEALTH

vs.

CHRISTOPHER ELLEN.

MEMORANDUM AND ORDER PURSUANT TO RULE 1:28

The defendant was convicted, by a jury, of assault with the
intent to murder, assault and battery by means of a dangerous
weapon, and burglary. He appeals, alleging that the prosecutor
improperly commented on the defendant's right to remain silent
and made numerous missteps in his closing argument. He also
claims that the Commonwealth did not prove that the incident
occurred at night as mandated by the burglary charge. We affirm.

Comment on exercise of Miranda rights. Commonwealth v.
Mahdi, 388 Mass. 679 (1983), and its progeny discuss postarrest
post-Miranda silence. "[E]vidence of a criminal defendant's
postarrest, post-Miranda silence cannot be used for the
substantive purpose of permitting an inference of guilt . . . ."
Id. at 694. In Mahdi, after eliciting from the arresting police
officer that, after being advised of his Miranda rights, the
defendant chose "to remain mute," the prosecutor used that
testimony to the defendant's detriment during closing argument.
Ibid. In the case at hand, no evidence pertaining to the

prosecutor, in his closing remarks,[3] invited the jury to draw inferences from some inappropriate behavior in the courtroom.

He also complains that the trial judge abused her discretion (a) in allowing the victim advocate and others to remain in the courtroom despite their having made audible and visible responses from the back of the courtroom while the defendant testified; and (b) not questioning the jurors.

As for the prosecutor's somewhat confusing remark in closing, we note that an objection was lodged, which was sustained.

On the defendant's latter point, we agree with his observation that the judge is ordinarily in the best position to handle such a situation and we defer to her discretion in such instances.  Commonwealth v. Toon, 55 Mass. App. Ct. 642, 656-657 (2002).  Here, the record reflects a perceptive judge recognizing a problem and handling it quickly and appropriately.  There was no error.

(c)  The numerous other improper inferences, factual mistakes, pleas for sympathy and statements of personal opinion. We are urged by the defendant to consider the totality of the prosecutor's closing remarks.  "In evaluating the effect of the

---

[3] In his closing remarks, the ADA stated, "You may have had an opportunity to look over to Mr. Ellen or Adair Rowland, or other people who were testifying.  Were his responses in shaking his head either in agreement or disagreement, responsive?"

3

A4

prosecutor, in his closing remarks,[3] invited the jury to draw inferences from some inappropriate behavior in the courtroom.

He also complains that the trial judge abused her discretion (a) in allowing the victim advocate and others to remain in the courtroom despite their having made audible and visible responses from the back of the courtroom while the defendant testified; and (b) not questioning the jurors.

As for the prosecutor's somewhat confusing remark in closing, we note that an objection was lodged, which was sustained.

On the defendant's latter point, we agree with his observation that the judge is ordinarily in the best position to handle such a situation and we defer to her discretion in such instances. Commonwealth v. Toon, 55 Mass. App. Ct. 642, 656-657 (2002). Here, the record reflects a perceptive judge recognizing a problem and handling it quickly and appropriately. There was no error.

(c)  The numerous other improper inferences, factual mistakes, pleas for sympathy and statements of personal opinion. We are urged by the defendant to consider the totality of the prosecutor's closing remarks. "In evaluating the effect of the

---

[3] In his closing remarks, the ADA stated, "You may have had an opportunity to look over to Mr. Ellen or Adair Rowland, or other people who were testifying. Were his responses in shaking his head either in agreement or disagreement, responsive?"

3

circumstantial evidence, see Commonwealth's brief at pages forty-nine to fifty, was presented warranting the conviction.

Judgments affirmed.

By the Court (Rapoza, Grasso, & Kantrowitz, JJ.),

Ashley Ahea

Clerk

Entered: October 28, 2003

5

A 6

# Supreme Judicial Court for the Commonwealth of Massachusetts
### One Beacon Street, Third Floor, Boston, Massachusetts 02108
### (617) 557-1020

David J. Barend, Esquire
2 Stonewood Circle
N. Attleboro, MA 02760


. RE: Docket No. FAR-13793

**COMMONWEALTH**
        **vs.**
**CHRISTOPHER ELLEN**

> Essex Superior Court No. ESCR199901647
> A.C. No. 2002-P-0803

#### NOTICE OF DENIAL OF F.A.R. APPLICATION

Please take note that on 12/29/03, the above-

captioned Application for Further Appellate Review was denied.


                                Susan Mellen, Clerk

Dated: December 29, 2003

To:  Elin H. Graydon, A.D.A.
     David J. Barend, Esquire

A7