## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **CHRISTOPHER ELLEN,** ) | |
| ) | |
| **Petitioner,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 05-10538-WGY** |
| ) | |
| **DONALD LEVESQUE,** ) | |
| ) | |
| **Respondent.** ) | |

### RESPONDENTS' RULE 5 APPENDIX ACCOMPANYING HIS ANSWER

Respondent Donald Levesque (the "Respondent") hereby submits this Appendix to his

Answer in accordance with Rule 5 of the Rules Governing Section 2254 Cases.

1.    Attached hereto as Exhibits are the following materials:

Exhibit A.    Volume VI of the transcript of the trial in connection with

Commonwealth v. Ellen, Case No. 9977-CR1647-1650 in the

Essex County, Massachusetts, Superior Court.

Exhibit B.    The Brief and Record Appendix for the Defendant in connection

with Commonwealth v. Christopher Ellen, Case No. 02-P-803 in

the Massachusetts Appeals Court.

Exhibit C.    The Brief and Supplemental Record Appendix for the

Commonwealth in connection with Commonwealth v. Christopher

Ellen, Case No. 02-P-803 in the Massachusetts Appeals Court.

Exhibit D.    The Reply Brief for the Defendant in connection with
Commonwealth v. Christopher Ellen, Case No. 02-P-803 in the
Massachusetts Appeals Court.

Exhibit E.    The Application for Further Appellate Review for the Defendant in
connection with Commonwealth v. Christopher Ellen, Case No.
FAR-13793 in the Supreme Judicial Court for the Commonwealth
of Massachusetts.

Exhibit F.    Commonwealth v. Christopher Ellen, 59 Mass. App. Ct. 1109, 797
N.E.2d 946 (2003), the October 28, 2003 opinion issued in
connection with Case No. 02-P-803 in the Massachusetts Appeals
Court.

Exhibit G.    Commonwealth v. Christopher Ellen, 440 Mass. 1109, 801 N.E.2d
802 (2003) (table decision), the December 29, 2003 decision
issued in connection with Case No. FAR-13793 in the Supreme
Judicial Court for the Commonwealth of Massachusetts.

2.    The following additional transcripts produced in connection with Commonwealth
v. Ellen, Case No. 9977-CR1647-1650 in the Essex County, Massachusetts,
Superior Court, are currently available and can be furnished upon one day's
notice:

a.    Volumes I through V, and VII through IX of the transcript of the trial held
in October 2000;

b.    The one-volume transcript of the pre-trial hearing conducted on November
10, 1999; and

2

      c.      The one-volume transcript of the pre-trial hearing conducted on August 16, 2000.

2.      The Respondent is not aware of any further transcripts prepared in connection with <u>Commonwealth v. Ellen</u>, Case No. 9977-CR1647-1650 in the Essex County, Massachusetts, Superior Court, or the appeal from rulings in that case.

3.      The September 9, 2003 oral argument in connection with <u>Commonwealth v. Christopher Ellen</u>, Case No. 02-P-803 in the Massachusetts Appeals Court, has been recorded, but not transcribed.

4.      The Respondent is not aware of any other proceedings that have been recorded but not transcribed.

The Respondent respectfully reserves the right to amend or supplement this Answer in the future should that need arise.

Respectfully submitted,

THOMAS F. REILLY
Attorney General


 /s/ Randall E. Ravitz
Randall E. Ravitz (BBO # 643381)
Assistant Attorney General
Criminal Bureau
One Ashburton Place
Boston, Massachusetts  02108
(617) 727-2200, ext. 2852

Dated:  July 27, 2005

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document, along with all Exhibits thereto that have not been filed electronically, was served on July 27, 2005, by first-class mail, postage prepaid, upon:

David J. Barend, Esq.
2 Stonewood Circle
North Attleboro, MA  02760


 /s/ Randall E. Ravitz
Randall E. Ravitz

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

ESSEX ss.                                  NO. 02-P-803


COMMONWEALTH

v.

CHRISTOPHER ELLEN

---

BRIEF AND RECORD APPENDIX FOR THE DEFENDANT
ON APPEAL FROM ESSEX COUNTY SUPERIOR COURT

---


DAVID J. BAREND

ATTORNEY FOR DEFENDANT

2 Stonewood Circle
North Attleboro, MA 02760
(508) 316-1171
BBO #564032


November, 2002

# TABLE OF CONTENTS

TABLE OF CASES. . . . . . . . . . . . . . . . . .ii

ISSUES PRESENTED. . . . . . . . . . . . . . . .iii

STATEMENT OF THE CASE. . . . . . . . . . . . . .1

STATEMENT OF FACTS. . . . . . . . . . . . . . . 2

ARGUMENTS . . . . . . . . . . . . . . . . . . .29

I.   THE JUDGE ERRED BY DENYING MR. ELLEN'S MOTION
FOR A MISTRIAL AFTER THE COMMONWEALTH VIOLATED HIS
RIGHT TO REMAIN SILENT. . . . . . . . . . . . 29

II.   JUDGE MERRICK ERRED BY FAILING TO GRANT A
MISTRIAL BASED ON THE PROSECUTOR'S IMPROPER
INFERENCE IN HIS CLOSING CONCERNING MR.ELLEN'S
RIGHT TO TESTIFY. . . . . . . . . . . . . . . .35

III. THE PROSECUTOR'S IMPROPER INFERENCE IN HIS
CLOSING CONCERNING MS. ROLWAND'S COURTROOM ANTICS
MANDATES THAT THE CONVICTIONS BE REVERSED. . . . 36

IV. JUDGE MERRICK ERRED BY DENYING MR. ELLEN'S
MOTION FOR MISTRIAL BASED ON THE TOTALITY OF THE
COMMONWEALTH'S CLOSING WHICH INCLUDED IMPROPER
INFERENCES, FACTUAL MISTAKES, AND PLEAS TO THE
SYMPATHY OF THE JURY. . . . . . . . . . . . . .38

V. THE JUDGE ERRED BY DENYING MR. ELLEN'S MOTION
FOR REQUIRED FINDING OF NOT GUILTY FOR THE CHARGE
OF BURGLARY ASSAULT. . . . . . . . . . . . . . 45

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . .48

RECORD APPENDIX. . . . . . . . . . . . . . . . . . . .49

## TABLE OF CASES

1.  Commonwealth v. Bennett, 424 Mass. 64 (1997)
. . . . . . . . . . . . . . . . . . . . . . . 46

2.  Commonwealth v. Coren, 437 Mass. 723 (2002)
. . . . . . . . . . . . . . . . . . . . . 39-40

3.  Commonwealth v. Fancy, 349 Mass. 196  (1965)
. . . . . . . . . . . . . . . . . . . . . . .47

4.  Commonwealth v. Gallego, 27 Mass App. Ct. 714
(1989) . . . . . . . . . . . . . . . . . . . 38

5.  Commonwealth v. Hardy, 431 Mass. 387 (2000)
. . . . . . . . . . . . . . . . . . . . . . 37

6.  Commonwealth v. Kozec, 399 Mass. 514 (1987)
. . . . . . . . . . . . . . . . . . . . . . 40

7.  Commonwealth v. Lee, 383 Mass. 507 (1981)
. . . . . . . . . . . . . . . . . . . . . . .33

8.  Commonwealth v. Lodge, 431 Mass. 461 (2000)
. . . . . . . . . . . . . . . . . . . . . . .42

9.  Commonwealth v. Mahdi, 388 Mass. 679 (1983)
. . . . . . . . . . . . . . . . . . . . . 29-35

10.  Commonwealth v. Roberts, 378 Mass. 116 (1979)
. . . . . . . . . . . . . . . . . . . . . . .45

11.  Commonwealth v. Simpson, 434 Mass. 570 (2001)
. . . . . . . . . . . . . . . . . . . . . . .45

12.  Commonwealth v. Smith, 387 Mass. 900 (1983)
. . . . . . . . . . . . . . . . . . . .35-36, 41

13.  Commonwealth v. Smith, 403 Mass. 489 (1988)
. . . . . . . . . . . . . . . . . . . . . . .38

14.  Commonwealth v. Toon, 55 Mass. 642, 656 (2002)
. . . . . . . . . . . . . . . . . . . . . .37

15.  Commonwealth v. Tuitt, 393 Mass. 801 (1985)
. . . . . . . . . . . . . . . . . . . . . . .41

16.  Commonwealth v. Turner, 28 Mass. App. Ct. 909
(1989). . . . . . . . . . . . . . . . . . . .46

17.  Commonwealth v. Waite, 422, Mass. 792 (1996)
. . . . . . . . . . . . . . . . . . . . . . 31

## ISSUES PRESENTED

I.   Whether the judge erred by denying Mr. Ellen's motion for a mistrial after the Commonwealth violated his right to remain silent.

II.  Whether Judge Merrick erred by failing to grant a mistrial based on the prosecutor's improper inference in his closing concerning Mr. Ellen's right to testify.

III. Whether the prosecutor's improper inference in his closing concerning Ms. Rolwand's courtroom antics mandated that the convictions be reversed.

IV. Whether Judge Merrick erred by denying Mr. Ellen's motion for mistrial based on the totality of the Commonwealth's closing which included improper inferences, factual mistakes, and pleas to the sympathy of the jury.

V. Whether the judge erred by denying Mr. Ellen's motion for a required finding of not guilty for the charge of burglary assault.

## STATEMENT OF THE CASE

An Essex County Grand Jury indicted Christopher Ellen on the charges of: assault with intent to murder, (no.99-1647), assault with intent to rape, (no.99-1648), burglary - assault on occupant (no.99-1649), and assault and battery by means of a dangerous weapon, (no.99-1650). (R.5-8).[1] Mr. Ellen's jury trial commenced on October 10, 2000 in Essex County Superior Court. (Tr.V.1). Judge Merrick granted Mr. Ellen's motion for required finding of not guilty for the assault with intent to rape charge. (Tr.VII.9). On October 16, 2000, the jury found Mr. Ellen guilty on the three remaining indictments. (Tr.IX.120). The judge sentenced Mr. Ellen that same day to an 18-25 year commitment at MCI Cedar Junction on the burglary assault conviction. (Tr.IX.134). She ordered a concurrent sentence of 8-10 years on the assault and battery with a dangerous weapon conviction. (Tr.IX.134). On the assault with intent to murder conviction, Mr. Ellen received five years of probation to be run from and after his burglary assault sentence. (Tr.IX.134). Trial counsel timely filed a Notice of Appeal. (R.9). The case was entered in this Court on May 28, 2002.

---

[1] The trial transcript will be cited by volume as (Tr.  ), and the record appendix will be cited as (R.  ).

1

## STATEMENT OF FACTS

On October 2, 2000, Judge Merrick discussed with counsel a motion in limne concerning Mr. Ellen's refusal to provide the police with his fingernail scrapings. (Tr.I.128). The prosecutor, Mr. Fredrick McAlary, asserted that if the defense called an expert to testify that Mr. Ellen was not criminally responsible, he would submit evidence that Mr. Ellen refused to turn over the fingernail scrapings. (Tr.I.130). He would also enter evidence that Mr. Ellen made a knowing and intelligent waiver of his Miranda rights. (Tr.I.130). The prosecutor then asked the judge to hold her ruling on the motion. (Tr.I.130). After confirming the prosecutor's intention not to make any mention of this in his case in chief, the judge decided to reserve her ruling until the issue arose. (Tr.I.130).

The judge also allowed defense counsel, Mr. Lawrence McGuire, to address his motion in limne concerning stalking evidence. (Tr.I.131). Attorney McGuire explained that testimony had been given at pre-trial proceedings that the victim, Ms. Adair Rowland, would change her clothes near a window in her walk-in closet. (Tr.I.133). There had also been evidence presented that Mr. Ellen's house could be seen from that window. (Tr.I.134). He requested the judge exclude any intimation that

2

Mr. Ellen stalked, leered or peeped at Ms. Rowland. (Tr.I.135).    The prosecutor agreed to exclude "any testimony concerning speculation that the defendant peeped at her"  (Tr.I.136).

The trial began on October 10, 2000 after the judge provided some preliminary jury instructions (Tr.V.13-19).  Ms. Rowland testified that in May of 1999, she moved to 72 Highland Street in Amesbury. (Tr.V.40).  For the month of July, 1999, she lived alone while her two boys attended camp.  (Tr.V.41).

At 9:00 p.m. on Friday, July 23, 1999, Ms. Rowland locked her doors and then left her home. (Tr.V.43,130).  She testified that the bulkhead basement door had an "ineffectual" slide bolt. (Tr.V.47).  She returned home shortly after midnight.  (Tr.V.46).  The following morning she noticed a tie knotted to a pipe in her dining room. (Tr.V.48).  This tie had previously been in a box in her third floor attic.  (Tr.V.48).  At that point she believed that her one of her sons might have been responsible for placing the tie around the pipe.  (Tr.V.136).  Ms. Rowland untied the tie and put it on a bench.  (Tr.V.49).  She spent the remainder of that day in her house. (Tr.V.51).

The next day, Sunday July 25, 1999, at 5:00 p.m., she dressed in a red shift and left for a party at Ms. Joan Blankenau's house – three doors down from Ms. Rowland's home.  (Tr.V.42,53).  She

3

closed, but did not lock, the back door when she
departed. (Tr.VIII.57).[2] While walking down the
street and carrying a bottle of wine, Ms. Rowland
noticed some men standing with glasses in their
hands. (Tr.V.53,54). One called out, "Don't think
we didn't see you walking with that bottle of
wine." Ms. Rowland glanced up and said, "I think
you've already got it covered." (Tr.V.54). She
did not recognize any of those men. (Tr.V.55).

At a little before 10:00 p.m., Ms. Rowland
left the dinner party. (Tr.V.57). Upon entering
her house, she locked the back door and proceeded
up stairs. (Tr.V.59). While in her bedroom she
discovered that two of her lights did not work.
(Tr.V.63). Ms. Rowland then noticed her yellow
sweater tied to a bedpost of her headboard under
the box spring. (Tr.V.68). Although startled, she
managed to untie the sweater. (Tr.V.68).

Ms. Rowland subsequently entered her first
floor office and called Ms. Blankenau.
(Tr.V.70,71). Both Ms. Blankenau and Ms. Mary
Doyle testified that Ms. Blankenau received a call
that evening after 10:30 p.m. (Tr.V.209,239).
According to Ms. Doyle, she, Ms. Blankenau and Ms.
Virginia Hallman immediately departed for Ms.

---

[2] Defense counsel re-called Ms. Rowland on October
13, 2000. (Tr.VIII.57).

4

Rowland's home when Ms. Blankenau finished her
conversation. (Tr.V.210).

While waiting in her kitchen, Ms. Rowland saw
bearded man stagger towards her. (Tr.V.76). He
wore only a pair of shorts and tube socks on his
hands. (Tr.V.76). She testified that she had
never seen this man before. (Tr.V.76). During the
trial, Ms. Rowland identified Mr. Ellen as the man
who had entered her home. (Tr.V.81).

Mr. Ellen began hitting Ms. Rowland in the
face. (Tr.V.77,79,172). When she said that she
had notified the police he called her a liar. Ms.
Rowland then told him that she had called her
neighbor. (Tr.V.80). After throwing her against
the counter, Mr. Ellen locked the back door.
(Tr.V.80,163). When Mr. Ellen re-entered the
kitchen, Ms. Rowland threw a cordless phone at him.
(Tr.V.84). She next swung a saucepan at him.
(Tr.V.84). Ms. Mary Reily testified that at 10:30
p.m. that evening she heard a pan drop.
(Tr.V.196). She then looked out her back door, saw
a man and a woman fighting in the house across the
street and then called 911. (Tr.V.198). Mr. Ellen
then punched Ms. Rowland in the stomach, put his
sock covered hand over her face and threw her to
the floor. (Tr.V.86).

Ms. Rowland testified that while lying on the
floor she heard Ms. Blankenau's voice. (Tr.V.86).

5

Ms. Blankenau testified that she said, "Adair, it's Joan. Do you want me to call the police?" (Tr.V.236). Ms. Rowland claimed that Mr. Ellen ordered her tell her friend to go home. (Tr.V.87). Ms. Rowland told Mr. Ellen that he could have her money. (Tr.V.87). Mr. Ellen's reply of "What, four bucks?" revealed to Ms. Rowland that he had been through her purse which she did not bring with her to the party. (Tr.V.87). She then offered him her car. (Tr.V.87). Mr. Ellen responded, "Adair, I don't want your car." (Tr.V.87). Ms. Rowland then yelled, "Joan, go away." (Tr.V.88,212). Ms. Blankenau yelled back that she was going to call the police. (Tr.V.88,213,236).

The next thing Ms. Rowland saw was a purple sash that had been in the same box as the tie that she discovered on Saturday. (Tr.V.88). Mr. Ellen looped the sash over her head and pulled it tight. (Tr.V.89). Mr. Ellen loosened the sash and then jerked it tight again. (Tr.V.90). Suddenly, Mr. Ellen released the sash and said, "This is stupid, this is stupid. I'm a dead man." (Tr.V.91). Ms. Rowland testified that she did not take Mr. Ellen's hand when he offered to assist her to her feet. (Tr.V.92). She remembered asking Mr. Ellen, "Who are you?" (Tr.V.92). Mr. Ellen said, "I'm an insane individual and you're a victim and I'm a victim." (Tr.V.92). After her ten to fifteen

6

second conversation with Mr. Ellen, Ms. Rowland saw police cruisers at her house. (Tr.V.92,186).

Sergeant William Scholtz testified that he arrived at 72 Highland Street within two minutes of receiving a dispatch. (Tr.VI.10,40). He noticed Officer Mark Valli had exited his cruiser. (Tr.VI17). Officer Valli believed that before he parked, he saw Sergeant Scholtz exiting his cruiser. (Tr.VI.56). He could not recall what time he arrived. (Tr.VI.70). Officer Kevin Ouellet reached the scene a short time after Officer Valli and Sergeant Scholtz. (Tr.VI.80).

Sergeant Scholtz approached the residence and asked Ms. Rowland to step outside. (Tr.V.93, VI.20). In order to exit her home, Ms. Rowland would have had to cross in front of Mr. Ellen. (Tr.V.93). She testified that Mr. Ellen realized this and stated offered to step out instead (Tr.V.93). Ms. Rowland testified that the entire episode lasted four or five minutes. (Tr.V.183). She admitted that Mr. Ellen never tried to remove her clothing or grab "private areas." (Tr.V.169).

When Mr. Ellen departed Ms. Rowland's house, Sergeant Scholtz and Officer Ouellet noticed something light colored in the his hands. (Tr.VI.24,84). Sergeant Scholtz was later told that he had socks belonging to Ms. Rowland's sons on his hands. (Tr.VI.50). Both Officers Valli and

7

Ouellet testified that Mr. Ellen admitted that he had struck Ms. Rowland. (Tr.VI.75,86). Officer Ouellet claimed that he smelled a slight odor of alcohol on Mr. Ellen's breath. (Tr.VI.91).

At different points throughout the evening, Sergeant Scholtz, Detective David Pare and Detective Robert Wile searched Ms. Rowland's house. Ms. Rowland also testified that she guided officers through her home. (Tr.V.95). Their discoveries included: (1) a purple sash on the floor of the foyer, (Tr.V.99, VI.155,171), (2) a white bathrobe sash also found on the floor of the foyer, (Tr.V.99, VI.155,171), (3) a ripped and knotted sleeveless blouse at the bottom of the back stairway, (Tr.V.96, VI.148), (4) a pair of silk slacks tied to a bedpost at the foot of Ms. Rowland's bed, (Tr.V.101, Tr.VI.175), (5) another pair of knotted slacks tied to the right head post of Ms. Rowland's bed. (Tr.V.103, VI.151.175).

Additionally, Ms. Rowland claimed that she and Detective Pare noticed that the bulkhead door to her basement had been wedged open. (Tr.V.47). She also testified that they saw a belt which had been in the box on her third floor attic, amongst a stream of clothing coming out of her bedroom closet. (Tr.V.104, VI.155). Ms. Rowland testified that she generally changed her clothes in that closet. (Tr.VIII.58). Although there was a window

8

in that closet, Ms. Rowland claimed that the area
beyond that point was the only spot in her bedroom
with privacy. (Tr.VIII.58). The prosecutor showed
her a photograph which, according to Ms. Rowland,
depicted the view of Mr. Ellen's house from her
closet window. (Tr.VIII.59).

During his investigation of Ms. Rowland's
bedroom Sergeant Scholtz saw that a telephone cord
had been unplugged from the wall. (Tr.VI.28).
Detective Wile testified that upon opening a closet
near the back stairs, he discovered the tie that
Ms. Rowland had claimed to have previously seen
knotted to her steam pipe. (Tr.VI.178).

While the searches of Ms. Rowland's house were
taking place, Mr. Ellen had been brought to the
police station. (Tr.VI.89). Officers Valli and
Ouellte assisted Mr. Ellen out of the cruiser and
noticed a pair of socks in the back seat.
(Tr.VI.64,92). Officer Ouellet claimed that during
the booking of Mr. Ellen, he heard something fall
to the floor. (Tr.VI.119). Officer Ouellet then
discovered a condom packet near Mr. Ellen's feet.
(Tr.VI.119). The officer conducted a search Mr.
Ellen's waistband which revealed a second condom
packet. (Tr.VI.120).

Officer Ouellet further testified that he read
the Miranda warnings to Mr. Ellen from a card.
(Tr.VI.96). The prosecutor asked Officer Ouellet,

"At the conclusion of giving him his Miranda
warning, what if anything, did you say or do with
him?" (Tr.VI.97). Officer Ouellet responded, "On
the bottom of the card is, you know, 'Do you wish
to speak to me now, is on the bottom of it.' And
on that when, I asked him to sign it he printed the
word "no" and signed the card." (Tr.VI.97).
Defense counsel objected and argued that the
comment on Mr. Ellen's right to remain silent
mandated that a mistrial be ordered. (Tr.VI.97).

The prosecutor contended that due to the
defense of "mental impairment" the testimony was
admissible. (Tr.VI.99). The judge then indicated
that this issue was analogous to the previously
discussed issue regarding the fingernail scrapings.
(Tr.VI.100). According to the judge, the
Commonwealth had agreed not to delve into that
topic until after the defense had put on its case.
(Tr.VI.100). She then confirmed that the
prosecutor believed that Officer Ouellet's answer
was relevant to the lack of criminal responsibility
issue. (Tr.VI.101).

The prosecutor subsequently averred that his
own lack of willfulness mitigated the seriousness
of any error. (Tr.Vi.108). He stated that he
asked the officer, "'Did he, after he read the
Miranda rights, did he indicate to you that he
understood his rights?' And my recollection of the

10

answer was, 'Yes, he understood.' And then the officer went on and he said he did not want to talk.  That was not what I was eliciting." (Tr.VI.108,109).  Attorney McGuire informed the judge that he had a different memory concerning the prosecutor's question.  (Tr.VI.110).

Defense counsel then argued that since the officer's statement went to the heart of Mr. Ellen's case, Commonwealth v. Mahdi, 388 Mass. 679 (1983), required that a mistrial be granted. (Tr.VI.111).  Judge Merrick asserted that the prosecutor in Commonwealth v. Mahdi made two references to the inadmissible evidence, as opposed to Mr. McAlary's single reference.  (Tr.VI.113). She also noted that no curative instruction was provided in that case.  (Tr.VI.113).  The judge, therefore, decided to deny the motion for a mistrial and provide a curative instruction. (Tr.VI.113,114).

Defense counsel immediately objected asserting that such an instruction would underline the error. (Tr.VI.114).  The judge maintained her ruling and told the jurors that a person who is arrested has the right to remain silent.  (Tr.VI.116).  She further instructed that "when someone chooses to avail themselves" of that right it should never be used against that person.  (Tr.VI.116).  The judge concluded by ordering the jury to disregard the

11

officer's statement. (Tr.VI.117). Defense counsel
renewed his motion for a mistrial contending that
the instruction "made things worse." (Tr.VI.118).
The judge denied the motion and Officer Ouellet
resumed his testimony. (Tr.VI.119).

When the Commonwealth rested, defense counsel
moved for required findings of not guilty.
(Tr.VI.204,208). With respect to the burglary
assault charge, Mr. McGuire asserted that the
Commonwealth failed to enter sufficient evidence
that Mr. Ellen had entered Ms. Rowland's house in
the nighttime. (Tr.VI.212). The judge disagreed.
(Tr.VI.218, VII.9). She did, however, enter a
finding of not guilty on the assault with intent to
rape indictment. (Tr.VII.9).

Christopher and Denise Ellen provided
testimony as part of the case for the defense.
(Tr.VII). Mr. Ellen had not seen his father since
he was two years old. (Tr.VII.100). His mother
physically abused him. (Tr.VII.102). While in
kindergarten, Mr. Ellen's mother was admitted to a
mental institution which led to his placement into
a foster home. (Tr.VII.101). Mr. Ellen suffered
mental, physical and sexual abuse by his foster
family. (Tr.VII.103). In fits of anger his foster
mother would strangle him. (Tr.VII.136). Mr.
Ellen also testified that while in high school a
student strangled him. (Tr.VII.136).

Mr. Ellen eventually enlisted in the United States Marine Corps and became stationed in the Philippines. (Tr.VII.118). He and a number of sergeants engaged in a non-sanctioned patrol searching for Philippine insurgents. (Tr.VII.123). During the mission, Mr. Ellen was garroted. (Tr.VII.124). After Mr. Ellen managed to shoot his attacker his patrol rushed over and administered first aid. (Tr.VII.127). Mr. Ellen testified that he could not be taken to the hospital due to the secrecy of the mission. (Tr.VII.129). He displayed his scars to the jury. (Tr.VII.126).

Mr. Ellen also recalled that while stationed on Thailand-Cambodia border he saw unexploded mortar shell stuck in the ground. (Tr.VII.134). He testified that he became mesmerized by the burning and smoking white fuse. (Tr.VII.134). Although the round could have exploded, Mr. Ellen sat down next to it. (Tr.VII.134). Members of his unit had to wrestle him away. (Tr.VII.135).

After obtaining his discharge from the military, Mr. Ellen met Denise. (Tr.VII.138, VI.24). Mrs. Ellen testified that they were married on August 24, 1991. (Tr.VI.25). Both Mr. and Mrs. Ellen testified that over time he eventually became depressed. (Tr.VII.148). At some point Mr. Ellen stopped sleeping with his wife. (Tr.VII.140). He sought treatment for this

13

depression for a couple of months at the Veteran's Outreach Center in Haverhill. (Tr.VII.28,29,149).

From about 1995 through 1999, Mr. Ellen had a well-paid job at Varian Corporation (Tr.VII.194). He recalled an incident when he noticed another employee viewing child pornography on the internet. (Tr.VII.146). He reported this, but nothing was done. (Tr.VII.147). On Wednesday, July 14, 1999, Mr. Ellen engaged in a heated argument with a man in Varian's parking lot. (Tr.VII.143). Later that morning, Mr. Ellen received notification that he would be suspended without pay for the next three days. (Tr.VII.145).

At that time Mr. and Mrs. Ellen lived in a second floor apartment with their two young boys, at 2 Carver Street in Amesbury. (Tr.VII.24,141). Mrs. Ellen testified that it would be possible to see a part of Ms. Rowland's house from two of the windows in her apartment. (Tr.VII.I.61). On Saturday July 17, 1999, the family embarked for their New Hampshire vacation. (Tr.VII.147). At approximately 3:00 p.m. on Friday July 23, 1999 the Ellens arrived back at their apartment. (Tr.VII.35,154). Mr. Ellen stayed home that entire evening. (Tr.VII.154). Mrs. Ellen stated that Mr. Ellen came into their bedroom shortly after 11:00 p.m. (Tr.VII.38).

In the afternoon of Sunday, July 25, 1999, Mr. Ellen drove to a liquor store and purchased a large bottle of Jim Beam Whisky. (Tr.VII.161). He claimed that he bought the whisky to cope with the depression he felt from his anticipated return to Varian Corporation. (Tr.VII.161). Mrs. Ellen testified that throughout the course of the evening she witnessed Mr. Ellen consume three full large glasses of the whisky mixed with Coca-Cola. (Tr.VII.54). Mr. Ellen asserted that he drank throughout the afternoon. (Tr.VII.164). He recalled making his first drink after he arrived home from the store. (Tr.VII.164). The whisky bottle was entered into evidence. (Tr.VII.52).

At some point the Ellens walked to a neighbor's house. (Tr.VII.164). While standing outside, Mr. and Mrs. Ellen saw a woman walking down the street carrying a bottle of wine. (Tr.VII.56,165). Mr. Ellen testified that he had never seen this woman before and did not know where she lived. (Tr.VII.56,166). Mr. Ellen's neighbor mentioned that she had just moved into the house on the corner of Carver Street and Highland Street. (Tr.VII.166, VIII.38). With a drink in his hand, Mr. Ellen jokingly said, "Don't think we don't see you with that bottle of wine." (Tr.VII.166). The woman responded, "Don't worry; I think you're

15

covered." (Tr.VII.166). Mr. Ellen did not see
where this woman went. (Tr.VII.207).

When Mr. Ellen returned to his apartment, he
mixed another drink. (Tr.VII.60,167). He had yet
another drink once the children went to bed.
(Tr.VII.170). He then went into his bedroom,
grabbed two condoms from a box and put them in his
pocket. (Tr.VII.170). He testified that he
intended on having relations with his wife that
evening. (Tr.VII.171).

Mrs. Ellen testified that later that evening
she and her husband began to argue. (Tr.VII.62).
After a short period of time, Mrs. Ellen asked Mr.
Ellen if he wanted her to set the clock that he
used when he slept on the couch. (Tr.VII.64,172).
Mr. Ellen understood this to mean that Mrs. Ellen
wanted him to sleep on the couch. (Tr.VII.172).
Mrs. Ellen testified that he then sat on the couch
in silence and then left their apartment at some
point between 9:00 p.m. and 9:15 p.m. (Tr.VII.65).

Mr. Ellen testified that he had a memory lapse
that commenced after his wife's comment about the
clock. (Tr.VII.172). Mr. Ellen's next memory was
coming into the light in a kitchen. (Tr.VII.173).
He claimed that he heard no sounds and had no
intentions or thought patterns. (Tr.VII.174,181).
Mr. Ellen further stated that he felt nothing and
the experience was just visual. (Tr.VII.175).

16

As he walked forward his hands met those of the woman in a blue dress. (Tr.VII.174). He pulled a hand away and saw a "slow body motion of an uppercut." (Tr.VII.179). Mr. Ellen heard a voice in his mind, which he had never heard before say, "Get a knife." (Tr.VII.181). The woman swung a big blue frying pan at him and he deflected it with his left hand. (Tr.VII.175). Mr. Ellen then knocked the pan and the woman to the floor. (Tr.VII.175). He testified that "the next thing I know I was like slowly pulling the reins of a horse." (Tr.VII.175).

After a period of time, Mr. Ellen realized that something was actually happening. (Tr.VII.175). From this point on Mr. Ellen's recollection of the events did not substantially differ from the testimony of the Commonwealth's witnesses. (Tr.VII.176). He, however, testified that Ms. Rowland took his hand when he offered to helped her up. (Tr.VII.176). He also stated that three or four minutes had passed from the time he regained control until the police arrived. (Tr.VII.49). He further testified that he told Detective Pare that he had been drinking. (Tr.VII.180). Finally he maintained that before July 25, 1999, he had never been inside Ms. Rowland's house at 72 Highland Street. (Tr.VII.153).

17

On cross-examination, the prosecutor asked,
"Isn't it a fact that on several occasions you had
looked out and seen Adair Rowland in her bedroom
area?" (Tr.VII.45). The judge overruled Attorney
McGuire's objection, but ordered the prosecutor
"not to ask any questions that on prior occasions
had he been peeping at her or anything along those
lines." (Tr.VIII.46). The judge denied defense
counsel's motion for a mistrial. (Tr.VIII.47).

During Mr. Ellen's testimony on the afternoon
of October 12, 2000, Judge Merrick suspended the
proceedings until the next day. (Tr.VII.219). At
that point she informed counsel that Ms. Rowland,
Ms. Blankenau, and the victim advocate, Kathleen
Draper, had been making audible responses
throughout Mr. Ellen's testimony while sitting in
the back of the courtroom. (Tr.VII.222,227).
Judge Merrick told Ms. Draper that she had seen her
engage in similar improper action in a previous
case and ordered that the behavior cease.
(Tr.VIII.227,228). The judge then stated that she
believed that the jurors did not notice the conduct
of the three women. (Tr.VIII.228).

After Mr. Ellen completed his testimony, the
defense called Dr. David Rosemarin as its expert
witness. (Tr.VIII.69). Dr. Rosemarin examined Mr.
Ellen for ten and one-half hours. (Tr.VIII.81).
The doctor noted that he placed importance on Mr.

18

Ellen's reports of being strangled by his foster
mother, a high school student and a Philippine
insurgent. (Tr.VIII.106,107).

Dr. Rosemarin also found significance in Mr.
Ellen's "disassociation" episode that took place
when he sat next to the burning mortar.
(Tr.VIII.107). The doctor explained that
disassociation involves the lack of integration of
the senses, memory and consciousness.
(Tr.VIII.109). He asserted that disassociation is
most common during warfare due to the immense
stress. (Tr.VIII.110). He also claimed that
people who have suffered extreme abuse are prone to
disassociations. (Tr.VIII.110). Dr. Rosemarin
believed that Mr. Ellen's experience with the bomb
was his first disassociation. (Tr.VIII.110).

Mr. Ellen's next disassociation occurred when
he inexplicably found himself in Boston.
(Tr.VIII.112). Mr. and Mrs. Ellen an incident to
Dr. Rosemarin when Mr. Ellen called his wife to
tell her that he was in Boston, but he had no idea
how he got there. (Tr.VIII.112). Dr. Rosemarin
testified that the loss of time and memory had the
hallmarks of a disassociation. (Tr.VIII.113).

Dr. Rosemarin believed that Mr. Ellen's third
disassociation occurred on the evening of July 25,
1999. (Tr.VIII.129). He asserted that the stress
of having to go back to work compelled Mr. Ellen to

19

drink three-fourths of a bottle of whisky.
(Tr.VIII.128,168).  Dr. Rosemarin emphasized that
stress and intoxication are causes of
disassociation.  (Tr.VIII.130).  While inebriated,
Mr. Ellen faced another stressor – the rejection by
his wife.  (Tr.VIII.129).  This was Mr. Ellen's
last memory and the commencement of his
disassociation.  (Tr.VIII.129).

Mr. Ellen's recollection of hearing no sound,
having no intentions, and seeing things in slow
motion fit Dr. Rosemarin's understanding of the
symptoms of a disassociation.  (Tr.VIII.130).
According to Dr. Rosemarin, the fact that Mr. Ellen
did not know Ms. Rowland and had no motive to try
to kill her is further evidence of a
disassociation.  (Tr.VIII.133).  Dr. Rosemarin also
opined that the knotted clothes discovered
throughout Ms. Rowland's house evidenced non-
sensible, non-goal directed behavior consistent
with a disassociation.  (Tr.VIII.134).  On cross-
examination, the prosecutor asked Dr. Rosemarin if
he was aware that there was evidence and testimony
that when Mr. Ellen went through Ms. Rowland's
pocketbook he saw her business cards.
(Tr.VIII.191).  The judge sustained defense
counsel's objection.  (Tr.VIII.191)

According to Dr. Rosemarin, when Mr. Ellen
said the name Adair, that did not mean that he

understood whom he was attacking.
(Tr.VIII.139,145).  Dr. Rosemarin inferred that Mr.
Ellen thought that he was strangling some
combination of the people who had tried to strangle
him in the past.  (Tr.VIII.139).  The doctor
testified "that this is a man who suffered a mental
illness that was of relatively short-lived duration
that was brought on by acute intoxication, and in
the midst of that was in mortal combat, but not
with the woman next door, in his appreciation and
understanding."  (Tr.VIII.196).

Doctor Rosemarin also testified that the
records from Mr. Ellen's counseling at the
Veteran's Center revealed that he re-initiated his
relationship with his therapist after the
pornography incident in his work place.
(Tr.VIII.117).  Dr. Rosemarin believed that Mr.
Ellen's anti-pornography feelings provided strong
evidence against the contention that he entered Ms.
Rowland's house with the intent to rape and murder
her.  (Tr.VIII.117).

Based on the above analysis, Dr. Rosemarin
concluded that unless the jury determined that Mr.
Ellen had been in Ms. Rowland's home prior to July
25, 1999, he should be found not criminally
responsible.  (Tr.VIII.141).  He opined that on
July 25, 1999, Mr. Ellen lacked substantial
capacity to conform his conduct to the requirements

21

of the law and to appreciate the wrongfulness and criminality of his conduct. (Tr.VIII.145).

Once Dr. Rosemarin finished testifying, the Commonwealth called Dr. Malcolm Rogers as its expert witness. (Tr.VIII.213). Dr. Rogers reviewed the police reports, court documents and Mr. Ellen's medical records. (Tr.VIII.218). On August 22, 2000, he interviewed Mr. Ellen for ninety minutes. (Tr.VIII.218). Based on all of this information the doctor found Mr. Ellen to be criminally responsible. (Tr.VIII.219). He found that Mr. Ellen was able to conform his conduct to the requirements of the law and had the ability to appreciate the wrongfulness of his actions. (Tr.VIII.251,252). Although alcohol may have had some debilitating effect on Mr. Ellen, Dr. Rogers did not believe that it substantially removed his capacity to form the intent to rape or murder. (Tr.VIII.253).

Dr. Rogers recalled inquiring as to whether Mr. Ellen had any disassociation episodes. (Tr.VIII.223). Mr. Ellen never told him about the time when he sat next to an unexploded mortar round. (Tr.VIII.223). Dr. Rogers believed that incident could have been a prior disassociation, but hearing Mr. Ellen's testimony about that event did not change his criminal responsibility conclusion. (Tr.VIII.224,228). Mr. Ellen did

22

inform Dr. Rogers of the time that he inexplicably found himself in Boston. (Tr.VIII.228). Dr. Rogers opted not include this in his report. (Tr.VIII.228). Dr. Rogers claimed that Mr. Ellen had not experienced a pattern of disassociation episodes that would be consistent with a disassociation disorder. (Tr.VIII.239).

Dr. Rogers also believed that being hit by a frying pan or a telephone would generally cause someone in a disassociation to snap back into reality. (Tr.VIII.250). The doctor additionally claimed that Mr. Ellen's statement that Ms. Rowland only had four dollars in her purse showed that he could integrate his knowledge into a response. (Tr.VIII.243). His use of Ms. Rowland's first name suggested some capacity to appreciate circumstances. (Tr.VIII.244). Further, Mr. Ellen's proclamation that he was "a dead man" indicated some comprehension that he was in trouble. (Tr.VIII.251). Dr. Rogers drew the same conclusion from Mr. Ellen's reported fear that the condoms in his pocket would be misunderstand by the police. (Tr.VII.239).

Although Dr. Rogers could not exclude the possibility that Mr. Ellen malingered his lack of memory, he testified that "at some level, Mr. Ellen probably didn't appreciate the difficulty he was in and the problems he would face until the very end

23

of the process." (Tr.VIII.247,249). Lastly, he admitted that if everything that Mr. Ellen said was believed it could be concluded that he had been in a disassociation on July 25, 1999. (Tr.VIII.278).

Before counsel proceeded with their summations, Judge Merrick informed the jurors that closing statements are not evidence and that the Commonwealth has the burden of proof. (Tr.IX.4,6). The prosecutor's commenced his closing by describing the task of jury deliberation as a "contrivance." (Tr.IX.28). He then claimed that since the closing statements were not evidence, the jury's most important tool was their ability to recall what they have heard. (Tr.IX.29).

The assistant district attorney went on to state, "recall when the defendant took the stand and keep in mind he had absolutely no obligation to take the stand in this case, because the burden is on the Commonwealth." (Tr.IX.29). At that point, defense counsel objected. (Tr.IX.29). The judge responded by sustaining the objection. (Tr.IX.29). The prosecutor continued stating, "But when he took the stand, and Dr. Rosemarin took the stand on direct examination by Mr. McGuire, it flowed like a cassette. Everything was rehearsed, everything was planned." (Tr.IX.29).

The prosecutor then focused on the jurors' ability to recall what they had seen in the

24

courtroom.  (Tr.IX.30).   He argued, "You may have
had an opportunity to look over to Mr. Ellen or
Adair Rowland, or other people who were testifying.
Were his responses in shaking his head either in
agreement or disagreement, responsive?"
(TR.IX.30).  This prompted another objection by
defense counsel  (Tr.IX.30).  Immediately after the
judge sustained the objection, Mr. McAlary told the
jury, "You have the ability to recall what you have
seen.  Was it a logical response to what was
happening on the witness stand?"  (Tr.IX.31).

     The assistant district attorney subsequently
moved on to the issue of criminal responsibility.
(Tr.XI.32).  He claimed there were facts that "the
defense needs you to believe on order to prove or
disprove that he was insane."  (Tr.IX.32).  The
prosecutor asserted that Mr. Ellen wanted the jury
to believe that he had no idea who Ms. Rowland was
or where she lived.  (Tr.IX.32).  In arguing
against that position the prosecutor stated, "You
will see a picture of the Ellen house from her
bedroom and how close it is.  And I suggest to you
that the defendant, during the ten weeks that Adair
lived there, saw her, he observed her.  (Tr.IX.33).

     After the judge overruled Mr. McGuire's
objection to that statement, Mr. McAlary claimed
that Mr. Ellen "was attracted to her.  He wanted
her.  He had been thinking about her.  And when he

25

saw her walking down the street that day, he wanted her even more." (Tr.IX.33). Another objection was overruled by the judge. (Tr.IX.33). The prosecutor subsequently contended, "She's an attractive woman. And the defendant was sort of captivated by her." (Tr.IX.43). He further averred that Mr. Ellen possibly knew that Ms. Rowland always changed her clothes in her bedroom closet. (Tr.IX.48).

Mr. Mcalary then rhetorically asked the jury, "Well, what explanation is there from the Commonwealth for [Mr. Ellen's] behavior?" (Tr.IX.60). According to Mr. McAlaray, "The defendant thought about Adair Rowland, he had seen her, he was infatuated with her. She was single, she was alone, she was attractive, he wanted her in the state he was in, depressed, upset at work, not a happy marriage. She was something he wanted." (Tr.IX.61).

The Commonwealth's closing also included references to Mr. Ellen's past. (Tr.IX.42). The assistant district attorney mentioned that at one time Mr. Ellen noticed a co-worker viewing pornography. (TrIX.42). The prosecutor's version of the evidence was that Mr. Ellen feared being blamed for those actions. (Tr.IX.42). Further, Mr. McAlary indicated that Mr. Ellen had received

no "treatment" prior to Dr. Rogers' assessment.
(Tr.IX.60).

The prosecutor provided a review of Dr.
Rosemarin's testimony as well.  He claimed that
"Dr. Rosemarin wants you to believe it is everyone
else's fault except Christopher Ellen's."
(Tr.IX.57).  In addition, Mr. McAalry told the jury
that Dr. Rosemarin testified that a disassociation
disorder had to be persistent and recurring.
(Tr.IX.58).

The prosecutor also argued that the
Commonwealth presented "overwhelming evidence" that
Mr. Ellen had been inside Ms. Rowland's home before
July 25, 1999.  (Tr.IX.34).  He averred that Mr.
Ellen could have obtained a pair of socks that
belonged to one of his sons before he departed his
home on July 25, 1999.  (Tr.IX.48).  He contended
that it would be reasonable to infer that when Mr.
Ellen left his house that night, he looked into Ms.
Blankenau's window and saw Ms. Rowland and the
other guests dining.  (Tr.IX.46).

Mr. McAlary further asserted that Mr. Ellen
looked at business cards in Ms. Rowland's purse
(Tr.IX.38).  The assistant district attorney also
claimed that the longest it took any of the first
three officers to arrive at the scene was
approximately one minute.  (Tr.IX.40).  He asserted
that, "Only the resourcefulness of Adair Rowland

27

and her alertness and alertness of neighbors who called 911, and quick response of the Amesbury Police prevented the defendant from carrying out his plan." (Tr.IX.61).

Immediately following the prosecutor's closing statement, defense counsel moved for a mistrial. (Tr.IX.62). Mr. McGuire contented that "the Commonwealth improperly referred to the defendant's actions during the trial, to infer guilt and his mental state" and at one point, shifted the burden of proof. (Tr.IX.62). Defense counsel also argued that the prosecutor relied on facts not in evidence, speculation, illogical inferences and pleas to the sympathy of the jury. (Tr.IX.63-64).

The judge denied the motion for a mistrial. (Tr.IX.65). She then instructed the jury that closing arguments were not evidence, that the Commonwealth had the burden to prove that Mr. Ellen was sane beyond a reasonable doubt, and that their power to draw inferences does not allow them to speculate. (Tr.IX.68). After a brief recess, the judge provided her full instructions to the jury. (Tr.IX.69). Defense counsel renewed his motion for a mistrial arguing that the judge did not cure the harm caused by the prosecutor. (Tr.IX.112). The judge denied the motion. (Tr.IX.112).

28

## ARGUMENTS

### I.   THE JUDGE ERRED BY DENYING MR. ELLEN'S MOTION FOR A MISTRIAL AFTER THE COMMONWEALTH VIOLATED HIS RIGHT TO REMAIN SILENT.

Fundamental unfairness results from the use of evidence that a defendant invoked his right to remain silent.  <u>Commonwealth v. Mahdi</u>, 388 Mass. 679, 695 (1983).  On direct examination the prosecutor asked Officer Ouellet, "At the conclusion of giving [Mr. Ellen] his Miranda warning, what if anything, did you say or do with him?"  (Tr.VI.97).  Officer Ouellet responded, "On the bottom of the card is, you know, 'Do you wish to speak to me now?' is on the bottom of it.  And on that when, I asked him to sign it he printed the word "no" and signed the card."  (Tr.VI.97).  This unacceptable comment on Mr. Ellen's intention to exercise his right to remain silent requires that his convictions be reversed.  <u>Id</u>.

The Supreme Judicial Court has stated that the nature of such an error "is so egregious that reversal is the norm, not the exception."  <u>Id</u>. at 698.  Once the officer made the above statement, defense counsel objected and moved for a mistrial.  (Tr.VI.97).  A review of the facts and reasoning of <u>Commonwealth v. Mahdi</u>, 388 Mass. 679, clearly indicates that Judge Merrick erred when she denied Mr. Ellen's motion for a mistrial.

The defendant in <u>Commonwealth v. Mahdi</u>, 388 Mass. at 683, entered a Springfield grocery store with two other men and shot the owners. Upon his arrest, the defendant received his Miranda warnings and remained silent. <u>Id</u>. At the trial he asserted a lack of criminal responsibility based, in part, on a psychiatrist's testimony that he had suffered a disassociation at the time of the incident. <u>Id</u>. at 684, 687. During his direct examination of the arresting officer, the district attorney inquired what the defendant had said after being advised of his Miranda rights. Id. at 694. The witness responded that the defendant stated, "I prefer to remain mute." <u>Id</u>. Later in his summation, the prosecutor commented on the defendant's desire to remain silent as a means of inferring sanity. <u>Id</u>.

The Court held that the remarks concerning the defendant's right to remain silent constituted an error that could not be considered harmless beyond a reasonable doubt. <u>Id</u>. at 698. In reaching this conclusion the Court considered the following factors: "(1) the relationship between the evidence and the premise of the defense; (2) who introduced the issue at trial; (3) the weight or quantum of evidence of guilt; (4) the frequency of the reference; and (5) the availability or effect of curative instructions." <u>Id</u>. at 696-697.

30

Applying those five factors to the case at hand reveals that the error cannot be characterized as harmless beyond a reasonable doubt. There can be no dispute that it was the Commonwealth who introduced the issue and that it went directly against the premise of the defense of lack of criminal responsibility. As in Commonwealth v. Mahdi, 388 Mass. at 697, the prosecutor intended to use the evidence to "strike at the jugular of the defendant's insanity defense".

In addition, given that the main issue at the trial was criminal responsibility, this Court need not assess the strength of the Commonwealth's case concerning whether Mr. Ellen committed the actions alleged. According to Commonwealth v. Mahdi, 388 Mass. at 698, the appropriate factor to consider is the weight of the evidence that related to the issue of sanity. Similar to the situation in Commonwealth v. Mahdi, 388 Mass. at 698, the psychiatric testimony was conflicting with Dr. Rosemarin having testified that Mr. Ellen may not have had the necessary mental capacity to understand his actions. The factor concerning the quantum of evidence of guilt cannot, therefore, be considered favorable to the Commonwealth.

The Commonwealth may contend that Judge Merrick's curative instruction provided sufficient grounds to find that the error was harmless beyond

31

a reasonable doubt.  According to <u>Commonwealth v. Mahdi</u>, 388 Mass. at 697, this Court must asses more than just the "availability" of a curative instruction.  The instruction's "effect" must be analyzed as well. <u>Id</u>.  In this case, Judge Merrick's instruction hurt Mr. Ellen's defense substantially more than it may have helped.

The Court in <u>Commonwealth v. Waite</u>, 422, Mass. 792, 800, (1996), noted that a curative instruction regarding a violation of the right to remain silent could call further attention to the problem. Defense counsel echoed that sentiment by asserting that an instruction would simply underline the error.  (Tr.VI.114).  The judge ignored defense counsel's desires and went on to inform the jury that Mr. Ellen had the right to choose to remain silent.  (Tr.VI.116).  This statement very likely allowed the jurors to conclude that since Mr. Ellen had the ability to make this decision he could not have been insane.  The strong possibility that this "curative" instruction compounded the negative "effect" on Mr. Ellen's case should assist this Court in finding that the error was not harmless beyond a reasonable doubt.

Mr. Ellen concedes that in contrast to the prosecutor in <u>Commonwealth v. Mahdi</u>, 388 Mass. at 698, Mr. McAlary did not make an improper inference in his closing concerning Mr. Ellen's right to

32

remain silent.  This difference should have little if any bearing on the Court's decision. Commonwealth v. Mahdi, 388 Mass. 679, never stated that a prosecutor needed to make multiple improper references for the harmless beyond a reasonable doubt standard to be met.

The Supreme Judicial Court did mention, however, that the five factors it listed were not exhaustive.  Id. at 697.  In finding harmful error the Court in Commonwealth v. Mahdi, 388 Mass. at 698-699, also took into account an unrelated error in the prosecutor's closing.  As discussed below, Mr. McAlary made numerous errors in his closing statement.  In addition, this Court should consider the fact that Mr. Ellen's attorney, as opposed to the attorney in Commonwealth v. Mahdi, objected to the improper testimony.  Thus, there can be no dispute concerning whether defense counsel made a strategic decision to allow that testimony in evidence.  See Commonwealth v. Lee, 383 Mass. 507, 512 (1981).

Finally, the prosecutor attempted to minimize the error associated with Officer Ouellet's testimony by arguing that he lacked culpability. (Tr.VI.108).  An analysis of Mr. McAlary's comments and actions reveals that such a contention will not assist the Commonwealth.  The assistant district attorney initially claimed that that the officer's

33

testimony was admissible and relevant to the issue
of criminal responsibility. (Tr.VI.99-101).
Seventeen years earlier, however, <u>Commonwealth v.
Mahdi</u>, 383 Mass. at 695, expressly rejected that
same argument. In addition, a motion involving a
nearly identical issue had previously been
addressed. (Tr.I.130). Judge Merrick intimated
that her decision to hold her ruling on that motion
should have provided the prosecutor sufficient
notice to avoid related topics. (Tr.VI.100).

Mr. McAlary subsequently claimed that he never
intended to elicit evidence that Mr. Ellen invoked
his right to remain silent. (Tr.VI.108). This
contention cannot be reconciled with his original
argument that the evidence was admissible. In
addition, during the pre-trial discussion on the
motion in limne, the prosecutor clearly expressed
his desire to enter evidence that Mr. Ellen made a
knowing and intelligent waiver of his Miranda
rights. (Tr.I.130).

The prosecutor attempted to buttress his
alleged lack of intent by claiming that he asked
Officer Ouellet, "After [Mr. Ellen] read the
Miranda rights, did he indicate to you that he
understood his rights?" (Tr.VI.108). The
prosecutor asserted to the judge that Officer
Ouellet responded by saying 'Yes, he understood,'
and then went on to say that Mr. Ellen did not want

34

to talk. (Tr.VI.108,109).  This was not even close
to what actually happened.  Thus, a review of
totality of Mr. Ellen's case, including the
culpability of the prosecutor, indicates that this
is not one of the "few and discrete" occasions
where reversal is inappropriate.  Id. at 698.

## II. JUDGE MERRICK ERRED BY FAILING TO GRANT A MISTRIAL BASED ON THE PROSECUTOR'S IMPROPER INFERENCE IN HIS CLOSING CONCERNING MR.ELLEN'S RIGHT TO TESTIFY.

In his closing, the prosecutor told the jury
to "recall when the defendant took the stand and
keep in mind he had absolutely no obligation to
take the stand in this case, because the burden is
on the Commonwealth." (Tr.IX.29).  It is apparent
that the intent of this statement was for the jury
to infer from the mere fact that Mr. Ellen
testified that the Commonwealth had meet its
burden.  The statement further insinuated that Mr.
Ellen's decision to take the stand after the
Commonwealth met its burden allows for the
conclusion that Mr. Ellen lied.  This argument
improperly infringed and denigrated Mr. Ellen's
constitutional right to testify.  See Commonwealth
v. Smith, 387 Mass. 900, 903 (1983).

According to Commonwealth v. Smith, 387 Mass.
at 909, a prosecutor "may not draw any inference
from the exercise of a constitutional right."  This
Court must set aside a conviction for such an

35

impropriety unless it finds the error harmless beyond a reasonable doubt. Id. The Court in Commonwealth v. Smith, 387 Mass. at 909, determined that a prosecutor's stress on the defendant's failure to testify combined with a lack of a curative instruction can hardly be said to be harmless beyond a reasonable doubt. Similarly, Mr. McAlary's improper inference with respect to Mr. Ellen's right to testify unaccompanied by a curative instruction from Judge Merrick "can hardly be said to be harmless beyond a reasonable doubt." Judge Merrick, therefore, erred by denying defense counsel's motion for mistrial.

III. THE PROSECUTOR'S IMPROPER INFERENCE IN HIS CLOSING CONCERNING MS. ROLWAND'S COURTROOM ANTICS MANDATES THAT THE CONVICTIONS BE REVERSED.

After excusing the jury on October 12, 2000, Judge Merrick informed counsel that Ms. Rowland, Ms. Blankenau, and the victim advocate, Kathleen Draper, had been making audible responses throughout Mr. Ellen's testimony while sitting in the back of the courtroom. (Tr.VII.222,223,227). Judge Merrick told Ms. Draper that she had seen her engage in similar improper action in a previous case and ordered that the behavior cease. (Tr.VIII.227,228). The judge then that she believed that the jurors did not notice the conduct of those three women. (Tr.VIII.228).

36

Mr. Ellen concedes that the Courts have deferred to a judge's discretion in determining the adequacy of handling such a situation. Commonwealth v. Toon, 55 Mass. 642, 656 (2002). In this case, however, Judge Merrick definitely employed flawed judgement in allowing Ms. Draper into the courtroom knowing of her previous misconduct. In addition, while the judge may have been in the best position to observe whether the jurors witnessed any of the antics, she would have no way of knowing if they heard the "audible" comments. The judge's failure to engage in a careful and thorough questioning of each juror or even provide a general cautionary instruction was erroneous. See Commonwealth v. Hardy, 431 Mass. 387, 392 (2000).

The substantially more egregious mistake with respect to this issue occurred when the prosecutor stated in his closing, "You may have had an opportunity to look over to Mr. Ellen or Adair Rowland, or other people who were testifying. Were his responses in shaking his head either in agreement or disagreement, responsive?" (TR.IX.30). Immediately after the judge sustained defense counsel's objection, Mr. McAlary told the jury, "You have the ability to recall what you have seen. Was it a logical response to what was happening on the witness stand?" (Tr.IX.31).

37

These remarks were reasonably susceptible of being interpreted by the jury as an invitation to make inferences from Ms. Rowland's conduct during Mr. Ellen's testimony.

The Supreme Judicial Court has stated that it is of vital importance that a jury trial is free from outside influences. Commonwealth v. Smith, 403 Mass. 489, 495 (1988). Thus, a prosecutor cannot make inferences based on extraneous matters in his closing statement. Commonwealth v. Gallego, 27 Mass App. Ct. 714, 717 (1989). The error is especially glaring in this case given that the judge had notified the prosecutor of her extreme displeasure with Ms. Rowland's actions. A new trial must, therefore, be granted.

IV. JUDGE MERRICK ERRED BY DENYING MR. ELLEN'S MOTION FOR MISTRIAL BASED ON THE TOTALITY OF THE COMMONWEALTH'S CLOSING WHICH INCLUDED IMPROPER INFERENCES, FACTUAL MISTAKES, AND PLEAS TO THE SYMPATHY OF THE JURY.

Even if this Court finds that Arguments II and III above are insufficient to set aside the verdicts, an assessment of the entirety of the Commonwealth's closing should result in the reversal of Mr. Ellen's convictions. In addition to the above mentioned errors, the prosecutor's summation included numerous other improper inferences, factual mistakes, pleas to the sympathy of the jurors and statements of his personal

opinion. (Tr.IX.28-62). The assistant district attorney also made a comment suggesting that Mr. Ellen had the burden of proof. (Tr.IX.32). Due to the unduly prejudicial nature of the whole of the Commonwealth's closing, this Court must provide Mr. Ellen with a new trial. See Commonwealth v. Coren, 437 Mass. 723, 733 (2002).

According to Commonwealth v. Coren, 437 Mass. at 731, the Commonwealth can only make inferences in its closing statement that can reasonably be drawn from the evidence. One of the more blatantly erroneous inferences made by the prosecutor was that Mr. Ellen was obsessed with Ms. Rowland. Specifically, he claimed that Mr. Ellen "wanted" Ms. Rowland, was "attracted" to Ms. Rowland, was "captivated" by Ms. Rowland, and had become "infatuated" with Ms. Rowland. (Tr.IX.33,43,60).

Defense counsel object and correctly asserted that there was absolutely no evidence upon which this inference could be based. (Tr.IX.63,63). Mr. Ellen never testified that he found Ms. Rowland attractive. Both Ms. Rowland and Mr. Ellen stated that they had never seen each other before July 25, 1999. (Tr.V.94,98, VII.165,166). Further, the police discovered no evidence in Mr. Ellen's possession, such as photos of Ms. Rowland, that would suggest an infatuation.

39

In addition, the prosecutor made the "infatuation" inference as an attempt to concoct a motive for Mr. Ellen's actions. (Tr.IX.60). The record clearly reveals that a lack of motive was a major part of Mr. Ellen's lack of criminal responsibility defense. (Tr.VIII.133). According to Commonwealth v. Coren, 437 Mass. at 731, the fact that the prosecutor's argument struck at the heart of Mr. Ellen's case increases the severity of the error.

The assistant district attorney made a similar and equally baseless inference that Mr. Ellen had been "peeping" at Ms. Rowland. The prosecutor claimed that Mr. Ellen had been observing and thinking about Ms. Rowland during the ten weeks that she lived at 72 Highland Street. (Tr.IX.33). He also asserted the possibility that Mr. Ellen had been watching Ms. Ellen undress in the closet of her bedroom. (Tr.IX.48-49).

Once again, defense counsel correctly objected to these statements that "exceeded the scope of proper argument by misstating important aspects of the testimony beyond inferences that might reasonably have been drawn from the evidence." Id. Moreover, this Court should view this error in light of the prosecutor's pre-trial agreement not to delve into allegations of "peeping" and his subsequent assurance to the judge during the trial

40

that he would avoid this issue.  (Tr.I.135,
Tr.VI.45-46).

The other improper inferences in the closing
were that the socks on Mr. Ellen's hands belonged
to one of his sons and that he peered into Ms.
Blankenau's window before entering Ms. Rowland's
home on July 25, 1999.  (Tr.IX.46,48).  The
testimony regarding the socks actually indicates
they belonged to one of Ms. Rowland's sons.
(Tr.VI.50).  In addition, none of the women at Ms.
Blankenau's party ever claimed to have seen anyone
peek through a window.  The prosecutor wanted the
jury to accept his mere speculation in order to
buttress his claim that Mr. Ellen did not suffer a
disassociation, but instead carried out a plan.
"Arguments that are unsupported by the evidence and
thus are speculative and conjectural are, of
course, improper.  Commonwealth v. Kozec, 399 Mass.
514, 522 (1987).

Arguments based personal belief are also
improper.  Commonwealth v. Smith, 387 Mass. at 906.
Here, the prosecutor labeled the jury's task a
"contrivance".  (Tr.IX.28).  He then asserted that
the testimony of Mr. Ellen and Dr. Rosemarin
"flowed like a cassette.  Everything was rehearsed,
everything was planned."  (Tr.IX.29).  In addition,
although the Court in Commonwealth v. Tuitt, 393
Mass. 801 (1985), strongly disapproved of remarks

41

by a prosecutor to the effect that evidence of guilt is "overwhelming", Mr. McAlary claimed that there was "overwhelming" evidence that Mr. Ellen had been in Ms. Rowland's house before July 25, 1999. (Tr.IX.34).

The prosecutor had previously described the incident in Ms. Rowland's house as a woman's worst nightmare. (Tr.IX.31). He then told the jurors that only the resourcefulness of Ms. Rowland, the alertness of her neighbors and the quick response of the police prevented Mr. Ellen from carrying out his plan. (Tr.IX.61). These pleas to the sympathy of the jury are not permitted in a summation. Commonwealth v. Lodge, 431 Mass. 461, 471 (2000). Nor is a suggestion that there are facts that "the defense needs you to believe on order to prove or disprove that he was insane." (Tr.IX.32). This comment could reasonably be interpreted as shifting the burden of proof to the defendant. Id. at 472.

Finally, Mr. McAlary seemingly ignored the obvious requirement that his closing not misstate the evidence. Commonwealth v. Kozec, 399 Mass. at 516. As defense counsel noted in his objection the prosecutor incorrectly asserted that Dr. Rosemarin wanted the jury to believe that everyone other than Mr. Ellen was to blame for the incident. (Tr.IX.57). He further misstated Dr. Rosemarin's opinion by claiming that the doctor had testified

42

that a disassociation disorder had to include
persistent and recurring episodes. (Tr.IX.58). He
also attributed a statement to Dr. Rogers that he
never made concerning Mr. Ellen's decision to drink
to increase his courage. (Tr.IX.46).
Additionally, the prosecutor stated that Mr. Ellen
had received no previous treatment at the time Dr.
Rogers examined him. (Tr.IX.60). This is directly
contradicted by the testimony relative to Mr.
Ellen's counseling at the Veteran's Center.
(Tr.VIII.116). By aiming each of these four
misstatements at the heart of Mr. Ellen's lack of
criminal responsibility defense, Mr. McAlary caused
substantial prejudice to Mr. Ellen. See
Commonwealth v. Coren, 437 Mass. at 731.

The list of factual mistakes committed by the
assistant district attorney does not, however, end
at a mere four. According to the prosecutor, Mr.
Ellen feared being blamed for his co-worker's
action of viewing pornography. (Tr.IX.42). Not
only was this statement completely inaccurate, it
potentially allowed the jury to disbelieve Dr.
Rosemarin's opinion on that subject.
(Tr.VIII.117). As opposed to the prosecutor's
assertion in his closing, Ms. Rowland never
testified that she had business cards in her purse.
(Tr.IX.38). Mr. McAlary made this statement even
though the judge had forbid him from asking Dr.

43

Rosemarin questions concerning the alleged existence of business cards.  (Tr.VIII.191).

Lastly, the assistant district attorney claimed that the first three officer to arrived at the scene in approximately one minute.  (Tr.IX.40). Sergeant Scholtz testified that he arrived in less than two minutes and at almost the same time as Officer Valli.  (Tr.VI.10,40).  Officer Ouellet, the third officer on the scene, came even later. (Tr.VI.80).  Thus, not one of the officers, let alone all three, claimed to have arrived in approximately one minute.  This misstatement provided additional strength to the Commonwealth's contention that Mr. Ellen ceased strangling Ms. Rowland because he saw the police and not due to the termination of a disassociation.

After denying defense counsel's motion for mistrial based on the Commonwealth's closing, Judge Merrick provided curative instructions. (Tr.IX.68).  While the case law indicates that instructing the jury as to the errors in a prosecutor's closing will generally result in a finding of harmless error, this is not a typical situation.  Compare Commonwealth v. Coren, 437 Mass. at 733.  The instructions provided by the judge never specifically addressed the errors made by the prosecutor.  See Id.

44

Moreover, the Commonwealth's case concerning Mr. Ellen's criminal responsibility was far from overwhelming. Contrast <u>Commonwealth v. Roberts</u>, 378 Mass. 116, 124 (1979). Their expert actually admitted that if everything that Mr. Ellen said was believed it could be concluded that he had been in a disassociation on July 25, 1999. (Tr.VIII.278). Further, this was not a case with one isolated mistake. Contrast <u>Commonwealth v. Simpson</u>, 434 Mass. 570, 585 (2001). The plethora of incorrect inferences and factual mistakes combined with the other errors, including those listed in the above Arguments II and III, "may have made a difference in the jury's conclusions." <u>Commonwealth v. Coren</u>, 437 Mass. at 733. A new trial must, therefore, be granted. <u>Id</u>.

### V. <u>THE JUDGE ERRED BY DENYING MR. ELLEN'S MOTION FOR REQUIRED FINDING OF NOT GUILTY FOR THE CHARGE OF BURGLARY ASSAULT.</u>

At the close of the Commonwealth's case, defense counsel moved for a required finding of not guilty on the burglary assault charge. (Tr.VI.212). He argued that the motion should be allowed due to the Commonwealth's failure to enter evidence that Mr. Ellen entered Ms. Rowland's house in the nighttime. (Tr.VI.212). Judge Merrick erred by denying that motion. (Tr.VI.218, VII.9).

45

In order for the Commonwealth to prove a charge of burglary assault, it must enter sufficient evidence that the crime was committed in the nighttime. <u>Commonwealth v. Bennett</u>, 424 Mass. 64, 65 (1997). The term nighttime has been defined as "the time between one hour after sunset on one day and one hour before sunrise on the next day." <u>Id</u>. Ms. Rowland testimony comprised almost all of the Commonwealth's evidence concerning when Mr. Ellen entered her house. She stated that she left her home at or near 5:00 p.m. on July 25, 1999. (Tr.V.53). She also testified that she returned home at approximately 10:00 p.m. (Tr.V.57). In addition, based on Ms. Blankenau's testimony that she had a telephone conversation with Ms. Rowland at approximately 10:30 p.m., a rational trier of fact could determine that Ms. Rowland's encounter with Mr. Ellen did not take place until after 10:30 p.m. (Tr.V.209,233).

Taken in the light most favorable to the Commonwealth, the evidence at the close of their case indicates that Mr. Ellen could have entered Ms. Rowland's house any time after 5:00 p.m. and before 10:30 p.m. As opposed to <u>Commonwealth v. Bennett</u>, 424 Mass. 64, 65 (1997) and <u>Commonwealth v. Turner</u>, 28 Mass. App. Ct. 909 (1989), no interpretation of the evidence could lead to a greater reason to believe that Mr. Ellen entered in

46

the nighttime.  "When the evidence tends equally to sustain either of two inconsistent propositions, neither of them can be said to have been established by legitimate proof".  <u>Commonwealth v. Fancy</u>, 349 Mass. 196, 200 (1965).  The motion for a required finding of not guilty should, therefore, have been allowed.

CONCLUSION

For the reasons set forth above, the Defendant's convictions should be overturned and a not guilty verdict should be entered for the charge of burglary - assault on occupant.

Respectfully submitted,

DAVID J. BAREND
ATTORNEY FOR DEFENDANT

2 Stonewood Circle
North Attleboro, MA 02760
(508) 316-1171
BBO #564032

November, 2002

RECORD APPENDIX

Table of Contents

DOCKET ENTRIES..............................R. 1

INDICTMENTS.................................R. 5

NOTICE OF APPEAL............................R. 9

# Commonwealth of Massachusetts
## ESSEX SUPERIOR COURT
### Case Summary
### Criminal Docket

## ESCR1999-01647
## Commonwealth v Ellen, Christopher

| | | | | |
|---|---|---|---|---|
| **File Date** | 08/11/1999 | **Status** | Disposed (appeal pending) (dappen) | |
| **Status Date** | 10/16/2000 | **Session** | 1 - CtRm 1 (Salem) | |
| **Jury Trial** | Yes | **Origin** | I r Indictment | |
| **Lead Case** | | | | |

| | | | |
|---|---|---|---|
| **Trial Deadline** | **Deadline Status** | | **Status Date** |
| | **Custody Status** Bridgewater State Hospital | | **Start Date** |
| **Weapon** | **Substance** | | **Prior Record** Unknown |
| **Arraignment** 08/11/1999 | **PTC Deadline** | | **Pro Se Defendant** No |

### OFFENSES

| Num | Offense | Code | Status | Status Date |
|---|---|---|---|---|
| 1 | 07/25/1999 | 265:015.1 | Guilty verdict | 10/16/2000 |
| | Assault, intent to murder | | | |
| 2 | 07/25/1999 | 265:024.1 | Not guilty finding | 10/12/2000 |
| | Assault, intent to rape | | | |
| 3 | 07/25/1999 | 266:014.12 | Guilty verdict | 10/16/2000 |
| | Burglary, assault | | | |
| 4 | 07/25/1999 | 265:015A:b | Guilty verdict | 10/16/2000 |
| | Assault & battery, dangerous weapon | | | |

### PARTIES

**Plaintiff**
Commonwealth
Gender: Unknown
Active 08/11/1999

**District Atty's Office 326420**
Frederick B McAlary Jr
Essex County District Atty's Office
1 East India Square
Museum Place
Salem, MA 01970
Phone: 978-745-6610
Fax: 978-741-4971
Active 09/21/2000 Notify

**Defendant**
Christopher Ellen
Gender: Unknown
Active 08/11/1999

**Public Counsel 335080**
Lawrence J McGuire
Mass Public Counsel Services (Salem)
1 Salem Green
Suite 408
Salem, MA 01970-3724
Phone: 978-744-9113
Fax: 978-741-8567
Inactive 05/30/2002

**Private Counsel 344100**
James E Methe
1350 Main Street
Bank Boston Building 10th floor
Springfield, MA 01103
Phone: 413-746-9257
Fax: 413-732-5828
Withdrawn 11/24/2000

R 1

**ESCR1999-01647**
**Commonwealth v Ellen, Christopher**

| | |
|---|---|
| | **Public Counsel 552993** |
| | Peter M Onek |
| | Mass Public Counsel Services (Boston) |
| | 44 Bromfield Street |
| | Suite 310-A |
| | Boston, MA 02108 |
| | Phone: 617-482-6212 |
| | Fax: 617-988-8495 |
| | Inactive 05/30/2002 |
| | |
| | **Private Counsel 564032** |
| | David Barend |
| | 2 Stonewood circle |
| | North Attleboro, MA 02760 |
| | Phone: 508-316-1171 |
| | Fax: 508-316-1192 |
| | Active 05/30/2002 Notify |

**ENTRIES**

| Date | Paper | Text |
|---|---|---|
| 8/11/1999 | | Original case info: ORIGIN=I. #29 |
| 9/16/2000 | | Stat at cnvrsn to cmputr 09/16/2000. |
| | | (see docket book for previous docket entries). |
| 9/20/2000 | 30.0 | Habeas corpus for Deft at Bridgewater State Hospital for October 2, 2000 at 9:00 a.m. in Salem. |
| 9/26/2000 | 31.0 | Impounded Hospital records from Brighams and Womens Hospital received on 09/26/00. |
| 0/02/2000 | | Jury Impanelment Begins |
| 0/02/2000 | 32.0 | Motion to Permit Defendant to Receive Clothing Allowed |
| 0/02/2000 | 33.0 | Motion to be Free of Handcuffs and Shackles Allowed |
| 0/02/2000 | 34.0 | Motion for Sequestion of Witnesses After hearing ALLOWED |
| 0/02/2000 | 35.0 | Motion for Voir Dire of Proposed Expert Witnesses Filed. |
| 0/02/2000 | 36.0 | Motion in Limine Concerning Proposed Fresh Complaint Evidence Allowed |
| 0/02/2000 | 37.0 | Motionto Exclude Evidence of A Certain Pseudo-Scientific Experiment after Hearing ALLOWED |
| 0/02/2000 | 38.0 | Motion for Individual Voir Dire of Prospective Jurors Allowed in Part and Denied in Part |
| 0/02/2000 | 39.0 | Commonwealth's List of Potetial Witnesses Filed |
| 0/02/2000 | 40.0 | Witnesses Filed |
| 0/02/2000 | 41.0 | Motion in Limine Concerning Refusal Evidence Reserved at this time |
| 0/02/2000 | | Merrick,J>< Presiding; K. Gordon, Court Reporter |
| 0/03/2000 | | Jury Trial Continues |
| 0/03/2000 | | Jury Impaneled but not Sworn In |
| 0/03/2000 | 42.0 | Commonwealth's Motion in Limine Filed |
| 0/03/2000 | 43.0 | Motion in Limine Concerning "Stalking" Evidence Filed. |
| 0/03/2000 | | Merrick,J>< Presiding; K. Gordon, court Reporter |
| 0/04/2000 | | Continued until 10/05/2000 for Trial Jury not Sworn In |
| 0/04/2000 | | Merrick,J>< Presiding; K. Gordon<C ourt Reporter |

**Commonwealth of Massachusetts**
ESSEX SUPERIOR COURT
Case Summary
Criminal Docket

# ESCR1999-01647
## Commonwealth v Ellen, Christopher

| Date | Paper | Text |
|------|-------|------|
| 0/05/2000 | | Jury Impanelment Continues to Replace an Excused Juror (Seat #13) and Now Impanel 16 Seats. Jury Impaneled with 16 Seat, Jury Not Sworn In |
| 0/05/2000 | | Continued until 10/10/2000 for Trial |
| 0/05/2000 | | Merrick, J., Presiding; K. Gordon, Reporter |
| 0/10/2000 | | Jury Sworn In and Trial Begins |
| 0/10/2000 | | Merrick,J>< Presiding; K. Gordon, Court Reporter |
| 0/10/2000 | 58.0 | Request for jury instructions, filed in court. (Merrick, J.) |
| 0/11/2000 | | Jury Continues |
| 0/11/2000 | | Oral Motion by Defendant foa a Mistrial DENIED |
| 0/11/2000 | | Re-Newed Motion by the Defendant for Mistrial DENIED |
| 0/11/2000 | | Merrick,J>< Presidin; K. Gordon, Court Reporter |
| 0/12/2000 | 44.0 | Motion for Required Finding of Not Guilty Allowed for 9977CR-1648 (002) |
| 0/12/2000 | | RE Offense 2:Not guilty finding |
| 0/12/2000 | 45.0 | Motion for Required Finding of Not Guilty at the Close of the Commonwealth's Case DENIED as to Indictmetn 99-1647, 99-1649 and 99-1650 ALLOWED as to 99-1648 |
| 0/12/2000 | | Merrick,J>< Presiding; K. Gordon, Court Reporter |
| 0/13/2000 | | Trial Continues |
| 0/13/2000 | | Merrick,J>< Presiding; K. Gordon, Court Reporter |
| 0/16/2000 | 46.0 | Motion for Required Finding of Not Guilty or in the Alternative A New Trial Filed |
| 0/16/2000 | | Jury Deliberations Begin |
| 0/16/2000 | 47.0 | RE Offense 1:Guilty verdict (99-1647 ) |
| 0/16/2000 | 48.0 | RE Offense 3:Guilty verdict (99-1649) |
| 0/16/2000 | 49.0 | RE Offense 4:Guilty verdict (99-1650) |
| 0/16/2000 | | SENTENCE Re Offense 1 (99-1647): Five Years (5) Probation From and After 99-1649 (003) |
| 0/16/2000 | | Special Conditions of Probation: 1. No Contanct With Victim |
| 0/16/2000 | 50.0 | Sentence Re Offense 3 (99-1649): Eighteen to Twenty Five (18-25) Years Committed to the Massachusetts Correctional Institution Cedar Junction. Credit of 448 Days. |
| 0/16/2000 | 51.0 | SENTENCE Re Offense 4 (99-1650): Eight to Ten (8-10) Years Committed to the Massachusetts Correctional Institution Cedar Junction. Concurrent with 99-1649 (003) Credit of 448 Days |
| 0/16/2000 | 52.0 | Motion for Stay of Execution Pending Appeal DENIED |
| 0/16/2000 | 53.0 | Victim-witness fee assessed: $60.00 on Each Total $120.00 |
| 0/16/2000 | 54.0 | Notice of Appeal Filed |
| 0/16/2000 | | Merrick,J>< Presiding; K. Gordon, Court Reporter |
| 0/17/2000 | 55.0 | Motion to Revoke and Revise Sentence Filed (no action) |
| 0/24/2000 | 56.0 | Court Reporter Kay Gordon is hereby notified to prepare one copy of the transcript of the evidence of 10/02/2000 thru 10/16/00 |
| 0/24/2000 | 57.0 | Court Reporter Ann Green is hereby notified to prepare one copy of the transcript of the evidence of 11/10/1999 Motion to Suppress before Fremont-Smith,J., and 8/16/00 before Whitehead,J., Pre-Trial Motions |

## ESCR1999-01647
## Commonwealth v Ellen, Christopher

| ate | Paper | Text |
|---|---|---|
| )/24/2000 | | Notice to Committee for Public Counsel Services, Boston to appoint attorney |
| 1/06/2000 | 59.0 | Motion (P#59, Motion for additional funds Psychiatrist) ALLOWED in part/ DENIED in part, see endorsement. (Issac Borenstein, Justice) |
| 1/09/2000 | 60.0 | Notice of Assignment of Counsel C2825519-4 James Methe, Esq., appointed |
| 1/14/2000 | 62.0 | Appearance of Deft's Atty: James E Methe |
| 1/16/2000 | 61.0 | Motion for reconsideration of motion for additional funds. |
| 1/17/2000 | | Motion (P#61, Motion for reconsideration of motion for additional funds) allowed (Borenstein, J.) |
| 1/22/2000 | 62.0 | Notice of disappearance, ALLOWED, (R.P. Murphy, Clk/Mag) |
| 2/28/2000 | 63.0 | Appearance of Deft's Atty: Peter M Onek |
| 4/02/2001 | 64.0 | Transcript of testimony received 2 Volumes dated 11/10/99 and 8/16/00 from Ann Green, Court Reporter |
| 5/31/2001 | 65.0 | Victim-witness fee paid as assessed on indictment 9977CR1649 |
| 5/31/2001 | 66.0 | Victim-witness fee paid as assessed on indictment 9977CR1650. |
| 3/06/2002 | | Transcript of testimony received 9 volumes from court reporter, Gordon, Kathleen A. |
| 5/08/2002 | 67.0 | Certificate of delivery of transcript by clerk (11 Volumes) to District Attorney's Office filed. |
| 5/23/2002 | 68.0 | Notice of assembly of record; mailed to Appeals Court per Rule 9(d) |
| 5/30/2002 | 69.0 | Notice of assignment of counsel # C2626599-3 for  Atty. David Barend filed. |
| 6/03/2002 | 70.0 | Notice of Entry from the Appeals Court |
| 8/15/2002 | 71.0 | General correspondence regarding: Letter from Bridgewater State Hospital to inform court Defendant to be discharged to Old Colony Correctional Center. |

# COMMONWEALTH OF MASSACHUSETTS

Essex, to wit:

At the *SUPERIOR COURT* begun and holden at Salem, within and for said County of Essex, on the first Monday of **July** in the year of our Lord one thousand nine hundred and ninety-nine.

THE JURORS for the Commonwealth of Massachusetts upon their oath present, that

## CHRISTOPHER ELLEN

of **Amesbury,** in said County of Essex, on the **twenty-fifth** day of **July** in the year of our Lord one thousand nine hundred and ninety-nine, at **Amesbury** in the County of Essex aforesaid

did assault Adair Rowland with intent to murder said Adair Rowland,

against the peace of the Commonwealth aforesaid, and contrary to the form of the statute in such case made and provided.

A TRUE BILL:

_____
District Attorney

_____
Foreperson of the Grand Jury

R.5

# COMMONWEALTH OF MASSACHUSETTS

Essex, to wit:

At the *SUPERIOR COURT* begun and holden at Salem, within and for said County of Essex, on the first Monday of **July** in the year of our Lord one thousand nine hundred and ninety-nine.

THE JURORS for the Commonwealth of Massachusetts upon their oath present, that

## CHRISTOPHER ELLEN

of **Amesbury**, in said County of Essex, on the **twenty-fifth** day of **July** in the year of our Lord one thousand nine hundred and ninety-nine, at **Amesbury** in the County of Essex aforesaid

did assault Adair Rowland with intent to commit rape,

against the peace of the Commonwealth aforesaid, and contrary to the form of the statute in such case made and provided.

A TRUE BILL:

_Kevin M. Burke_

_____
District Attorney

_[signature]_

_____
Foreperson of the Grand Jury

R6

# COMMONWEALTH OF MASSACHUSETTS

Essex, to wit:

At the *SUPERIOR COURT* begun and holden at Salem, within and for said County of Essex, on the first Monday of **July** in the year of our Lord one thousand nine hundred and ninety-nine.

THE JURORS for the Commonwealth of Massachusetts upon their oath present, that

## CHRISTOPHER ELLEN

of **Amesbury**, in said County of Essex, on the **twenty-fifth** day of **July** in the year of our Lord one thousand nine hundred and ninety-nine, at **Amesbury** in the County of Essex aforesaid

did break and enter a dwelling house in the night time with intent to commit a felony, and while therein did assault Adair Rowland, a person lawfully therein,

against the peace of the Commonwealth aforesaid, and contrary to the form of the statute in such case made and provided.

A TRUE BILL:

_Kevin M. Burke_

District Attorney

Foreperson of the Grand Jury

# COMMONWEALTH OF MASSACHUSETTS

Essex, to wit:

At the *SUPERIOR COURT* begun and holden at Salem, within and for said County of Essex, on the first Monday of **July** in the year of our Lord one thousand nine hundred and ninety-nine.

THE JURORS for the Commonwealth of Massachusetts upon their oath present, that

## CHRISTOPHER ELLEN

of **Amesbury**, in said County of Essex, on the **twenty-fifth** day of **July** in the year of our Lord one thousand nine hundred and ninety-nine, at **Amesbury** in the County of Essex aforesaid

did assault and beat Adair Rowland by means of a dangerous weapon,

against the peace of the Commonwealth aforesaid, and contrary to the form of the statute in such case made and provided.

*Kevin M. Burke* A TRUE BILL:

_____          _____

District Attorney                          Foreperson of the Grand Jury

R-8

*54*

## COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss.

SUPERIOR COURT DEPARTMENT
ESSEX DIVISION
NOS: 99 CR 1647-1650

COMMONWEALTH

V.

CHRISTOPHER ELLEN

NOTICE OF APPEAL

FILED IN COURT
ATTEST
ASST. CLERK

Notice is hereby given that the defendant in the above case, being aggrieved by certain opinions, rulings. Directions and judgements of the Court, hereby appeals pursuant to Massachusetts Rules of Appellate procedure, Rule 3.

CHRISTOPHER ELLEN
By his attorney

Lawrence J. McGuire
BBO No: 335080
Committee for Public Counsel Services
One Salem Green Suite 408
Salem, Massachusetts 01970
978-744-9113

Dated: 10 · 16 · 00

R.9

<u>CERTIFICATE OF SERVICE</u>

Date:  November 4, 2002

Ashley Brown Ahearn, Clerk
Appeals Court
15th Floor, New Court House
Pemberton Square
Boston, MA  02108

Dear Madam:

Herewith are seven copies of the brief and

record appendix in No. 02-P-803,


COMMONWEALTH

v.

CHRISTOPHER ELLEN


I certify that I have made service by
depositing in the post office, with first-class
postage prepaid, two copies of the brief for the
above referenced case to the office of the District
Attorney of Essex County One East India Square,
Salem, Massachusetts 01970.


DAVID J. BAREND
Attorney for Christopher Ellen

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT
NO. 02-P-803

ESSEX   SS.

———————————————————————

COMMONWEALTH,
Appellee

V.

CHRISTOPHER ELLEN,
Appellant

—— ————————— ——— — —————————

ON APPEAL FROM A CONVICTION
OF THE SUPERIOR COURT

——————————— —— —————————

BRIEF AND SUPPLEMENTAL RECORD APPENDIX
FOR THE COMMONWEALTH

——————————— —— —————————

FOR THE COMMONWEALTH:

JONATHAN W. BLODGETT
DISTRICT ATTORNEY
  FOR THE EASTERN DISTRICT

CATHERINE LANGEVIN SEMEL
ASSISTANT DISTRICT ATTORNEY
Two East India Square
Salem, Massachusetts  01970
(978) 745-6610 ext. 141
BBO # 639596

January, 2003

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT
NO. 02-P-803

ESSEX, SS.

———————————————

COMMONWEALTH,
Appellee

V.

CHRISTOPHER ELLEN,
Appellant

———————————————

ON APPEAL FROM A CONVICTION
OF THE SUPERIOR COURT

———————————————

BRIEF AND SUPPLEMENTAL RECORD APPENDIX
FOR THE COMMONWEALTH

———————————————

FOR THE COMMONWEALTH:

JONATHAN W. BLODGETT
DISTRICT ATTORNEY
  FOR THE EASTERN DISTRICT

CATHERINE LANGEVIN SEMEL
ASSISTANT DISTRICT ATTORNEY
Two East India Square
Salem, Massachusetts  01970
(978) 745-6610 ext. 141
BBO # 639596

January, 2003

TABLE OF CONTENTS

Issues Presented                                                    1

Statement of the Case                                               1

Statement of Facts                                                  3

Summary of the Argument                                            24

Argument

    I.    The isolated reference to the                        25
defendant's invocation of his right to
remain silent, while improper, did not
warrant a mistrial under the facts of
this case, and the trial judge acted
well within her discretion in denying
the motion for mistrial, and addressing
the issue by striking the reference and
issuing a strong curative instruction.

    II.    The prosecutor's statement during                    33
closing argument regarding the
defendant taking the stand despite
having no obligation to do so did not
improperly suggest that the defendant
must be lying or that the Commonwealth
must have met its burden of proof.

    III. The prosecutor's remarks in closing                   34
argument regarding the defendant's
courtroom demeanor were not improper
and could not plausibly have been
construed by jurors as a license to
consider the off-the-stand behavior of
the victim, her friend, and the
victim's witness advocate, which,
according to the judge, jurors did not
even observe.

    IV.  Remarks made by the prosecutor in                     36
closing argument, whether considered
individually or in their totality, did
not deny the defendant a fair trial.

V.    Circumstantial evidence presented in          47
      the Commonwealth's case in chief was
      sufficient for jurors to conclude
      beyond a reasonable doubt that the
      defendant entered the victim's home in
      the "nighttime."

Conclusion                                           50

Supplemental Record Appendix

# TABLE OF AUTHORITIES

## Cases

Commonwealth v. Adams,                                      38
    434 Mass. 805 (2001)

Commonwealth v. Alisha A.,                                  40
    56 Mass. App. Ct. 311 (2002)

Commonwealth v. Alphas,                                     34
    430 Mass. 8 (1999)

Commonwealth v. Bennett,                                    48
    424 Mass. 64 (1997)

Commonwealth v. Brum,                                       32
    438 Mass. 103 (2002)

Commonwealth v. DeCicco,                                    47
    44 Mass. App. Ct. 111 (1998)

Commonwealth v. DePace,                                     27
    433 Mass. 379 (2001)

Commonwealth v. Devlin,                                     34
    335 Mass. 555 (1957)

Commonwealth v. Dinkins,                                    37
    415 Mass. 715 (1993)

Commonwealth v. Fancy,                                      49
    349 Mass. 196 (1965)

Commonwealth v. Hartford,                                   45
    425 Mass. 378 (1997)

Commonwealth v. Kingsbury,                                  48
    378 Mass. 751 (1979)

Commonwealth v. Kosilek,                                    47
    423 Mass. 449 (1996)

Commonwealth v. Lanagan,                                    48
    56 Mass. App. Ct. 659 (2002)

Commonwealth v. Latimore,                        47
    378 Mass. 671 (1979)

Commonwealth v. Mahdi,                15, 26, 29, 31
    388 Mass. 679 (1983)

Commonwealth v. Martinez,                    29, 47
    431 Mass. 168 (2000)

Commonwealth v. Martinez                         30
    437 Mass. 84 (2002)

Commonwealth v. Morgan,                          27
    369 Mass. 332 (1975)

Commonwealth v. Pearce,                          37
    427 Mass. 642 (1998)

Commonwealth v. Peixoto,                         32
    430 Mass. 654 (2000)

Commonwealth v. Rembiszewski,                    27
    363 Mass. 311 (1973)

Commonwealth v. Roberts,                         46
    433 Mass. 45 (2000)

Commonwealth v. Shea,                            37
    401 Mass. 731 (1988)

Commonwealth v. Smith,                           35
    387 Mass. 900 (1983)

Commonwealth v. Smith,                           38
    404 Mass. 1 (1989)

Commonwealth v. Stout,                           34
    356 Mass. 237 (1969)

Commonwealth v. Toon,                            36
    55 Mass. App. Ct. 642 (2002)

Commonwealth v. Tuitt,                           46
    393 Mass. 801 (1985)

Commonwealth v. Turner,                          48
    28 Mass. App. Ct. 909 (1989)

Commonwealth v. Vizcarrondo,                                46
    431 Mass. 360 (2000)

Commonwealth v. Waite,                                      30
    422 Mass. 792 (1996)

Commonwealth v. Wilson,                                     37
    427 Mass. 336 (1998)

Other Authorities

Nolan and Sartoria, Criminal Law  405 (2001)               47

Liacos, Handbook of Massachusetts Evidence
(7th ed. 1999)                                       27, 35

Merriam-Webster's Collegiate Dictionary, p. 360
(10th ed. 1994)                                          43

## ISSUES PRESENTED

I.   Whether the trial judge acted within her discretion in denying the defendant's motion for new trial and issuing a strong curative instruction, in response to improper testimony regarding the defendant's invocation of his right to remain silent.

II.  Whether the prosecutor's remark during closing that the defendant took the stand despite having no obligation to do so improperly commented on the defendant's exercising his right to testify.

III. Whether the prosecutor's remarks during closing argument concerning the defendant's courtroom behavior were improper or could plausibly have been construed by jurors as license to consider the off-the-stand behavior of the victim and others, which according to the judge, jurors did not even observe.

IV.  Whether remarks made by the prosecutor in closing argument denied the defendant a fair trial in any of the ways now alleged.

V.   Whether the Commonwealth's evidence was sufficient for jurors to find that the defendant entered the victim's house in the nighttime.

## STATEMENT OF THE CASE

The defendant, Christopher Ellen, appeals his convictions for burglary with assault on the occupant, assault and battery with a dangerous weapon and assault with intent to murder.    The defendant was

caught at the scene, and defended the case on a theory of lack of criminal responsibility.

On August 11, 1999, an Essex County Grand Jury indicted the defendant for assault with intent to murder (G.L. c. 265, § 15); assault with intent to rape (G.L. c. 265, § 24); burglary (assault on the occupant) (G.L. c. 266, § 14); and assault and battery with a dangerous weapon (G.L. c. 265, § 15A(b)) (Nos. 9977 CR 1647-1650, respectively) (S.R.A. 5,8,11,14).[1]

At the start of trial, several motions were addressed (Staffier, J., [Merrick]). Among them, the defendant moved to exclude any evidence or opinions indicating that he was in the victim's house prior to the night of the assault, had stalked her, or watched her neighbor, Joan Blankenau (Tr. 1: 138). The judge excluded evidence concerning the defendant's actions toward Blankenau, and any witness opinions or speculations (Tr. 1: 140-141). She ruled admissible, however, evidence indicating that the defendant had previously been in the victim's house, concluding that the inference was permissible (Tr. 1: 141).

A jury trial took place October 2 to 16, 2000. At the close of the Commonwealth's case, the defendant

---

[1]    The following citations are used: the trial transcript, (Tr. vol.: page); the Record Appendix, (A. page); the defendant's brief, (D.Br. page); and the Supplemental Record Appendix, (S.R.A. page).

moved for a required finding of not guilty on all charges (Tr. 6: 204). The motion was allowed solely as to the count of assault and battery with intent to rape, the judge finding insufficient evidence of the requisite specific intent (Tr. 7: 8-9). In denying the motion regarding the count of burglary with assault on occupant, the judge found that the failure to establish a specific time of entry did not preclude the case from going to the jury (Tr. 7: 9).

On October 16, 2000, the jury convicted the defendant, as charged, of assault with intent to murder, assault and battery with a dangerous weapon, and burglary (assault on occupant) (Tr. 9: 119-120, 120-121). On the same day, the defendant was sentenced to an eighteen to twenty-five year committed MCI-Cedar Junction term for burglary, a concurrent eight to ten year term for assault and battery with a dangerous weapon, and a subsequent five year probation term for assault with intent to murder (Tr. 9: 134).

The defendant filed a timely notice of appeal on October 16, 2002 (S.R.A. 3). The case was docketed in this Court on May 29, 2002.

## STATEMENT OF FACTS

### I.    The Burglary and Attack

In May, 1999, the victim, Adair Rowland, moved into a home at 72 Highland Avenue in Amesbury (Tr. 5: 39-40). The area was predominately residential, the

street was "wide open" and the houses were large and Victorian (Tr. 6: 168-169).  The victim was separated from her husband, and lived there with her two sons, aged ten and thirteen (Tr. 5: 40).  She was self-employed and worked out of her house (Tr. 5: 40).

.   During July, the victim was alone in the house, while her sons were away at camp (Tr. 5: 41).  She met a neighbor during that time, Joan Blankenau, who lived a few houses away and invited the victim to attend a dinner party on Sunday, July 25 (Tr. 5: 42).

The victim spent most of the weekend of the dinner party at home, going out Friday night for a 9:00 movie and returning after midnight (Tr. 5: 42-43, 45).  On Saturday morning, she was cleaning when she discovered a green necktie knotted to the drainpipe beside the radiator in her dining room (Tr. 5: 48, 133).  That necktie had been stored in a costume box, inside a closet in her third floor attic (Tr. 5: 48-49).  At the time, she thought one of her sons might have tied it there; the pipe was readily visible, in a recessed area in her dining room (Tr. 5: 134, 136).

On Sunday, the day of the dinner party, the victim again spent most of the day at home, going out for only a short while (Tr. 5: 52).  About 5:00 p.m., she left for the dinner party, leaving her purse on a chair in her office (Tr. 5: 52-53).  She closed but

did not lock the back door (Tr. 8: 57),[2] then walked down the street, wearing an ankle-length, red, linen shift and carrying a bottle of wine (Tr. 5: 53).

On her way, the victim passed a group of men standing by a front stoop, holding glasses or bottles (Tr. 5: 54). Somebody called out, "Don't think we didn't see you walking by with that bottle of wine" (Tr. 5: 54). She glanced up and said, "It looks like you've already got it covered," and walked on (Tr. 5: 54-55). Two small children ran by (Tr. 5: 55).[3]

The victim remained at the dinner party until about 10:00 p.m., then walked home (Tr. 5: 57). She did not see anyone on the way (Tr. 5: 58). She entered her house through the back door, noticing a "strong smell" as she did, but went straight up the staircase located there to the second floor (Tr. 5: 58-60). In her bedroom, the lights were off, and she tried to turn on both the bureau lamp and a swag light near her bed, but neither worked (Tr. 5: 63). Jumping up, she was able to turn on the overhead light, using a pull chain (Tr. 5: 64, 65-66).

She went to the door leading from her bedroom to the sunporch, which had been leaking, and knelt down

---

[2]    This point was established when the victim was recalled during the defendant's case (Tr. 8: 57).

[3]    The defendant later testified that he was the one who had called out to the victim, although he said he did not know who she was (Tr. 7: 165-166).

to check the rug for wetness (Tr. 5: 66). As she did, she saw under the bed a yellow sweater of hers that she recalled putting away in her bureau drawer that morning (Tr. 5: 67). She tried to pull it, but then saw that it was knotted underneath the box spring to the bedpost (Tr. 5: 68). "[S]tartled" and "confused" she untied the sweater, thinking, "I've seen this before" (Tr. 5: 68-69). She had found the green necktie knotted to the radiator drainpipe just the previous morning (Tr. 5: 48, 133).

The victim took the sweater, and went back downstairs to her office, where she tried to call her ex-husband (Tr. 5: 69-70). He did not answer, but she left a message on his answering machine, saying she was at home, something was wrong, and she needed to talk to him (Tr. 5: 70). She retrieved Blankenau's telephone number from upstairs, and returned to her office to call her (Tr. 5: 70-71).

Blankenau was at home with two remaining dinner party guests when she received the victim's call (Tr. 5: 208, 234). The victim, sounding very agitated, told her that something was wrong in her house (Tr. 5: 71, 234). She declined Blankenau's offer to call the police, but agreed that Blankenau should come over to the house herself (Tr. 5: 71, 235).

Hanging up the phone, but still holding onto the handset, the victim went to the back door, unlocked

it, and turned on the outside light (Tr. 5: 73, 74).

Right after she turned the light on, it flicked off --

there was a secondary switch located at the top of the

stairs (Tr. 5: 73). She turned the light on again,

and it stayed on (Tr. 5: 73-74).

The victim had just rounded the doorway back into

the kitchen, when she heard a "very loud noise coming

down the stairs" (Tr. 5: 75). She turned to see a

bearded, dark-eyed man enter the kitchen; he was bare-

chested, barefooted, dressed only in a pair of shorts,

and advancing toward her with his hands in front of

him (Tr. 5: 75-76). What at first appeared to be

casts on his hands were actually tube socks, and the

man, later determined to be the defendant, began

hitting her about the face, backing her into a corner

of the kitchen (Tr. 5: 76-77, 81). She ducked, trying

to keep out of his range, and lied to him, saying,

"The police are coming, they're on their way" (Tr. 5:

77). "You're a liar," he told her in a low voice,

continuing to hit her (Tr. 5: 80). She said that she

had called her neighbor who lived only a few houses

away, and who would arrive any second, and the

defendant took her by the shoulders, lifted her up and

threw her against the counter, then ran to the back

door, where she heard the lock click shut (Tr. 5: 80).

As the defendant returned, the victim picked up

the telephone receiver and threw it at him (Tr. 5:

84).    She grabbed a saucepan and brought it up over her head and down on him, but it "connected" only slightly, if at all (Tr. 5: 84).  She tried to hit him again, but he grabbed her, pulled her to another part of the kitchen, and pushed her up against the counter (Tr. 5: 84-85).

She "felt his thumbs under [her] chin," as though "he was trying to press [her] head off [her] neck" (Tr. 5: 85).  The saucepan fell to the floor (Tr. 5: 85).  She tried to get her arms free or kick him in the groin, but she could not do it, and he punched her in the stomach (Tr. 5: 86).  She tried to wrench her head around and did bite something she thought was his hand, and she wrenched free and screamed, "Somebody, somebody help me" (Tr. 5: 86).  He took hold of her again, with his hand over her face, and threw her to the floor (Tr. 5: 86).

The victim heard Blankenau's voice and heard her banging on the back door (Tr. 5: 86-87).  The defendant, straddling her, said, "Turn off the lights and tell your friend to go home" (Tr. 5: 87).  The victim tried to stall, saying, "You can have my money, you can have my wallet" (Tr. 5: 87).  He calmly replied, "What, four bucks?" (Tr. 5: 87).  She realized that he must have gone through her purse; he knew how much money she had in her wallet (Tr. 5: 87).  She tried again, "You can have the keys to my car, you

can get away" (Tr. 5: 87). "Adair, I don't want your car," he replied (Tr. 5: 87).

Unable to stall anymore, the victim called out, "Joan, go away" (Tr. 5: 88). She heard Joan call back, "I'm calling 911" (Tr. 5: 88). The next thing she knew, the defendant had looped a sash around her neck twice (Tr. 5: 88). It was a long purple sash from her junior prom dress; the dress had been stored in the same costume box in the attic as the necktie she had found tied in the dining room the previous day (Tr. 5: 88). The victim was on her knees trying to get up, but the defendant pulled the sash tight, forcing her back to her knees (Tr. 5: 89). She managed to get her thumbs under the sash (Tr. 5: 90). Twice he loosened the sash, then pulled it tight (Tr. 5: 90). She was having trouble breathing, was starting to see "lights flashing" and to feel "lightheaded" (Tr. 5: 91).

Just when the victim thought she was going to black out, he let go (Tr. 5: 91). He said, "This is stupid, this is stupid. I'm a dead man" (Tr. 5: 91). She had fallen against the radiator when he let go, and he held out his hand to her, asking, "Are you okay? Can I help you up?" (Tr. 5: 91). She replied, "I'm just so frightened. Who are you?" (Tr. 5: 91). He stepped backward and replied, "Who am I? Well, I'm an insane individual and you are a victim and I'm a

victim" (Tr. 5: 91-92). She told him, "The keys, you can still get away, take my car" (Tr. 5: 92). But he said, "Where would I go?" then he added, "Oh, look, they're here" (Tr. 5: 92).

The kitchen was separated from a sunporch at the front of the house by a pair of French doors (Tr. 5: 93). The victim had stood up but was facing away from that area (Tr. 5: 92-93). Turning, now, she saw the blue lights from the cruisers (Tr. 5: 91-92). She heard a police officer say, "Ma'am, could you step out of the house" (Tr. 5: 92-93).

The victim estimated that the entire episode with the defendant lasted four to five minutes (Tr. 5: 183). About ten seconds elapsed from when he released the pressure on the sash to when she saw the police (Tr. 5: 185).

II. The 911 Calls and Police Arrival at the Scene

Joan Blankenau arrived at the victim's house two to three minutes after receiving her call (Tr. 5: 235). Finding the back door locked, and after a brief exchange with the victim, see supra, p. 9, Blankenau ran home to call 911 (Tr. 5: 235-236, 237-238).

Meanwhile, Mary Reily, who lived at 71 Highland Street, diagonally across the street from the victim, heard a loud noise, "like a pan dropping" at about 10:30 p.m. (Tr. 5: 194-196). From her back door, she could see into the victim's house, where a woman and a

man were fighting, and she heard the woman scream, "Help, help me" (Tr. 5: 197-200). She dialed 911, telling the dispatcher that it looked like a domestic dispute (Tr. 5: 200). Hanging up, she returned to watch the scene until three police cruisers pulled up (Tr. 5: 201-202). She estimated that the entire span of time she watched the episode across the street was thirty seconds, including before and after she made the 911 call (Tr. 5: 201).

Amesbury police sergeant William Scholtz received a dispatch to respond to the victim's house at about 10:30 p.m., and arrived at the scene in less than two minutes (Tr. 6: 14-16). Officer Mark Valli arrived almost simultaneously, with his blue lights flashing (Tr. 6: 16, 55-56, 72). Officer Kevin Ouellet arrived third, in "three minutes or less" from the time of dispatch (Tr. 6: 79).

Sgt. Scholtz approached the porch door of the residence, and, seeing a man and woman inside said, "Open the door" (Tr. 6: 19). After a pause, and a repeated command from the officer, they approached the door, and the man, the defendant, unlocked it (Tr. 6: 19-20). Sgt. Scholtz asked the woman, the victim, to step out (Tr. 6: 20). After a repeated request, the defendant said, "It's her house, I'll step out," and he stepped past Sgt. Scholtz to where Officers Valli and Ouellet were standing behind him (Tr. 6: 20).

Sgt. Scholtz then spoke with the victim, who was "very wide-eyed," had labored breathing and seemed to be having difficulty swallowing (Tr. 6: 21). She told him that the defendant had "attacked" her, "tried to kill" her, "strangled" her (Tr. 6: 23). Asked who he was, she said she did not know; she had never seen him before (Tr. 6: 23).

Officers Ouellet and Valli, meanwhile, spoke with the defendant. He admitted having hit the victim, but said he did not know why (Tr. 6: 86-87). Officer Valli also recalled the defendant saying they "were having a discussion" (Tr. 6: 60). The defendant was arrested and placed in a cruiser (Tr. 6: 87-88).

Police officers went through the house that night with the victim, and found numerous articles of clothing that the victim identified as coming from the closet in her bedroom or the costume box upstairs (Tr. 5: 95-97, 99-104). Many of the items were knotted or ripped, some were found in her bedroom closet, others were strewn about on the floor, and a pair of slacks was tied to the bedpost at the head of the victim's bed (Tr. 5: 95-97, 99-104; Tr. 6: 151-153). In the kitchen area, the victim's glasses were found, bent, on the floor, along with the cordless phone, a saucepan, some blonde hair, and both a purple and a white sash (Tr. 5: 98; Tr. 6: 154-155, 171-172). A blouse that had been hanging in the victim's closet

was found ripped and knotted at the bottom of the back stairway (Tr. 5: 99, 148), and a green necktie was found knotted in the closet at the top of the stairs (Tr. 6: 177). The phone in the victim's room was unplugged (Tr. 6: 30), and the bulkhead entering the basement, which had a nonfunctioning slide bolt, was wedged open (Tr. 5: 47).[4]

About fifteen minutes after police arrived at the scene, the defendant was transported to the Amesbury police station (Tr. 6: 89). After the defendant was removed from the car, Officer Valli noticed a pair of white gym socks in the back seat of the cruiser (Tr. 6: 64). Both Sgt. Scholtz and Officer Ouellet had noticed that the defendant appeared to have some sort of white "cloth" in his hand when he emerged from the victim's house (Tr. 6: 24, 84).

All of the officers who had contact with the defendant noted he was "sweating profusely" (Tr. 6: 20, 74, 134, 146). Officer Ouellet detected a "slight odor of alcohol on his breath" (Tr. 6: 91), but none of the officers noticed slurred speech or other evidence of impairment (Tr. 6: 66, 95, 161, 166).

At the station, during the defendant's booking, Officer Ouellet heard something "hit the floor" (Tr.

---

[4]    Several days later, the victim discovered a scarf knotted and tied around the bedpost in her son's room, partially obscured by the pillow (Tr. 6: 32-33).

6: 119). He looked and discovered one sealed condom packet on the floor, then, checking the defendant's waistband, he discovered another (Tr. 6: 119-120).

III. THE TRIAL

The Commonwealth's theory of the case was that the defendant had become aware of the victim and interested in her after she moved onto Highland Street, and had specifically targeted her, entering her house once on the Friday night before the dinner party, then again, on the night of the assault. The defendant, meanwhile, asserted that he had never been in the victim's house prior to that assault, and that, while attacking the victim, he was suffering from dissociative disorder, such that he did not really know whom he was attacking or why.[5]

A.   The Commonwealth's Case

The Commonwealth's witnesses testified as set forth at pages 4-14 of this brief. During Officer Ouellet's testimony, the prosecutor questioned him about the defendant's advisement of rights during booking (Tr. 6: 95-97). After ascertaining that the officer had read the defendant his <u>Miranda</u> warnings

---

[5]   Dissociation involves a lack of integration between the normal spectrum of thinking and emotions, where "your consciousness is only attending to one thing, and other things are being ignored" (Tr. 8: 108-109, 112).

from a card (Tr. 6: 96-97), the following exchange took place (Tr. 6: 97):

> Q: At the conclusion of giving him his Miranda warning, what, if anything, did you say or do with him?
> A: On the bottom of the card is, you know, Do you wish to speak to me now, is on the bottom of it. And on that, when I asked him to sign it, he printed the word no. [A]nd signed the card.

The defendant moved for a mistrial based on the Commonwealth having introduced evidence that the defendant had exercised his right to remain silent and asserted that any instruction would merely "underline[e] the error" (Tr. 6: 97, 114).

After extended discussion and the judge's review of relevant case law (Tr. 6: 105, 111), the court denied the motion for mistrial, concluding that the circumstances were distinguishable from Commonwealth v. Mahdi, 388 Mass. 679 (1983), the case primarily relied upon by the defense (Tr. 6: 111-114). The court issued a strong curative instruction, explaining the constitutional principles involved, and struck the testimony, likewise ordering jurors to strike it from their minds (Tr. 6: 114-117; S.R.A. 17-20). Thereafter, the defendant renewed his mistrial motion, arguing that the instruction highlighted the error (Tr. 6: 117-118). His motion was denied (Tr. 6: 118).

B.    The Defense Case

Both the defendant and his wife, Denise Ellen, testified at trial. They lived on the second floor of a two-family house on Carver Street, about a hundred yards from the victim's house, which was located on the corner of Carver and Highland (Tr. 5: 229-230; Tr. 7: 24, 69; Tr. 8: 38).

The defendant, his wife and their two sons left for a vacation in New Hampshire on July 17, returning home at 2:30 to 3:00 p.m. on Friday, July 23 (Tr. 7: 33-35). During their vacation the Ellen's resumed "intimate relations" which they had had only sporadically in the past five years (Tr. 7: 30, 36, 73-74). The Friday and Saturday night after they returned, the defendant slept in bed with his wife, although he had, for a number of years, slept on their couch (Tr. 7: 30, 38, 45-46). She testified that he did not leave the bed all night (Tr. 7: 38, 46, 75).

At about 4:00 p.m. on Sunday, July 25, after a day of family activities, the defendant went out and bought a bottle of Jim Beam whiskey (Tr. 7: 46-50). He was apparently depressed about returning to work the next day (Tr. 7: 161). He had been having difficulty at work, had been suspended for three days just prior to their vacation for a parking lot altercation, and generally felt unappreciated and that co-workers took credit for work that he did (Tr. 7:

142-145).  Over the course of the evening, from 4:00
until 9:00, the defendant had three glasses of whiskey
mixed with Coke (Tr. 7: 54).

Not long after buying the whiskey, the defendant
and his family walked to a neighbor's house, the
Hume's, and were standing outside talking when the
victim walked by (Tr. 7: 55-56, 164-165).  Although he
did not know her, the defendant made a comment to the
victim about the bottle of wine she was carrying (Tr.
7: 165-166).  She responded and kept on walking and
Terry Hume mentioned that she was the new neighbor and
was divorced (Tr. 7: 165-166).

The defendant and his family returned home (Tr.
7: 58).  Later that evening, he changed out of his
clothes, into just a pair of black shorts that he wore
at night (Tr. 7: 63, 169).  He retrieved two condoms
from their bedroom, hoping to have intimate relations
with his wife that night (Tr. 7: 170-171).

At one point, however, the defendant's wife told
him that she had been "living with a bastard for the
last eight years" (Tr. 7: 62).  She also asked if she
should reset his clock by the couch, which he took to
mean that he was no longer welcome to sleep in the
bedroom (Tr. 7: 64-65, 172).  The defendant said he
was going for a walk, and although she did not see him
leave, she estimated that he left the house at between
9:00 and 9:30 (Tr. 7: 66-67, 82).

The defendant did not remember any fight with his wife, other than her asking him about the clock, and his responding with an enraged "What?" (Tr. 7: 171-172).    He did not remember leaving his apartment, entering the victim's house, going through her purse, or doing anything with her clothes (Tr. 7: 173, 211, 214-218).    Rather, the next thing he remembered after the discussion about the clock was "coming out of a dark area into a kitchen" with his arms outstretched (Tr. 7: 172-173).    He recalled that there was a woman in a "blue dress" there, that there was no sound, but it was as if they were just "jostling or dancing apart," that he recognized a hand pull away as if in the slow motion of an uppercut, recalls the woman swinging a blue frying pan at him, hearing a male voice in his mind saying "get a knife," and that he knocked her to the ground (Tr. 7: 174-175, 181). Something was in his hands, and it was as though he was slowly pulling the reins of a horse, and eventually he began to realize that something real was happening, and he stopped (Tr. 7: 175-176).

The defendant denied that he had ever been in the victim's house before that night, denied recalling any spoken words between him and the victim during the assault, hearing anyone at the door, or seeing lights from the police cars until after he had stopped the assault (Tr. 7: 177, 183; Tr. 8: 18, 22).

## C.    The Recalled Witnesses

Recalled by the defense, the victim testified that she had left her back door closed but not locked when she went to the dinner party (Tr. 8: 58).    She also testified that she usually changed her clothes in a walk-in closet off her bedroom, for privacy, because her bedroom had a great number of windows (Tr. 8: 57-58).    A window in her closet looks out on Carver Street, and the victim identified a photograph showing the view of the defendant's home from that window (Tr. 8: 58-59).

Also recalled by the defense, the defendant's wife testified that four windows in their apartment look out on the side of the street where the victim's house is, and that it is possible to see the victim's house from two of them (Tr. 8: 60-61).

## D.    The Expert Witnesses

Both parties presented a forensic psychiatrist to address the defendant's claims that he was not criminally responsible and was in a dissociative state at the time that he attacked Adair Rowland.    The defense expert, Dr. David Rosmarin, issued a bifurcated opinion.    If, as was argued by the prosecution, jurors found that the defendant had been in the victim's house prior to the day of the attack then the defendant was criminally responsible, because such premeditation and planning is inconsistent with a

dissociative state (Tr. 8: 140-141). If, however, jurors believed that the defendant had not, in effect, staked out the victim's house, then the expert concluded that the defendant had been suffering from a dissociative disorder at the time of the attack, and that, as a result, he lacked substantial capacity either to appreciate the wrongfulness of his conduct and to conform his conduct to the law (Tr. 8: 142-145). On this theory, the defendant may have thought he was defending himself against one of the people in his past, in a flashback association (Tr. 8: 144-145).

According to Dr. Rosmarin, the defendant's dissociative state could have been brought on by the combined stress of returning to a hostile work environment and his wife's perceived abandonment (Tr. 8: 142). Alcohol was not the cause of the attack, except indirectly as it may contribute to a dissociative state (Tr. 8: 143). Dr. Rosmarin was also aware that the defendant had been treated for depression, by Veterans Administration therapist Sal Tagliamonte, but did not find this related to the crime (Tr. 8: 113, 116, 142)

In reaching his opinion regarding dissociative disorder, Dr. Rosmarin traced through pertinent points in the defendant's background, most of which were also testified to directly by the defendant. Significant events included childhood abuse by the defendant's

biological mother and foster mother, the latter including hitting him about the head and grabbing him about the neck (Tr. 8: 105-106). Also, during high school, another student had grabbed him by the neck, strangling him (Tr. 8: 106).

Dr. Rosmarin found two significant experiences during the defendant's years of Marine service. The first was when he was garroted while on a patrol in the Philippines -- a third instance of strangling in his lifetime (Tr. 7: 115-116, 124-129; Tr. 8: 107). The second significant event occurred where the defendant described sitting mesmerized before an unexploded mortar shell, finally having to be pulled away by his comrades (Tr. 8: 107). Dr. Rosmarin concluded that this was the defendant's first dissociative experience (Tr. 8: 110-112), and that a second dissociative experience occurred some time later, when the defendant described suddenly finding himself in Boston, sober, and having no idea how he had gotten there (Tr. 8: 112-113). He also found it significant that the defendant was upset by and reported a co-worker whom he had observed accessing pornography on the internet in an adjoining workspace, concluding that such repulsion for pornography was inconsistent with a sexual sadist or rapist (Tr. 7: 146-147; Tr. 8: 116-118).

The doctor testified, generally, that he viewed the defendant's actions at the scene as being confused and non-goal oriented (Tr. 8: 134-135). He noted that the defendant may merely have parroted the victim's name, "Adair," after he heard her friend at the door, without realizing who she was (Tr. 8: 138, 190).

The Commonwealth's expert, Dr. Malcolm Rogers, testified that, in his opinion, the defendant was criminally responsible (Tr. 8: 219). While acknowledging that the events as described by the defendant, if true, might signal a dissociative event, he did not believe the defendant's account of the experience, citing the purposeful nature of his actions, factors indicating that he appreciated the wrongfulness of what he was doing, evidence indicating he had been in the house before, and the lack of any persistent and recurring pattern of dissociative events (Tr. 8: 239, 242-245, 251-252). On this final point, he noted that neither of the two alleged prior dissociative events had been documented, that no treatment was sought for them, and that, in any event, they were not "persistent and recurring" (Tr. 8: 239, 245-247, 277-278). Dr. Rogers also found that the significant amount of whiskey that the defendant reportedly drank that night may have had some "disability effect," but did not render him lacking in criminal responsibility (Tr. 8: 253).

23

### E.   Closing Argument

During closing argument, the defendant objected to several of the prosecutor's remarks. [The prosecutor's closing argument is included in its entirety at S.R.A. 21-55]. Two objections -- regarding a remark that the defendant had no obligation to take the stand, and pointing out the responsiveness of the defendant's actions in shaking his head in agreement or disagreement in response to testimony -- were sustained (Tr. 9: 29, 30). Two other objections, concerning the prosecutor's argument that the defendant had "observed" the victim and "wanted her" were overruled (Tr. 9: 33).

Following the Commonwealth's summation, the defendant moved for mistrial, alleging a half dozen improprieties, but focusing on the prosecutor's "speculation that the defendant had formed some type of a lust for Ms. Rowland" (Tr. 9: 62-64). The judge denied the motion but concluded that the prosecutor had misstated the burden of proof as to insanity at one point, and had "pushed the envelope" with regard to the circumstantial evidence (Tr. 9: 65-66).

The judge issued an immediate curative instruction to the jury, prior to the final charge, reiterating that closing arguments were not evidence, that circumstantial evidence had been presented, but that the "power to draw inferences is not the power to

engage in speculation," and that "you can't just guess at things and call that an inference" (Tr. 9: 66-68). She also reminded jurors that it was the Commonwealth's burden to disprove insanity beyond a reasonable doubt (Tr. 9: 67).[6]

## SUMMARY OF THE ARGUMENT

I.    The judge properly issued a curative instruction and denied the defendant's motion's for mistrial, where the police officer's reference to the defendant exercising his right to remain silent was not deliberately elicited, was not repeated, and did not strike at the heart of the defense [pp. 25-32].

II.   The prosecutor's remark during summation concerning the defendant taking the stand despite having no obligation to do so was not improper.  The remark, in context, merely indicated that jurors should assess the defendant's credibility as they would any other witness [pp. 33-34].

III.  The prosecutor's remark during closing argument concerning the defendant's courtroom behavior was not improper and did not relate, even implicitly, to the courtroom behavior of the victim, her friend and the victim's advocate, which the court found to be improper [pp. 34-36].

---

[6]    For the sake of brevity, other pertinent instructions given by the court are addressed as they pertain to individual issues.

IV. The remaining closing argument remarks challenged by the defense did not deny the defendant a fair trial. Most of the remarks were proper, and any errors that could be charged to the prosecutor were neither flagrant nor egregious [pp. 36-47].

V. The circumstantial evidence produced by the Commonwealth was sufficient to find that the defendant entered the victim's house in the nighttime, despite no direct evidence -- except in the defense case -- as to when entry likely occurred [pp. 47-50].

<u>ARGUMENT</u>

I. **THE ISOLATED REFERENCE TO THE DEFENDANT'S INVOCATION OF HIS RIGHT TO REMAIN SILENT, WHILE IMPROPER, DID NOT WARRANT A MISTRIAL UNDER THE FACTS OF THIS CASE, AND THE TRIAL JUDGE ACTED WELL WITHIN HER DISCRETION IN DENYING THE MOTION FOR MISTRIAL, AND ADDRESSING THE ISSUE BY STRIKING THE REFERENCE AND ISSUING A STRONG CURATIVE INSTRUCTION.**

Officer Kevin Ouellet testified concerning the defendant's booking at the Amesbury police station (Tr. 6: 94-97). After a series of questions from the prosecutor concerning the defendant being advised of his <u>Miranda</u> rights, including having those rights read from a standard "green card" (Tr. 6: 95-97), the following exchange occurred (Tr. 6: 97):

> Q: At the conclusion of giving him his Miranda warning, what, if anything, did you say or do with him?
> A: On the bottom of the card is, you know, Do you wish to speak to me now, is on

the bottom of it. And on that, when I asked him to sign it, he printed the word no. [A]nd signed the card.

The defendant objected to the officer's reference to his exercising his right to remain silent, and requested a mistrial (Tr. 6: 97). After a lengthy discussion, as well as review of the pertinent case, the judge declined to declare a mistrial, but rather, gave a forceful curative instruction to the jury, over the defendant's objection that such an instruction would "underlin[e] the error" (Tr. 6: 114-117; S.R.A. 17-20). The defendant renewed his motion for mistrial after the curative instruction was given, and it was again denied (Tr. 6: 117-118).

The Commonwealth acknowledges that it could not properly introduce the defendant's invocation of his right to remain silent, either to suggest guilt or sanity. See Commonwealth v. Mahdi, 388 Mass. 679, 694-695 (1983). Nevertheless, as set forth below, the remedy imposed by the trial judge was appropriate and within her discretion, where the prosecutor did not elicit this testimony intentionally or make further reference to it, where evidence of the defendant's culpability was strong, and where, contrary to the defendant's claim, the improper testimony did not strike at the heart of the defense, and thus the strong instruction given by the court was sufficient to cure the error.

In determining whether the reference to an individual's invocation of his right to remain silent may be considered harmless, the Court will consider: "(1) the relationship between the evidence and the premise of the defense; (2) who introduced the issue at trial; (3) the weight or quantum of evidence of guilt; (4) the frequency of the reference; and (5) the availability or effect of curative instructions." Mahdi, 388 Mass at 695-697. Even while stating that the nature of such an error is "so egregious that reversal is the norm, not the exception," id. at 698, the Mahdi case, as well as both prior and subsequent decisions, have made clear that reversal is not automatic. Rather, "if the judge immediately instructs the jury to disregard the questions, reprimands the prosecutor, and explains why the questions are improper, the error may be found harmless." Liacos, Handbook of Massachusetts Evidence § 9.7.9, p. 643 (7th ed. 1999), citing Commonwealth v. Morgan, 369 Mass. 332, 338-344 (1975) and Commonwealth v. Rembiszewski, 363 Mass. 311, 316-317 (1973).

Here, the improper reference was introduced through a prosecution witness, but there is no suggestion on this record and no claim at trial that it was done deliberately. Contrast Commonwealth v. DePace, 433 Mass. 379, 385 (2001) (evidence of defendant's request to speak to attorney was

introduced twice by the Commonwealth and, "[b]y design, a 'video presenter monitor' was used to maximize the impact to the jury of the written form of the defendant's acknowledgement of the Miranda warnings and his request to speak with an attorney"). While the defendant asserts that the prosecutor initially argued that the officer's testimony was proper (D.Br. 33-34) -- and thus, implicitly, that he intended to elicit it -- that is not what the prosecutor said. Rather, the prosecutor was making the point that the general vein of his questioning -- to ascertain that the defendant understood his rights and signed the card containing those rights -- was appropriate (Tr. 6: 99-100). The prosecutor explicitly stated, "not that I would have asked if he made a statement" (Tr. 6: 100).

The open-endedness of the prosecutor's question further belies any suggestion that he deliberately elicited the remark. The Commonwealth's question, "At the conclusion of giving him his Miranda warning, what, if anything, did you say or do with him?" at the very least, should not have elicited any response as to what the defendant said (Tr. 6: 97). Thus, despite the Commonwealth being ultimately responsible for the

error, this is certainly not a case where the error was deliberately injected.[7]

The remaining factors further support a finding of harmless error. The reference was made only once, was stricken by the court with strong and explicit instructions (Tr. 6: 114-117; S.R.A. 17-20), and not reiterated during summation. Contrast Mahdi, 388 Mass. at 694 (after the remark was elicited by the Commonwealth, it was repeated by the Commonwealth in closing argument, with no intervening or subsequent instruction by the judge).

There is no reason to believe, as the defendant claims, that the instruction given by the court exacerbated the problem (D.Br. 32). Jurors are generally presumed to follow the court's instructions. See Commonwealth v. Martinez, 431 Mass. 168, 174 (2000). Knowledge as to the defendant's invocation of rights, under the circumstances of this case, was not

---

[7] The prosecutor's after-the-fact error, in misstating during sidebar that his question to the officer prompting the improper response had been, "[A]fter he read the Miranda rights, did he indicate to you that he understood his rights?" (Tr. 6: 108), does not affect this analysis as to the prejudice caused by the remark or as to the Commonwealth's culpability in eliciting it. In any event, defense counsel pointed out at the time that he had a different memory of the question asked (Tr. 6: 110), and thus it seems unlikely that the trial judge relied heavily on the prosecutor's representation of what, precisely, he had asked, in rendering her decision.

"'tantamount to asking the jury to ignore that an elephant has walked through the jury box.'" Id. at 174 n. 5 (internal citation omitted). The invocation of rights in and of itself does not signal an individual's culpability, and here, in any event, there was ample evidence that the defendant was aware he had done something wrong. Thus, while a defendant may as a strategic choice ask the trial judge not to give a curative instruction, see Commonwealth v. Waite, 422 Mass. 792, 800 (1996), the court is not obliged to comply with that request. See Commonwealth v. Martinez, 437 Mass. 84, 90 (2002) (trial judge is in the best position to determine likely prejudice and determine whether to give a curative instruction rather than declare a mistrial). Here, the defendant has identified no deficiency in the instruction given.

Furthermore, while the Commonwealth acknowledges that there was conflicting expert testimony as to the defendant's dissociative state, there was substantial evidence to support the opinion of Dr. Rogers that the defendant was not lacking in criminal responsibility due to a dissociative state (Tr. 8: 278-279). Even the defendant's expert acknowledged that if the defendant was in the house prior to the night of the attack -- a point for which 'there was strong circumstantial evidence -- then he most likely was

criminally responsible on the night of the offense (Tr. 8: 140-141).

Perhaps most importantly, however, evidence of the defendant's invocation of rights did not strike at the heart of his defense. As noted above, guilty knowledge is not really a factor in this case, where the defendant has essentially admitted committing the offense, and actually remembers most of it, albeit in a rather distorted fashion. Moreover, as to the insanity defense itself, the defense theory was that the defendant was in a dissociative state that ended abruptly when he stopped strangling Adair Rowland. Any evidence as to his clear thinking and desire for self-preservation at the police station does not tend to diminish his claim that he was in a dissociative state at the time of the attack. By the defendant's own account that state had concluded.

This case thus differs significantly from Mahdi, 388 Mass. at 697-699. There, the defendant asserted an insanity defense based on a host of stress-related issues, and testified that he did not recall what had happened. Id. at 684, 698. An invocation of rights thus may have been improperly used by jurors to infer that he did recall what had happened, as the prosecutor explicitly argued, and the lack of curative instructions in that case removed any bar to jurors doing so. Id. at 697-698.

Rather than <u>Mahdi</u>, the facts of this case seem to be closest to those in <u>Commonwealth</u> v. <u>Peixoto</u>, 430 Mass. 654, 661 (2000). There, the Supreme Judicial Court found no reversible error where the defendant's invocation of his right to remain silent was introduced only once, and where the impropriety of the prosecutor's question was exacerbated by the defendant's expansive response, curative instructions were given, the effect of the invocation of rights was lessened by the fact that the defendant later spoke to police, and there was substantial evidence of the defendant's guilt. <u>See also</u> <u>Commonwealth</u> v. <u>Brum</u>, 438 Mass. 103, 120-122 (2002) (no substantial risk of a miscarriage of justice in repeated reference by prosecution witnesses to the defendant's exercise of his <u>Miranda</u> rights, where strong curative instructions were given, the references bore no relationship to the premise of the defense, the prosecutor did not use those references to infer guilt, and the evidence of the defendant's guilt was overwhelming).

Here, particularly where the reference, contrary to the defendant's assertion, did not strike at the heart of his defense and was not mentioned or relied upon by the prosecution in his summation, no abuse of discretion occurred in the trial judge's decision to issue a strong curative instruction in lieu of taking the drastic step of ordering a mistrial.

II.  THE PROSECUTOR'S STATEMENT DURING CLOSING ARGUMENT REGARDING THE DEFENDANT TAKING THE STAND DESPITE HAVING NO OBLIGATION TO DO SO DID NOT IMPROPERLY SUGGEST THAT THE DEFENDANT MUST BE LYING OR THAT THE COMMONWEALTH MUST HAVE MET ITS BURDEN OF PROOF.

In closing argument, while commenting generally on the jurors' task of assessing the credibility of witnesses, the prosecutor began to explain that such assessment was equally applicable to the defendant:

> And on that particular point, recall when the defendant took the stand and keep in mind he had absolutely no obligation to take the stand in this case, because the burden is on the Commonwealth. . . .

(Tr. 9: 29).  The defendant successfully objected, but there was no discussion, and the defendant did not request any other remedy (Tr. 9: 29).  He now argues that this reference was an impermissible comment on his exercise of his right to testify (D.Br. 35-36). As set forth below, however, there was no impropriety, and certainly no prejudice.[8]  See Commonwealth v. Alphas, 430 Mass. 8, 13 n. 7 (1999).

---

[8]  The defendant's claim that this matter was raised in his motion for mistrial is not supported by the record (Tr. 9: 62-64).  Defense counsel argued, in support of the motion, that the Commonwealth improperly referred to the defendant's actions during trial to suggest guilt or sanity, but counsel was most likely referring to the prosecutor's comment concerning the defendant nodding in agreement or disagreement with witness testimony.  See Issue III, infra. Certainly the judge's curative instructions did not address a defendant's right to take the stand, and the defendant did not object (Tr. 9: 66-68).

While a prosecutor may not suggest that jurors should infer from the defendant's decision to testify either that the Commonwealth has met its burden of proof or that the defendant is lying, this is not even remotely what occurred here. <u>Contrast</u> D.Br. 35. The prosecutor did no more than remind jurors that the defendant was not forced to take the stand, and thus that any hesitancy or lack of forthrightness in his testimony should be considered in assessing his credibility as with any other witness. <u>Contrast</u> <u>Commonwealth</u> v. <u>Stout</u>, 356 Mass. 237, 244 (1969) (criticizing prosecutor's suggestion that the defendant had to relinquish his right not to testify because the case was so compelling against him); <u>Commonwealth</u> v. <u>Devlin</u>, 335 Mass. 555, 568 (1957) (same). Here, there was no error in the prosecutor's statement and certainly no prejudice to the defendant.

III. THE PROSECUTOR'S REMARKS IN CLOSING ARGUMENT REGARDING THE DEFENDANT'S COURTROOM DEMEANOR WERE NOT IMPROPER AND COULD NOT PLAUSIBLY HAVE BEEN CONSTRUED BY JURORS AS A LICENSE TO CONSIDER THE OFF-THE-STAND BEHAVIOR OF THE VICTIM AND HER COMPANIONS, WHICH, ACCORDING TO THE JUDGE, JURORS DID NOT EVEN OBSERVE.

During his closing argument, the prosecutor stated, "You may have had an opportunity to look over to Mr. Ellen or Adair Rowland, or other people who were testifying. Were his responses in shaking his head either in agreement or disagreement, responsive?"

(Tr. 9: 30).    The   defendant   objected   without
elaboration, and the judge sustained the objection,
after which the prosecutor continued without further
objection, "You have the ability to recall what you
have seen.    Was it a logical response to what was
happening on the witness stand?" (Tr. 9: 30-31).[9]

The defendant's claim that these remarks may have
been perceived by jurors as an invitation to consider
the inappropriate behavior of the victim and others in
making   audible   and   visible   responses   to   the
defendant's testimony in the courtroom, was never
explicitly argued below (Tr. 9: 30, 62). And, it is
contrary to the prosecutor's own words, which clearly
show that he was talking about the defendant's
responses to the witnesses, and not to the conduct of
the witnesses as spectators at trial (Tr. 9: 30).

Moreover, contrary to the defendant's argument,
the matter of witness responses in the courtroom was
dealt with properly by the trial judge. The Court
should credit the trial judge's representation that
she watched the jurors to ensure that they were not

---

[9]    Although the defendant does not seem to make this
claim, it bears noting that there was no error, in and
of   itself,   in   the   prosecutor's   statement.   A
prosecutor may "comment on affirmative behavior of a
defendant plainly visible in the courtroom." Liacos,
Handbook of Massachusetts Evidence § 11.11, p. 726 (7th
ed. 1999), citing Commonwealth v. Smith, 387 Mass.
900, 907 (1983).

looking toward the victim and others during this behavior, particularly since the judge was on guard against such misconduct due to her experience in a past trial (Tr. 7: 222-223, 228). She then made the improprieties known to the prosecutor, asked him to address them to the parties, then, at the prosecutor's suggestion, advised the victim's witness advocate directly that she and the witnesses would be removed from the courtroom if they were "unable to refrain from sitting passively during the trial" (Tr. 7: 222-224, 226-228). The trial judge's immediate and timely response was entirely appropriate and well within her discretion. See Commonwealth v. Toon, 55 Mass. App. Ct. 642, 656-657 (2002).

Defense counsel, in fact, did not ask for any remedy, did not object to the court's remedial action, and certainly did not ask for an evidentiary hearing or question the jurors about what they had observed (Tr. 7: 222-224, 226-229), as he now suggests would have been appropriate (D.Br. 37). There was no error.

IV. REMARKS MADE BY THE PROSECUTOR IN CLOSING ARGUMENT, WHETHER CONSIDERED INDIVIDUALLY OR IN THEIR TOTALITY, DID NOT DENY THE DEFENDANT A FAIR TRIAL.

"A prosecutor is entitled to argue forcefully for the defendant's conviction." Commonwealth v. Wilson, 427 Mass. 336, 360 (1998). In so doing, he "is expected to marshal the evidence," Commonwealth v.

<u>Shea</u>, 401 Mass. 731, 739 (1988), and is entitled to "suggest inferences that the jury may draw from it." <u>Commonwealth</u> v. <u>Dinkins</u>, 415 Mass. 715, 725 (1993). "The jury are presumed to have a certain measure of sophistication in sorting out excessive claims on both sides . . . [so] enthusiastic rhetoric, strong advocacy, and excusable hyperbole are not grounds for reversal." <u>Wilson</u>, 427 Mass. at 350 (internal quotations omitted).

When remarks do cross the line of reasonable advocacy, the Court, in determining the proper remedy, considers factors such as "whether the defendant seasonably objected; whether the error pertained to a merely collateral issue or went to the heart of the case; what remedial steps, if any, the judge took to mitigate the error; and whether, in all the circumstances, the error could have made a difference to the jury." <u>Commonwealth</u> v. <u>Pearce</u>, 427 Mass. 642, 643-644 (1998).

Here, of the approximately seventeen remarks now challenged by the defense, only about half were preserved by objection either during closing argument ·or in the subsequent mistrial motion (Tr. 9: 29-30, 33, 62-64). Objections were sustained as to comments on the burden of proof as to sanity and the defendant's physical response to witness testimony (Tr. 9: 29-30). The substance of the majority of the

objections was then addressed in the judge's curative
instructions immediately following closing argument,
either directly (as to the burden of proof) or by
strong instructions emphasizing that what is said in
closing argument is not evidence, and that reliance on
circumstantial evidence is not a license to speculate
(Tr. 9: 66-68).[10]

A.    "Speculative" comments

A prosecutor is entitled to make a "fair reply"
to defense arguments, Commonwealth v. Smith, 404 Mass.
1, 7 (1989), and to present a "complete picture" of
matters that have been raised by the defense,
Commonwealth v. Adams, 434 Mass. 805, 819 (2001).
Here, the defense focused on the theory that the
defendant's attack on the victim was a random,
dissociative act not consciously perpetrated against
the victim, but, in the defendant's mind, against
abusive persons from his past.  It was incumbent upon
the prosecutor to counter the alleged randomness of
the attack.  The prosecutor did this by showing that

_____

[10]    Jurors were advised numerous times that what
attorneys say is not evidence, including in a strong
pre-closing argument charge (Tr. 9: 3-4); by the
prosecutor at the start of his own closing argument
(Tr. 9: 29); prior to opening statements by the judge
(Tr. 5: 13-14); and in her final charge (Tr. 9: 71).
Jurors were also reminded in the final charge that
reliance on circumstantial evidence was not a license
to speculate (Tr. 9: 74) and that their verdict could
not be based upon sympathy (Tr. 9: 72).

the defendant had the opportunity and access to the victim, and by marshaling the evidence supporting the inference that the defendant did not just happen into the victim's house that night.

In support of his inference that the defendant had "observed" the victim and "wanted" her (Tr. 9: 33), the prosecutor laid out a web of supporting evidence: the proximity of the houses (Tr. 9; 32); that the victim uses the back entrance to her house, which faces the defendant's house (Tr. 9: 32-33); the defendant's comment to the victim on the street the night of the attack (Tr. 9: 33); nearly undeniable evidence that he had been in her house two nights before, had gone through a carton of garments and eerily knotted a necktie to a steam pipe (Tr. 9: 33-34); that he was carrying condoms the night of the attack (Tr. 9: 34); that he went through her purse (Tr. 9: 38); and that he used her first name during the attack (Tr. 9: 37-38).

Nor did he cross the line by suggesting that the defendant may have observed the victim getting dressed in her closet, noting the proximity of the defendant's house from the victim's bedroom window (Tr. 9: 33), and later stating, "Even Adair Rowland told you because of the windows in her bedroom, she almost always changed her clothes in the closet. Did the defendant know that? Possibly" (Tr. 9: 48-49).

Likewise, with regard to the white tube socks, the prosecutor reasonably stated, "I suggest to you they could belong to one of his two sons and he had taken them from his own house," prefacing this statement with the blunt acknowledgement, "Now, we don't know whose socks there [sic] are" (Tr. 9: 48). See Commonwealth v. Alisha A., 56 Mass. App. Ct. 311, 315 (2002) (statement prefaced with "I suggest" did not suggest personal belief).

While the prosecutor may have gone too far afield when he suggested that the defendant peeped into Joan Blankenau's house before going to the victim's home, he couched his suggestion with "it would be reasonable to infer," and did not suggest he had any personal knowledge of that fact, but rather, relied on the proximity of the Ellens' and Blankenau's houses, and the fact that the defendant had likely seen the victim enter the house earlier (Tr. 9: 46). Nor is this particular comment inconsistent with the defense case; even if the defendant did peek into the house, on his theory, it would not have meant anything because he did not know who the victim was and, in his dissociative state, his actions had no purpose.

Taken as a whole, any "speculation" by the prosecutor was minimal, was linked to the evidence rather than suggesting personal belief, was made in direct response to defense arguments, and was

adequately  addressed  by  the  judge's  repeated
admonishments  that  counsel's  arguments  are  not
evidence.  See, e.g., Tr. 9: 4-5, 66-67.

B.   Other Alleged Misstatements of Fact

Many  of  the  other  alleged  misstatements  of  fact
had support in the record.  The prosecutor's comment,
"Doctor  Rosmarin  wants  you  to  believe  that  it  is
everyone else's fault but the defendant" (Tr. 9: 57),
was  readily  recognizable  as  rhetoric,  commenting  on
the doctor's conclusion that the attack on the victim
was  a  flashback  association  concerning  his  past
abusers,  triggered  by  his  wife's  rejections  and  the
stress of an unfriendly work environment (Tr. 8: 142-
144).   It was explained as such by the prosecutor (Tr.
9: 57-58).

The  statement  that  the  defendant  had  "no  history
of treatment" was accurate (Tr. 9: 60).   It is evident
from context that it referred to the lack of treatment
regarding  the  defendant's  alleged  dissociative
disorder, a point made by Dr. Rogers in his testimony
(Tr. 8: 239).   The defendant's previous treatment was
for depression (Tr. 7: 149-150; Tr. 8: 116).

The   prosecutor's   statement   that   all   three
officers arrived at the scene in "approximately one
minute" (Tr. 9: 40), was supported by Mary Reily's
testimony. She said that the entire span of time in
which  she  watched  the  incident  across  the  street

(until the time when the three police cars arrived) was thirty seconds (Tr. 5: 201-202).

Other statements the prosecutor made had less clear support in the record, but were not prejudicial. The prosecutor's statement, "Someone was looking at pornography and he's afraid he might get caught" (Tr. 9: 42) is not particularly clear. If it indicated that the defendant reported his co-worker because he was afraid he would be blamed for the incident (see D.Br. 43), the inference had only weak support in the defendant's general acknowledgement of paranoia around workplace concerns (Tr. 7: 162). The point is not particularly important, however, where the record disclosed that the defendant had other reasons for reporting the incident, namely, that he felt generally unappreciated at work relative to his co-workers (Tr. 7: 142-143, 193-195), and where the issue as to "sexual sadism" (Tr. 8: 116-118) was somewhat nullified by the directing out of the charge of assault with intent to rape.

The prosecutor did mistakenly assert that the defendant went through the victim's purse and "looked at her business cards and found out she was a consultant" (Tr. 9: 38). There was no evidence that the victim had business cards in the purse. However, the point was not used to establish how the defendant came to know her name; rather, the prosecutor pointed

out that he "likely saw her driver's license," an item that ordinary jurors would know bore the owner's first name and would likely be kept in a woman's purse (Tr. 9: 38).

The defendant misquotes the prosecutor when he claims that the prosecutor incorrectly attributed a statement to Dr. Rogers concerning the defendant's "decision to drink to increase his courage" (D.Br. 43, citing Tr. 9: 46). The prosecutor did attribute a statement to Dr. Rogers indicating that the <u>effect</u> of the alcohol was to reduce the defendant's inhibitions and increase his courage (Tr. 9: 45). While the Commonwealth can find no such reference in Dr. Rogers' testimony, any error is insignificant where the comment, as stated, is really a matter of common knowledge; i.e., laypersons typically understand that alcohol consumption reduces inhibitions, or, stated otherwise, "increases courage."[11]

A potentially more damaging misrepresentation was the Commonwealth's suggestion that Dr. Rosmarin acknowledged that dissociative disorder has to be "persistent and recurring" (Tr. 9: 58). Dr. Rosmarin was never explicitly asked about this aspect of the

---

[11] See Merriam-Webster's Collegiate Dictionary, p. 360 (10th ed. 1994) (defining "Dutch courage" as "courage artificially stimulated especially by drink").

disorder, which Dr. Rogers later spoke about at length and which one was of several factors in Dr. Rogers' conclusion as to criminal responsibility.

The impact of the Commonwealth's misstatement is diminished, however, by the fact that jurors had already been left with the impression that the "persistent and recurring" element of the disorder was not in dispute.  The defense, in cross-examination of Dr. Rogers, never questioned his underlying premise on this point, merely pointing out that there has to be a first time for every pattern, and asking whether the two occurrences described by the defendant could not constitute such a pattern (Tr. 9: 277-278).  Nor did the defense recall Dr. Rosmarin to contest Dr. Rogers' assertions on this point.

To the contrary, Dr. Rosmarin's testimony buttressed this inference, suggesting that a recurring pattern was important by labeling the defendant's first alleged dissociative episode as "significant" (Tr. 8: 107), and then, at defense counsel's prompting, going on to discuss the second dissociative event, in Boston (Tr. 8: 112-113).  Under the circumstances, the prosecutor's representation that Dr. Rosmarin explicitly conceded a point that had only been implicitly conceded could not reasonably have affected the outcome of the case, particularly where the statement was unobjected-to by the defense.

### C.    Alleged Burden Shifting

The defendant's concern that the Commonwealth implicitly shifted the burden of proof by referring to the facts "the defense needs you to believe in order to prove or disprove that he was sane" overlooks the prosecutor's clear and proper statement just prior to that, "it's the Commonwealth's burden to prove beyond a reasonable doubt that [the defendant] knew what he was doing when he entered that house and attacked Adair Rowland" (Tr. 9: 32)    Any lingering doubt was amply cured by the judge's strong instruction directly after closing argument that the Commonwealth bore the burden of proof as to sanity (Tr. 9: 67), reiterated numerous times in her final charge (Tr. 9: 102-108).

### D.    Remarks as to Personal Belief and Sympathy

Neither the prosecutor's remark that this crime was a woman's "worst nightmare" nor his comment that only the "alertness of neighbors" and "quick response" of the police prevented the defendant from carrying out his plan, were improper appeals to sympathy. The former was "tolerable hyperbole." See Commonwealth v. Hartford, 425 Mass. 378, 381 (1997) (comment that the defendant was "every person's worst nightmare").    And the latter was an appropriate comment on the evidence, particularly where the defendant's intent was a hotly

contested point.  See Commonwealth v. Vizcarrondo, 431 Mass. 360, 363 (2000).

Nor did the remaining three statements constitute impermissible expressions of personal belief.  The prosecutor's fleeting reference to the jury's task as a "contrivance" was not made in any particular context and appears to be simply a poor choice of words (Tr. 9: 28).  His characterization of the defendant's and Dr. Rosmarin's testimony as "rehearsed" and that it "flowed like a cassette," was not well expressed, but was essentially a comment on the ease with which they answered defense questions versus his own.  The prosecutor may comment on defense tactics the jurors have witnessed themselves.  Commonwealth v. Roberts, 433 Mass. 45, 56-57 (2000).

And finally, the prosecutor's reference to "overwhelming" evidence that the defendant had been in the house prior to the night of the attack (Tr. 9: 34), even if inappropriate, see Commonwealth v. Tuitt, 393 Mass. 801, 811 (1985), was effectively countered by his later reference to the same matter as a "reasonable inference" (Tr. 9: 44).

Taken as a whole, the prosecutor's comments, many of which were unobjected-to, most of which were proper, and none of which were "egregious or flagrant" "did not reach the level of error requiring reversal of the defendant's convictions," see Commonwealth v.

DeCicco, 44 Mass. App. Ct. 111, 121 (1998), particularly in view of the strong and accurate instructions given by the court throughout the trial. In sum, "[t]he cumulative error was no more prejudicial than the individual errors, which had minimal impact." Martinez, 431 Mass. at 179, citing Commonwealth v. Kosilek, 423 Mass. 449, 457 (1996).

V.   **CIRCUMSTANTIAL EVIDENCE PRESENTED BY THE COMMONWEALTH WAS SUFFICIENT FOR JURORS TO CONCLUDE THAT THE DEFENDANT ENTERED THE VICTIM'S HOME IN THE "NIGHTTIME."**

At the close of the Commonwealth's case, the defendant moved for a required finding of not guilty, arguing that the Commonwealth had not shown that he entered the victim's house in the nighttime, as required for burglary (Tr. 6: 212-213).[12]  The court properly denied the motion (Tr. 7: 9).  Circumstantial evidence produced in the Commonwealth's case in chief, when viewed under the familiar Latimore standard, Commonwealth v. Latimore, 378 Mass. 671 (1979), was sufficient for jurors to conclude that the entry occurred in the nighttime -- defined as between one hour after sunset on one day and one hour before sunset on the other day, G.L. c. 278, § 10.[13]

---

[12]    The Massachusetts burglary statute is read to require that the actual entry be in the nighttime. See Nolan and Sartoria, Criminal Law § 405 (2001).

[13]    The time of sunset on July 25, 1999, was not directly established at trial. Jurors, however, could

The Commonwealth may rely on circumstantial evidence to establish the essential elements of an offense, including the fact that a breaking and entry occurred in the nighttime. See Commonwealth v. Bennett, 424 Mass. 64, 67 (1997); Commonwealth v. Turner, 28 Mass. App. Ct. 909, 911 (1989). In fact, the nature a covert entry, as well as the furtive nature of burglary itself, suggests that the time of entry will typically be established by circumstantial evidence. Cf. Commonwealth v. Lanagan, 56 Mass. App. Ct. 659, 665 (2002) ("'[o]f necessity, proof of arson must often rely on circumstantial evidence because arsonists are furtive criminals'"). Inferences drawn from circumstantial evidence need not be necessary, so long as they are "reasonable and possible." Bennett, 424 Mass. at 68.

Here, the evidence established that the victim was out of the house from roughly 5:00 to 10:00 p.m., and that the confrontation with the defendant occurred around 10:30 p.m. (Tr. 5: 52-53, 57, 196; Tr. 6: 15). The condition of the house suggested that the defendant had entered before the victim returned home.

While the defendant asserts that it was impossible for jurors to conclude, within this broad time frame, that it was "nighttime" when the defendant

rely on their general knowledge. See Commonwealth v. Kingsbury, 378 Mass. 751, 754-755 (1979).

entered the house, other evidence on which jurors could reasonably rely tips the balance in favor of sufficiency. <u>Contrast</u> <u>Commonwealth</u> v. <u>Fancy</u>, 349 Mass. 196, 200 (1965) ("[w]hen the evidence tends equally to sustain either of two inconsistent proposition, neither of them can be said to have been established by legitimate proof").

The victim's street was "pretty wide open," and largely residential, containing "mini mansions" (Tr. 6: 168-169). It was a summer night in July, and there were people were out and about; the victim passed both adults and children as she walked down the street (Tr. 5: 54-55). There was evidence indicating that the defendant entered the house through the bulkhead, something that may have drawn neighbors' attention more than simply walking through a back door (Tr. 5: 47). It would not be unreasonable for jurors to conclude that an individual breaking into someone's home under these circumstances would do so under the cover of darkness.

Importantly, though, there was also strong evidence that just two nights previously the defendant had done precisely the same thing -- entering the victim's home, under the cover of darkness, between 9:00 p.m. and midnight (Tr. 5: 43, 45). This prior event established a sort of modus operandi that jurors could likewise consider in reaching a conclusion as to

the defendant's likely time of entry. Taken as a whole and in conjunction with the time of the defendant's discovery, jurors could reasonably conclude that the defendant entered the house in the nighttime, as was, in fact, later more firmly established in the defense case (Tr. 7: 67, 82).[14]

### CONCLUSION

For the reasons stated, this Court should affirm the defendant's convictions.

FOR THE COMMONWEALTH:

JONATHAN W. BLODGETT
DISTRICT ATTORNEY
FOR THE EASTERN DISTRICT

CATHERINE LANGEVIN SEMEL
ASSISTANT DISTRICT ATTORNEY
  for the Eastern District
Two East India Square
Salem, Massachusetts  01970
(978) 745-6610 ext. 141
BBO # 639596

January, 2003

---

[14]    Although evidence presented in the defense case is not considered in reviewing the denial of the required finding motion, the reasonableness of the inference urged by the Commonwealth is supported by Denise Ellen's testimony that the defendant left home at 9:00 to 9:30 p.m. (Tr. 7: 67, 82). In fact, defense counsel noted in opening statement that the defendant left the apartment at 9:00 p.m. (Tr. 5: 34-35).

S U P P L E M E N T A L   R E C O R D   A P P E N D I X

## SUPPLEMENTAL RECORD APPENDIX

### Table of Contents

Essex Superior Court Docket Sheets          S.R.A. 1 - 16
    Nos. ESCR1999-01647 and
    9977CR1647 to 9977CR1650

Transcript Excerpt dated October 16, 2000    S.R.A. 17 - 20

Transcript Excerpt dated October 11, 2000    S.R.A. 21 - 55

S.R.A. 1
**ESCR1999-01647**
## Commonwealth v Ellen, Christopher

| | | | | |
|---|---|---|---|---|
| File Date | 08/11/1999 | Status | Disposed (appeal pending) (dappen) | |
| Status Date | 10/16/2000 | Session | 1 - CtRm 1 (Salem) | |
| Jury Trial | Yes | Origin | I - Indictment | |
| Lead Case | | | | |

| | | | |
|---|---|---|---|
| Trial Deadline | Deadline Status | | Status Date |
| | Custody Status | Bridgewater State Hospital | Start Date |
| Weapon | Substance | | Prior Record   Unknown |
| Arraignment   08/11/1999 | PTC Deadline | | Pro Se Defendant   No |

### OFFENSES

| Num | Offense | Code | Status | Status Date |
|---|---|---|---|---|
| 1 | 07/25/1999 | 265:015.1 | Guilty verdict | 10/16/2000 |
| | Assault, intent to murder | | | |
| 2 | 07/25/1999 | 265:024.1 | Not guilty finding | 10/12/2000 |
| | Assault, intent to rape | | | |
| 3 | 07/25/1999 | 266:014.12 | Guilty verdict | 10/16/2000 |
| | Burglary, assault | | | |
| 4 | 07/25/1999 | 265:015A:b | Guilty verdict | 10/16/2000 |
| | Assault & battery, dangerous weapon | | | |

### PARTIES

Plaintiff
Commonwealth
Gender: Unknown
Active 08/11/1999

District Atty's Office 326420
Frederick B McAlary Jr
Essex County District Atty's Office
1 East India Square
Museum Place
Salem, MA 01970
Phone: 978-745-6610
Fax: 978-741-4971
Active 09/21/2000 Notify

Defendant
Christopher Ellen
Gender: Unknown
Active 08/11/1999

Public Counsel 335080
Lawrence J McGuire
Mass Public Counsel Services (Salem)
1 Salem Green
Suite 408
Salem, MA 01970-3724
Phone: 978-744-9113
Fax: 978-741-8567
Inactive 05/30/2002

Private Counsel 344100
James E Methe
1350 Main Street
Bank Boston Building 10th floor
Springfield, MA 01103
Phone: 413-746-9257
Fax: 413-732-5828
Withdrawn 11/24/2000

-20020121

Commonwealth of Massachusetts

ESSEX SUPERIOR COURT

11/25/2002

Case 1:05-cv-10538-WGY    Document 14-3    Filed 07/27/2005    Page 61 of 115    03:13 PM

Case Summary
Criminal Docket

## S.R.A. 2
## ESCR1999-01647
## Commonwealth v Ellen, Christopher

Public Counsel 552993
Peter M Onek
Mass Public Counsel Services (Boston)
44 Bromfield Street
Suite 310-A
Boston, MA 02108
Phone: 617-482-6212
Fax: 617-988-8495
Inactive 05/30/2002


Private Counsel 564032
David Barend
2 Stonewood circle
North Attleboro, MA 02760
Phone: 508-316-1171
Fax: 508-316-1192
Active 05/30/2002 Notify

| | Paper | Text |
|---|---|---|
| /1999 | | Original case info: ORIGIN=I. #29 |
| /2000 | | Stat at cnvrsn to cmputr 09/16/2000. |
| | | (see docket book for previous docket entries). |
| /2000 | 30.0 | Habeas corpus for Deft at Bridgewater State Hospital for October 2, 2000 at 9:00 a.m. in Salem. |
| /2000 | 31.0 | Impounded Hospital records from Brighams and Womens Hospital received on 09/26/00. |
| /2000 | | Jury Impanelment Begins |
| /2000 | 32.0 | Motion to Permit Defendant to Receive Clothing Allowed |
| /2000 | 33.0 | Motion to be Free of Handcuffs and Shackles Allowed |
| /2000 | 34.0 | Motion for Sequestion of Witnesses After hearing ALLOWED |
| /2000 | 35.0 | Motion for Voir Dire of Proposed Expert Witnesses Filed. |
| /2000 | 36.0 | Motion in Limine Concerning Proposed Fresh Complaint Evidence Allowed |
| /2000 | 37.0 | Motionto Exclude Evidence of A Certain Pseudo-Scientific Experiment after Hearing ALLOWED |
| /2000 | 38.0 | Motion for Individual Voir Dire of Prospective Jurors Allowed in Part and Denied in Part |
| /2000 | 39.0 | Commonwealth's List of Potetial Witnesses Filed |
| /2000 | 40.0 | Witnesses Filed |
| /2000 | 41.0 | Motion in Limine Concerning Refusal Evidence Reserved at this time |
| /2000 | | Merrick,J>< Presiding; K. Gordon, Court Reporter |
| /2000 | | Jury Trial Continues |
| /2000 | | Jury Impaneled but not Sworn In |
| /2000 | 42.0 | Commonwealth's Motion in Limine Filed |
| /2000 | 43.0 | Motion in Limine Concerning "Stalking" Evidence Filed. |
| /2000 | | Merrick,J>< Presiding; K. Gordon, court Reporter |
| /2000 | | Continued until 10/05/2000 for Trial Jury not Sworn In |
| /2000 | | Merrick,J>< Presiding; K. Gordon<C ourt Reporter |

S.R.A. 3
ESCR1999-01647
**Commonwealth v Ellen, Christopher**

| ate | Paper | Text |
|---|---|---|
| /05/2000 | | Jury Impanelment Continues to Replace an Excused Juror (Seat #13) and Now Impanel 16 Seats. Jury Impaneled with 16 Seat, Jury Not Sworn In |
| /05/2000 | | Continued until 10/10/2000 for Trial |
| /05/2000 | | Merrick, J., Presiding; K. Gordon, Reporter |
| /10/2000 | | Jury Sworn In and Trial Begins |
| /10/2000 | | Merrick,J>< Presiding; K. Gordon, Court Reporter |
| /10/2000 | 58.0 | Request for jury instructions, filed in court. (Merrick, J.) |
| /11/2000 | | Jury Continues |
| /11/2000 | | Oral Motion by Defendant foa a Mistrial DENIED |
| /11/2000 | | Re-Newed Motion by the Defendant for Mistrial DENIED |
| /11/2000 | | Merrick,J>< Presidin; K. Gordon, Court Reporter |
| /12/2000 | 44.0 | Motion for Required Finding of Not Guilty Allowed for 9977CR-1648 (002) |
| /12/2000 | | RE Offense 2:Not guilty finding |
| /12/2000 | 45.0 | Motion for Required Finding of Not Guilty at the Close of the Commonwealth's Case DENIED as to Indictmetn 99-1647, 99-1649 and 99-1650 ALLOWED as to 99-1648 |
| /12/2000 | | Merrick,J>< Presiding; K. Gordon, Court Reporter |
| /13/2000 | | Trial Continues |
| /13/2000 | | Merrick,J>< Presiding; K. Gordon, Court Reporter |
| 16/2000 | 46.0 | Motion for Required Finding of Not Guilty or in the Alternative A New Trial Filed |
| /16/2000 | | Jury Deliberations Begin |
| /16/2000 | 47.0 | RE Offense 1:Guilty verdict (99-1647 ) |
| /16/2000 | 48.0 | RE Offense 3:Guilty verdict (99-1649) |
| 16/2000 | 49.0 | RE Offense 4:Guilty verdict (99-1650) |
| /16/2000 | | SENTENCE Re Offense 1 (99-1647): Five Years (5) Probation From and After 99-1649 (003) |
| /16/2000 | | Special Conditions of Probation: 1. No Contanct With Victim |
| /16/2000 | 50.0 | Sentence Re Offense 3 (99-1649): Eighteen to Twenty Five (18-25) Years Committed to the Massachusetts Correctional Institution Cedar Junction. Credit of 448 Days. |
| /16/2000 | 51.0 | SENTENCE Re Offense 4 (99-1650): Eight to Ten (8-10) Years Committed to the Massachusetts Correctional Institution Cedar Junction. Concurrent with 99-1649 (003) Credit of 448 Days |
| /16/2000 | 52.0 | Motion for Stay of Execution Pending Appeal DENIED |
| 16/2000 | 53.0 | Victim-witness fee assessed: $60.00 on Each Total $120.00 |
| /16/2000 | 54.0 | Notice of Appeal Filed |
| /16/2000 | | Merrick,J>< Presiding; K. Gordon, Court Reporter |
| /17/2000 | 55.0 | Motion to Revoke and Revise Sentence Filed (no action) |
| /24/2000 | 56.0 | Court Reporter Kay Gordon is hereby notified to prepare one copy of the transcript of the evidence of 10/02/2000 thru 10/16/00 |
| /24/2000 | 57.0 | Court Reporter Ann Green is hereby notified to prepare one copy of the transcript of the evidence of 11/10/1999 Motion to Suppress before Fremont-Smith,J., and 8/16/00 before Whitehead,J., Pre-Trial Motions |

# Commonwealth of Massachusetts
## ESSEX SUPERIOR COURT
### Case Summary
### Criminal Docket

## S.R.A. 4
## ESCR1999-01647
## Commonwealth v Ellen, Christopher

| | Paper | Text |
|---|---|---|
| 1/2000 | | Notice to Committee for Public Counsel Services, Boston to appoint attorney |
| 5/2000 | 59.0 | *Motion (P#59, Motion for additional funds Psychiatrist) ALLOWED in part/ DENIED in part, see endorsement. (Issac Borenstein, Justice)* |
| 0/2000 | 60.0 | Notice of Assignment of Counsel C2825519-4 James Methe, Esq., appointed |
| 1/2000 | 62.0 | Appearance of Deft's Atty: James E Methe |
| 3/2000 | 61.0 | *Motion for reconsideration of motion for additional funds.* |
| 7/2000 | | *Motion (P#61, Motion for reconsideration of motion for additional funds) allowed (Borenstein, J.)* |
| 2/2000 | 62.0 | Notice of disappearance, ALLOWED, (R.P. Murphy, Clk/Mag) |
| 1/2000 | 63.0 | Appearance of Deft's Atty: Peter M Onek |
| 2/2001 | 64.0 | *Transcript of testimony received 2 Volumes dated 11/10/99 and 8/16/00 from Ann Green, Court Reporter* |
| /2001 | 65.0 | Victim-witness fee paid as assessed on indictment 9977CR1649 |
| /2001 | 66.0 | Victim-witness fee paid as assessed on indictment 9977CR1650. |
| 5/2002 | | *Transcript of testimony received 9 volumes from court reporter, Gordon, Kathleen A.* |
| 3/2002 | 67.0 | Certificate of delivery of transcript by clerk (11 Volumes) to District Attorney's Office filed. |
| /2002 | 68.0 | Notice of assembly of record; mailed to Appeals Court per Rule 9(d) |
| /2002 | 69.0 | Notice of assignment of counsel # C2626599-3 for Atty. David Barend filed. |
| /2002 | 70.0 | Notice of Entry from the Appeals Court |
| /2002 | 71.0 | General correspondence regarding: Letter from Bridgewater State Hospital to inform court Defendant to be discharged to Old Colony Correctional Center. |

EVENTS

S.R.A. 5

9977 CR 1647

COMMONWEALTH
OF
MASSACHUSETTS
ESSEX, SS.
SUPERIOR COURT
CRIMINAL
DOCKET

COMMONWEALTH VS.    CHRISTOPHER ELLEN

OFFENSE:    Assault With Intent to Murder Chap. 265 sec. 15

PLACE: Amesbury

SURETY AND AMOUNT:

PROSECUTOR:    Fred McAlary, A.D.A. Museum Place, 1 East Indian Square, Salem, MA 01970

COUNSEL:    Committee For Public Counsel Services, One Salem Green, Salem, MA 01970

JUSTICE DISPOSING OF CASE:

| 1999 Aug 11 | 1 | INDICTMENT FILED: |
| Aug. 24 | | Fred McAlary, Assistant District Attorney Appears for the Commonwealth. |
| | 2 | Katherine Riley, Esq., Appointed and Appears for the Defendant. |
| | | Defendant Waives Reading of Indictment and Pleads Not Guilty. |
| | 3 | Defendant Ordered to Recognize Held Without Bail Until August 26, 1999. |
| | | Continued to August 26, 1999 for Bail Hearing. |
| | | Whitehead, J., Presiding; A. Green, Court Stenographer |
| Aug. 26 | | Oral Argument For Bail. |
| | | Defendant Ordered Held Without Bail for Reasons Stated on the Record. |
| | | Continued to August 31, 1999 for Pre-Trial Conference. |
| | | Whitehead,J., Presiding; K. Hezekiah, Court Stenographer |
| Aug. 31 | 4 | Pre-Trial Conference Report Filed. |
| | | Continued to September 13, 1999 for Motions. |
| | | Whitehead,J. Presiding; A. Green, Court Stenographer |
| Sept. 13 | 5 | Motion for Exculpatory Evidence - Rewards and Promises Agreed. |
| | 6 | Motion for Discovery of Evidence of Prior Bad Acts Agreed. |
| | 7 | Motion for A List of Persons Present Agreed. |
| | 8 | Motion for Discovery of Statements of Defendant Agreed. |
| | 9 | Motion to Inspect Statements of Witnesses Agreed. |
| | 10 | Motion for Discovery of Incident Reports and Recordings Agreed. |
| | 11 | Motion for A List of Potential Witnesses and Their Probation Records Agreed. |
| | 12 | Motion for Discovery of Physical Evidence Scientific Tests and Expert Evidence Agreed. |

| Date | No. | Entry |
|---|---|---|
| Sept. 13 | | Continued to October 7, 1999 for Compliance. |
| Oct. 7 | | Welch,J., Presiding; K. Gordon, Court Stenographer<br>Continued to October 19, 1999 for Lobby. |
| Oct. 19 | | vanGestal,J., Presiding; K. Gordon, Court Stenographer<br>Continued to October 25, 1999 for Status. |
| Oct. 25 | | vanGestal,J., Presiding; K. Rael, Court Stenographer<br>Continued to November 3, 1999 for Filing Evidentiary Motions. |
| Nov. 2 | 13 | vanGestal,J., Presiding; A. Green, Court Stenographer<br>Motion to Suppress Statements Filed. |
| | 14 | Motion to Suppress Physical Evidence and Statements Filed. |
| | 15 | Memorandum of law Filed. |
| Nov. 3 | | Continued to November 10, 1999 for Motion to Suppress.<br>Fremont-Smith,L., Presiding; A. Green, Court Stenographer |
| Nov. 3 | 16 | Application for Issuance and Service of Indigent Summons Filed After Hearing<br>and Allowed (Fremont-Smith,J.) |
| Nov. 23 | 17 | Summonses Issued Re: Motion #16. |
| | 18 | Motion for Free Transcripts Filed After Hearing and ALLOWED.<br>Hearing on Motion to Suppress Under Advisement.<br>Continued to December 8, 1999 for Status.<br>Fremont-Smith,J., Presiding; A. Green, Court Stenographer |
| Nov. 23 | 19 | Affidavit In Support of Motion to Suppress Filed. |
| Nov. 24 | | Motion #13 After Hearing DENIED See Separate Findings, Rulings and Order (Fremont-Smith)<br>Motion #14 After Hearing Denied See Separate Findings, Rulings and Order (Fremont-Smith) |
| Nov. 29 | 20 | Findings, Rulings and Order on Defendant's "Motion to Suppress Statments" and<br>"Motion to Suppress Physical Evidence" - The Defendant Motion to Suppress Statements<br>is ALLOWED and the Defendant's Motion to Suppress Physical Evidence is DENIED.<br>(Fremont-Smith,J.) |
| Dec. 8 | | Continued to January 3, 2000 for Trial Assignment.<br>Whitehead,J., Presiding; T. Spingthorp, Court Stenographer |
| 2000 | | |
| Jan 3 | | Continued to January 10, 2000 for Lobby.<br>Borenstein,J., Presiding; A. Green, Court Stenographer |
| Jan 10 | | Continued to January 25, 2000 for Lobby.<br>Borenstein,J., Presiding; A. Green, Court Stenographer |
| Jan 25 | 21 | Order of Commitment of A Defendant For Observation (Under Section 15(b) Chapter<br>123, General Laws)<br>Continued to February 14, 2000 for Status.<br>Borenstein,J., Presiding; A. Green, Court Stenographer |
| (LS)Feb 14 | | Continued to February 17, 2000<br>Kottmyer,J., Presiding; A. Green, Court Stenographer |

S.R.A. 7

99 77 CR-1647
PAGE II

COMMONWEALTH VS.    CHRISTOPHER ELLEN

COMMONWEALTH
OF
MASSACHUSETTS
ESSEX, SS.
SUPERIOR COURT
CRIMINAL
DOCKET

| 2000 | | |
|---|---|---|
| (LS) Feb 17 | 122 | Motion for Funds Filed After Hearing and Allowed. |
| | | Continued to April 24, 2000 for Trial. |
| | | Kottmyer,J., A. Green, Court Stenographer |
| March 15 | 23 | Motion for Continuance Filed.  (LS) |
| June 19 | | Continued to July 17, 2000 for trial. |
| | | Brady,J.,presiding; K. Gordan, court stenographer gh |
| June 27 | 245 | Commonwealth's Motion for a Continuance - ALLOWED, By Agreement. |
| | | Continued to September 18, 2000 for Trial. |
| | | Borenstein, J., presiding: K. Gordon, Court Stenographer mw |
| July 19 | 25 | Motion for additional funds psychiatrist, filed after hearing. gh |
| | | Motion #16 ALLOWED. (Borenstein, J.). gh |
| July 27 | 26 | Commonwealth's motion for psychiatric examination of defendant,filed in |
| | | court. (Borenstein, J.). |
| | | Continued to August 8, 2000 for motion. |
| | | Borenstein, J., Presiding, M. Hezekiah, Court Stenographer. gh |
| **OUT OF SEQ** July 21 | 27 | Motion for videotaping of defendant's psychiatric interview filed. gh |
| August 8 | | Continued to August 16, 2000 for motions |
| | | Whitehead, J., Presiding, A. Green, Court Stenographer. gh |
| August 16 | 28 | Motion for funds for forensic pathologist, filed after hearing, ALLOWED. |
| | | Motion #27 filed after hearing, DENIED. |
| | | Hearing on motions Continued to September 18, 2000 for trial. |
| | | Whitehead, J., Presiding, A. Green, Court Stenographer. gh |
| September 7 | 29 | Commonwealth's motion for a continuance filed in court, ALLOWED. gh |
| | | Continued to October 2, 2000 for trial. |
| | | Merrick, J., Presiding, K. Gordan, Court Stenographer. gh |
| SEPT. 16 | | SEE COMPUTER ENTRIES |

9977 CR 1648

COMMONWEALTH
OF
MASSACHUSETTS
ESSEX, SS.
SUPERIOR COURT
CRIMINAL
DOCKET

COMMONWEALTH VS.    CHRISTOPHER ELLEN

| | |
|---|---|
| OFFENSE: | Assault With Intent to Rape Chap. 265 Sec. 24 |
| | PLACE: Amesbury |
| SURETY AND AMOUNT: | Personal |
| PROSECUTOR: | Fred McAlary, A.D.A. Museum Place, 1 East Indian Square, Salem, MA 01970 |
| COUNSEL: | Committee For Public Counsel Services, One Salem Green, Salem, MA 01970 |

JUSTICE DISPOSING OF CASE:

| 1999 Aug. 11 | 1 | INDICTMENT FILED: |
|---|---|---|
| Aug. 24 | | Fred McAlary, Assistant District Attorney Appears for the Commonwealth. |
| | | Katherine Riley, Esq., Appointed and Appears for the Defendant. See #2 in 99CR-1647 |
| | | Defendant Waives Reading of Indictment and Pleads Not Guilty. |
| | | Defendant Ordered to Recognize Personal. |
| | | Continued to August 26, 1999 . |
| | | Whitehead, J., Presiding; A. Green, Court Stenographer |
| Aug. 26 | | Continued to August 31, 1999 for Pre-Trial Conference. |
| | | Whitehead,J., Presiding; K. Hezekiah, Court Stenographer |
| Aug. 31 | | Pre-Trial Conference Report Filed. See #4 in 99CR-1647 |
| | | Continued to September 13, 1999 for Motions. |
| | | Whitehead,J., Presiding; A. Green, Court Stenographer |
| Sept. 13 | | Motion for Exculpatory Evidence - Rewards and Promises Agreed. See #5 in 99CR-1647 |
| | | Motion for Discovery of Evidence of Prior Bad Acts Agreed. See #6 in 99CR-1647 |
| | | Motion for A List of Persons Present Agreed. See #7 in 99CR-1647 |
| | | Motion for Discovery of Statements of Defendant Agreed. See #8 in 99CR-1647 |
| | | Motion to Inspect Statements of Witnesses Agreed. See #9 in 99CR-1647 |
| | | Motion for Discovery of Incident Reports and Recordings Agreed. See #10 in 99CR-1647 |
| | | Motion for A List of Potential Witnesses and Their Probation Records Agreed. See #1 in 99CR-1647 |
| | | Motion for Discovery of Physical Evidence Scientific Tests and Expert Evidence Agreed. See #12 in 99CR-1647 |

| Sept. 13 | Continued to October 7, 1999 for Compliance. |
| | Welch,J., Presiding; K. Gordon, Court Stenographer |
| Oct. 7 | Continued to October 19, 1999 for Lobby. |
| | vanGestal,J., Presiding; K. Gordon, Court Stenographer |
| Oct. 19 | Continued to October 25, 1999 for Status. |
| | vanGestal,J., Presiding; K. Rael, Court Stenographer |
| Oct. 25 | Continued to November 3, 1999 for Filing Evidentuary Motions. |
| | vanGestal,J., Presiding; A. Green, Court Stenographer |
| Nov. 2 | Motion to Suppress Statements Filed. See #13 in 99CR-1647 |
| | Motion to Suppress Physical Evidence and Statements Filed. See #14 in 99CR-1647 |
| Nov. 3 | Memorandum of Law Filed. See #15 in 99CR-1647 |
| | Continued to November 10, 1999 for Motion to Suppress. |
| | Fremont-Smith,J., Presiding; A. Green, Court Stenographer |
| Nov. 3 | Application for Issuance and Service of Indigent Summons Filed After Hearing and Allowed (Fremont-Smith,J.) See #16 9977CR-1647 |
| Nov. 23 | Summonses Issued Re: Motion #16. See #17 in 9977CR-1647 |
| | Motion for Free Transcripts Filed After Hearing and ALLOWED. See #18 in 99CR-1647 |
| | Hearing on Motion to Suppress Under Advisement. |
| | Continued to December 8, 1999 for Status. |
| | Fremont-Smith,J., Presiding; A. Green, Court Stenographer |
| Nov. 23 | Affidavit In Support of Motion to Suppress Filed. See # 19 in 99CR-1647 |
| Nov. 24 | Motion #13 After Hearing DENIED See Separate Findings, Rulings and Order (Fremont-Smith) Motion #14 After Hearing DENIED See Separate Findings, Rulings and Order (Fremont-Smith) |
| Nov. 29 | Findings, Rulings and Order on Defendant's "Motion to Suppress Statements" and "Motion to Suppress Physical Evidence" - The Defendant Motion to Suppress Statements is ALLOWED and the Defendant's Motion to Suppress Physical Evidence is DENIED. (Fremont-Smith, J.) See #20 in 99CR-1647 |
| Dec. 8 | Continued to January 3, 2000 for Trial Assignment. |
| | Whitehead,J., Presiding; T. Spingthorp, Court Stenographer |
| 2000 | |
| Jan 3 | Continued to January 10, 2000 for Lobby. |
| | Borenstein, J., Presiding; A. Green, Court Stenographer |
| Jan 10 | Continued to January 25, 2000 for Lobby. |
| | Borenstein,J., Presiding; A. Green, Court Stenographer |
| Jan 25 | Order of Commitment of A Defendant For Observation (Under Section 15(b) Chapter 123, General Laws) See #21 in 99CR-1647 |
| | Continued to February 14, 2000 for Status. |
| | Borenstein,J., Presiding; A. Green, Court Stenographer |

COMMONWEALTH
OF
MASSACHUSETTS
ESSEX, SS.
SUPERIOR COURT
CRIMINAL
DOCKET

9977 CR-1648
PAGE II

COMMONWEALTH VS.  CHRISTOPHER ELLEN

| 2000 | |
|---|---|
| (LS) Feb 14 | Continued to February 17, 2000 |
| | Kotmyer,J., Presiding; A. Green, Court Stenographer |
| (LS) Feb 17 | Motion for Funds Filed After Hearing and Allowed. See #22 in 99CR-1647 |
| | Continued to April 24, 2000 for Trial. |
| | Kotmyer,J., Presiding; A. Green, Court Stenographer |
| March 15 | Motion for Continuance Filed. See #23 in 99CR-1647 (LS) |
| June 19 | Continued to July 17, 2000 for trial. |
| | Brady,J., Presiding; K. Gordan, court stenographer, gh |
| June 27 | Commonwealth's Motion for a Continuance -- ALLOWED. By Agreement (See #24 in 99CR-1647) |
| | Continued to September 18, 2000 for Trial. |
| | Borenstein J., presiding; K. Gordon, Court Stenographer   mw |
| July 19 | Motion for additional funds psychiatrist filed after hearing, see #25 in 99-1647. gh |
| July 27 | Motion #6 ALLOWED, (Borenstein, J.), see #   in 99-1647 gh |
| | Commonwealth's motion for psychiatric examination of defendant, filed in court, see #27 in 99-1647 gh |
| | Continued to August 8, 2000 for motion |
| | Borenstein, J., Presiding, M. Hezekiah, Court Stenographer gh |
| July 21 | Motion for videotaping of defendant's psychiatric interview filed see #28 in 99-1647. gh **OUT OF SEQUENCE** |
| August 8 | Continued to August 16, 2000 for motions. |
| | Whitehead, J., Presiding, A. Green, Court Stenographer, gh |
| August 16 | Motion #28 filed after hearing, ALLOWED, see #28 in 99-1647. |
| | Motion #27 filed after hearing, DENIED, see #27 in 99-1647. |
| | Hearing on motionsContinued to September 18, 2000 for trial |
| | Whitehead, J., Presiding, A. Green, Court Stenographer, gh |
| September 7 | Commonwealth's motion for a continuance filed in court, ALLOWED |
| | Continued to October 2, 2000 for trial |
| | Merrick, J. Presiding, K. Gordan, Court Stenographer, gh |
| SEPT. 16 | SEE COMPUTER ENTRIES |

S.R.A. 11

COMMONWEALTH
OF
MASSACHUSETTS
ESSEX, SS.
SUPERIOR COURT
CRIMINAL
DOCKET

9977 CR 1649

COMMONWEALTH VS. CHRISTOPHER ELLEN

**OFFENSE:** Burglary - Assault on Occupant Chap, 266 sec.14

PLACE: Amesbury

**SURETY AND AMOUNT:** Personal

**PROSECUTOR:** Fred McAlary, A.D.A, Museum Place, I East Indian Square, Salem, MA 01970

**COUNSEL:** Committee For Public Counsel Services, One Salem Green, Salem, MA 01970

JUSTICE DISPOSING OF CASE:

| 1999 Aug 11 | 1 | INDICTMENT FILED: |
|---|---|---|
| Aug. 24 | | Fred McAlary, Assistant District Attorney Appears for the Commonwealth. |
| | | Katherine Riley, Esq., Appointed and Appears for the Defendant. See #2 in 99CR-1647 |
| | | Defendant Waives Reading of Indictment and Pleads Not Guilty. |
| | | Defendant Ordered to Recognize Personal. |
| | | Continued to August 26, 1999. |
| | | Whitehead, J., Presiding; A. Green, Court Stenographer |
| Aug. 26 | | Continued to August 31, 1999 for Pre-Trial Conference. |
| | | Whitehead,J., Presiding; K. Hezekiah, Court Stenographer |
| Aug. 31 | | Pre-Trial Conference Report Filed. See #4 in 99CR-1647 |
| | | Continued to September 13, 1999 for Motions. |
| | | Whitehead,J., Presiding; A. Green, Court Stenographer |
| Sept. 13 | | Motion for Exculpatory Evidence - Rewards and Promises Agreed. See #5 in 99CR-1647 |
| | | Motion for Discovery of Evidence of Prior Bad Acts Agreed. See #6 in 99CR-1647 |
| | | Motion for A List of Persons Present Agreed. See #7 in 99CR-1647 |
| | | Motion for Discovery of Statements of Defendant Agreed. See #8 in 99CR-1647 |
| | | Motion to Inspect Statements of Witnesses Agreed. See #9 in 99CR-1647 |
| | | Motion for Discovery of Incident Reports and Recordings Agreed. See #10 in 99CR-164 |
| | | Motion for A List of Potential Witnesses and Their Probation Records Agreed. See #1 in 99CR-1647 |
| | | Motion for Discovery of Physical Evidence Scientific Tests and Expert Evidence Agreed. See #12 in 99CR-1647 |

| | |
|---|---|
| Sept. 13 | Continued to October 7, 1999 for Compliance. |
| Oct. 7 | Welch,I., Presiding; K. Gordon, Court Stenographer<br>Continued to October 19, 1999 for Lobby. |
| Oct. 19 | vanGestal,J., Presiding; K. Gordon, Court Stenographer<br>Continued to October 25, 1999 for Status. |
| Oct. 25 | vanGestal,J., Presiding; K. Rael, Court Stenographer<br>Continued to November 3, 1999 for Filing Evidentuary Motions. |
| Nov. 2 | vanGestal,J., Presiding; A. Green, Court Stenographer<br>Motion to Suppress Statements Filed. See #13 in 99CR-1647<br>Motion to Suppress Physical Evidence and Statements Filed. See #15 in 99CR-1647 |
| Nov. 3 | Memorandum of Law Filed. See #15 in 99CR-1647<br>Continued to November 10, 1999 for Motion to Suppress. |
| Nov. 3 | Fremont-Smith,J., Presiding; A. Green, Court Stenographer<br>Application for Issuance and Service of Indigent Summons Filed After Hearing and Allowed (Fremont-Smith,J.) See #16 99.77CR-1647 |
| Nov. 23 | Summonses Issued Re: Motion #16. See #17 in 99.77CR-1647<br>Motion for Free Transcripts Filed After Hearing and ALLOWED. See #18 in 99CR-1647 |
| | Hearing on Motion to Suppress Under Advisement.<br>Continued to December 8, 1999 for Status. |
| Nov. 23 | Fremont-Smith,J., Presiding; A. Green, Court Stenographer<br>Affidavit in Support of Motion to Suppress Filed. See # 19 in 99CR-1647 |
| Nov. 24 | Motion #13 After Hearing DENIED See Separate Findings, Rulings and Order (Fremont-Smith) |
| Nov. 29 | Motion #14 After Hearing DENIED See Separate Findings, Rulings and Order (Fremont-Smith<br>Findings, Rulings and Order on Defendant's "Motion to Suppress Statements" and<br>"Motion to Suppress Physical Evidence" - The Defendant Motion to Suppress Statements<br>is ALLOWED and the Defendant's Motion to Suppress Physical Evidence is DENIED.<br>(Fremont-Smith, J.) See #20 in 99CR-1647 |
| Dec. 8 | Continued to January 3, 2000 for Trial Assignment.<br>Whitehead,J., Presiding; T. Springthorp, Court Stenographer |
| 2000 | |
| Jan 3 | Continued to January 10, 2000 for Lobby.<br>Borenstein, J., Presiding; A. Green, Court Stenographer |
| Jan 10 | Continued to January 25, 2000 for Lobby.<br>Borenstein,J., Presiding; A. Green, Court Stenographer |
| Jan 25 | Order of Commitment of A Defendant For Observation (Under Section 15(b) Chapter 123, General Laws) See #21 in 99CR-1647<br>Continued to February 14, 2000 for Status.<br>Borenstein,J., Presiding; A. Green, Court Stenographer |

S.R.A   15

99 77 CR-1649
PAGE II

COMMONWEALTH VS.   CHRISTOPHER ELLEN

COMMONWEALTH
OF
MASSACHUSETTS
ESSEX.SS.
SUPERIOR COURT
CRIMINAL
DOCKET

| 2000 | |
|---|---|
| (LS) Feb 14 | Continued to February 17, 2000 |
| | Kottmyer,J., Presiding; A. Green, Court Stenographer |
| (LS) Feb 17 | Motion for Funds Filed After Hearing and Allowed. See #22 in 99CR-1647 |
| | Continued to April 24, 2000 for Trial. |
| | Kottmyer,J., Presiding; A. Green, Court Stenographer |
| March 15 | Motion for Continuance Filed. See #23 in 99CR-1647 (LS) |
| June 19 | Continued to July 17, 2000 for trial. |
| June 27 | Brady,L.,presiding; K. Gordan, court stenographer. gh |
| | Commonwealth's Motion for a Continuance - ALLOWED, By Agreement (See #24 in 99CR-1647) |
| | Continued to September 18, 2000 for Trial. |
| | Borenstein, J., presiding: K. Gordon, Court Stenographer mw |
| July 19 | Motion for additional funds psychiatrist filed after hearing, see #25 in 99-1647. gh |
| July 27 | Motion #16 ALLOWED, (Borenstein,J.) see #26 in 99-1647. gh |
| | Commonwealth's motion for psychiatric examination of defendant, filed in court, see #27 in 99-1647. gh |
| | Continued to August 8, 2000 for motion. |
| | Borenstein, J., Presiding, M. Hezekiah, Court Stenographer. gh |
| July 21 | Motion for videotaping of defendant's psychiatric interview filed see #28 in 99-1647. **Out OF Sequence** |
| August 8 | Continued to August 16, 2000 for motions |
| | Whitehead, L., Presiding, A. Green, Court Stenographer. gh |
| August 16 | Motion #27 filed after hearing, DENIED, see #27 in 99-1647. |
| | Motion #28 filed after hearing, ALLOWED, see #28 in 99-1647. |
| | Hearing on motionsContinued to September 18, 2000 for trial. |
| | Whitehead, J., Presiding, A. Green, Court Stenographer. gh |
| September 7 | Commonwealth's motion for a continuance filed in court, ALLOWED. |
| | Continued to October 2, 2000 for trial. |
| SEPT. 16 | Merrick, J., Presiding, K. Gordan, Court Stenographer. gh |
| | SEE COMPUTER ENTRIES |

COMMONWEALTH
OF
MASSACHUSETTS
ESSEX, SS.
SUPERIOR COURT
CRIMINAL
DOCKET

COMMONWEALTH VS.    CHRISTOPHER ELLEN

9977 CR 1650

| OFFENSE: | Assault and Battery by Means of A Dangerous Weapon chap. 265 Sec.15A(b) |
| | PLACE: Amesbury |

SURETY AND AMOUNT:    Personal

PROSECUTOR:    Fred McAlary, A.D.A. Museum Place, 1 East Indian Square, Salem, MA 01970

COUNSEL:    Committee For Public Counsel Services, One Salem Green, Salem, MA 01970

JUSTICE DISPOSING OF CASE:

| 1999 Aug. 11 | 1 | INDICTMENT FILED: |
| Aug. 24 | | Fred McAlary, Assistant District Attorney Appears for the Commonwealth. |
| | | Katherine Riley, Esq., Appointed and Appears for the Defendant. See #2 in 99CR-1647 |
| | | Defendant Waives Reading of Indictment and Pleads Not Guilty. |
| | | Defendant Ordered to Recognize Personal. |
| | | Continued to August 26, 1999. |
| | | Whitehead, J., Presiding; A. Green, Court Stenographer |
| Aug. 26 | | Continued to August 31, 1999 for Pre-Trial Conference. |
| | | Whitehead,J., Presiding; K. Hezekiah, Court Stenographer |
| Aug. 31 | | Pre-Trial Conference Report Filed. See #4 in 99CR-1647 |
| | | Continued to September 13, 1999 for Motions. |
| | | Whitehead,J., Presiding; A. Green, Court Stenographer |
| Sept. 13 | | Motion for Exculpatory Evidence – Rewards and Promises Agreed. See #5 in 99CR-1647 |
| | | Motion for Discovery of Evidence of Prior Bad Acts Agreed. See #6 in 99CR-1647 |
| | | Motion for A List of Persons Present Agreed. See #7 in 99CR-1647 |
| | | Motion for Discovery of Statements of Defendant Agreed. See #8 in 99CR-1647 |
| | | Motion to Inspect Statements of Witnesses Agreed. See #9 in 99CR-1647 |
| | | Motion for Discovery of Incident Reports and Recordings Agreed. See #10 in 99CR-1647 |
| | | Motion for A List of Potential Witnesses and Their Probation Records Agreed. See #11 in 99CR-1647 |
| | | Motion for Discovery of Physical Evidence Scientific Tests and Expert Evidence Agreed. See #12 in 99CR-1647 |

| Sept. 13 | Continued to October 7, 1999 for Compliance. |
| | Welch,J., Presiding; K. Gordon, Court Stenographer |
| Oct. 7 | Continued to October 19, 1999 for Lobby. |
| | vanGestal,J., Presiding; K. Gordon, Court Stenographer |
| Oct. 19 | Continued to October 25, 1999 for Status. |
| | vanGestal,J., Presiding; K. Rael, Court Stenographer |
| Oct. 25 | Continued to November 3, 1999 for Filing Evidentuary Motions. |
| | vanGestal,J., Presiding; A. Green, Court Stenographer |
| Nov. 2 | Motion to Suppress Statements Filed. See #13 in 99CR-1647 |
| | Motion to Suppress Physical Evidence and Statements Filed. See #15 in 99CR-1647 |
| Nov. 3 | Memorandum of Law Filed. See #15 in 99CR-1647 |
| | Continued to November 10, 1999 for Motion to Suppress. |
| | Fremont-Smith,J., Presiding; A. Green, Court Stenographer |
| Nov. 3 | Application for Issuance and Service of Indigent Summons Filed After Hearing and Allowed (Fremont-Smith,J.) See #16 9977CR-1647 |
| | Summonses Issued Re: Motion #16. See #17 in 9977CR-1647 |
| Nov. 23 | Motion for Free Transcripts Filed After Hearing and ALLOWED. See #18 in 99CR-1647 |
| | Hearing on Motion to Suppress Under Advisement. |
| | Continued to December 8, 1999 for Status. |
| | Fremont-Smith,J., Presiding; A. Green, Court Stenographer |
| Nov. 23 | Affidavit In Support of Motion to Suppress Filed. See # 19 in 99CR-1647 |
| Nov. 24 | Motion #13 After Hearing DENIED See Separate Findings, Rulings and Order (Fremont-Smith) |
| | Motion #14 After Hearing DENIED See Separate Findings, Rulings and Order (Fremont-Smith) |
| Nov. 29 | Findings, Rulings and Order on Defendant's "Motion to Suppress Statments" and "Motion to Suppress Physical Statements" - The Defendant Motion to Suppress Statements is ALLOWED and the Defendant's Motion to Suppress Physical Evidence is DENIED. (Fremont-Smith, J.) See #20 in 99CR-1647 |
| Dec. 8 | Continued to January 3, 2000 for Trial Assignment. |
| | Whitehead,J., Presiding; T. Spingthorp, Court Stenographer |
| 2000 | |
| Jan 3 | Continued to January 10, 2000 for Lobby. |
| | Borenstein, J., Presiding; A. Green, Court Stenographer |
| Jan 10 | Continued to January 25, 2000 for Lobby. |
| | Borenstein,J., Presiding; A. Green, Court Stenographer |
| Jan 25 | Order of Commitment of A Defendant For Observation (Under Section 15(b) Chapter 123, General Laws) See #21 in 99CR-1647 |
| | Continued to February 14, 2000 for Status. |
| | Borenstein,J., Presiding; A. Green, Court Stenographer |

COMMONWEALTH
OF
MASSACHUSETTS
ESSEX, SS.
SUPERIOR COURT
CRIMINAL
DOCKET

99 77 CR-1650
PAGE II

COMMONWEALTH VS.   CHRISTOPHER ELLEN

| 2000 | |
|---|---|
| (LS) Feb 14 | Continued to February 17, 2000 |
| | Kottmyer,J., Presiding; A. Green, Court Stenographer |
| (LS) Feb 17 | Motion for Funds Filed After Hearing and Allowed. See #22 in 99CR-1647 |
| | Continued to April 24, 2000 for Trial. |
| | Kottmyer,J., Presiding; A. Green, Court Stenographer |
| March 15 | Motion for Continuance Filed. See #23 in 99CR-1647 (LS) |
| June 19 | Continued to July 17, 2000 for trial. |
| | Brady,J.,presiding; K. Gordan, court stenographer gh |
| June 27 | Commonwealth's Motion for a Continuance – ALLOWED, By Agreement (See #24 in 99CR-1647) |
| | Continued to September 18, 2000 for Trial. |
| July 19 | Borenstein, J., presiding; K. Gordon, Court Stenographer mw |
| | Motion for additional funds psychiatrist filed after hearing, see #25 in 99-1647. gh |
| July 27 | Motion #16 ALLOWED, (Borenstein, J.) see #6 in 99-1647. gh |
| | Commonwealth's motion for psychiatric examination of defendant, filed in court, see #27 in 99-1647. gh |
| | Continued to August 8, 2000 for motion. |
| | Borenstein, J., Presiding, M. Hezekiah, Court Stenographer. gh |
| July 21 | Motion for videotaping of defendant's psychiatric interview filed see #28 in 99-1647. **Out Of Sequence** |
| August 8 | Continued to August 16, 2000 for motions. |
| | Whitehead, J., Presiding, A. Green, Court Stenographer. gh |
| August 16 | Motion #27 filed after hearing, DENIED, see #27 in 99-1647. |
| | Motion #28 filed after hearing ALLOWED, see #28 in 99-1647. |
| | Hearing on motions Continued to September 18, 2000 for trial |
| | Whitehead, J., Presiding, A. Green, Court Stenographer. gh |
| September 7 | Commonwealth's motion for a continuance filed in court, ALLOWED. |
| | Continued to October 2, 2000 for trial. |
| | Merrick,J., Presiding, K. Gordan, Court Stenographer gh |
| SEPT. 16 | SEE COMPUTER ENTRIES |

1 that reason, at this time I'm going to deny the Motion

2 for Mistrial.

3    MR. McGUIRE:  I can't see, quite frankly,

4 your Honor, how that is going to assist because you're

5 simply going to be underlining the error.  So I

6 object.

7    THE COURT:  That's my ruling.

8    MR. McGUIRE:  All right.

9    THE COURT:  All right.  We'll bring the

10 jurors back in.

11    Are you still with that witness?

12    MR. McALARY:  Yes.

13    (Jurors present)

14    THE COURT:  Welcome back, folks.  I'm sorry

15 it took so long.  We had a couple of other issues that

16 had to be taken up before we could bring you back

17 here.  So I do apologize for the delay.  And I just

18 wanted to give you -- I had mentioned to you that I

19 would give you instructions at the end of the trial,

20 but sometimes in the course of the trial I need to

21 give you some instructions, as well.  And I just

22 preface the instruction, again, with the instruction

23 that any instructions that I give, you are required to

24 follow and you promised that you would do that.  So

25

it's important that you do consider all instructions, including these and follow them to the letter.

Just before we broke, there was a question that was asked by the prosecutor with regard to Mr. Ellen being given his so-called Miranda rights. And I think most people are familiar with that concept, which are constitutional rights that we all have. And you will recall at the beginning of this trial before we even began the trial, before we even had you picked, I told you all when you were sitting there as a pool of jurors that there was some very core, basic constitutional principles and protections that we all have as American citizens. And one of those principles is that we are presumed, should we be charged with a crime, we are presumed to be innocent, and that we cannot be forced to testify against ourselves.

In other words, we have protection against incrimination, self incrimination. And those are very important principles of law that I touched on briefly, will define and discuss in more detail at the end of the case. But I told you at the beginning of this case about those principles and asked you if you understood and accepted them all. And these are

1   principles that continue to apply here in this case.

2        And so the defendant doesn't have to do

3   anything.  No defendant in a criminal case has to do

4   anything when they're charged.  They don't have to

5   present witnesses, they don't have to present

6   exhibits, they don't have to, they don't have to say

7   anything.  And indeed, once one is arrested, that's

8   really what Miranda, the Miranda case, the guarantees

9   envision is that someone cannot be forced to testify

10  against themselves.  And if they are asked, Do you

11  want to say something?, they have every right in the

12  world to say no, I don't want to.  Because they don't

13  have to do that.  The constitution doesn't make us do

14  that.  It gives us that protection.

15       And what goes with that is that when

16  someone chooses to avail themselves of that important

17  constitutional right that we all have, and this

18  defendant is no different, that important

19  constitutional right, when you say I'm going to invoke

20  that right and I don't want to talk to you, that

21  should never be used against you.  A jury should never

22  say, well, you know, he said he didn't want to talk,

23  that must mean something.  That would be wrong.  And

24  so that was an improper question that was put to the

1      witness to the extent the witness responded and said,

2      and gave the answer that he did.

3                    So what I'm going to do is strike that

4      answer that you heard from the police officer and tell

5      you and instruct you that you are to disregard that.

6      And I wanted you to understand why, because it is very

7      important and you have promised the Commonwealth and

8      the defendant that you would follow and honor these

9      important constitutional protections that we all have,

10     and that this defendant is entitled to in this case.

11     So please bear that in mind, just it is not something

12     that should be used against him.  It should not be

13     considered as evidence and it should be stricken from

14     your minds, as it is now from the record of this

15     trial.

16                    So with that, we will now move to -- I

17     guess he's still on the stand.

18                    MR. McGUIRE:  May we approach the bench,

19     please?

20                    THE COURT:  Yes.

21     BENCH CONFERENCE:

22                    MR. McGUIRE:  I'm going to renew my Motion

23     for Mistrial.  I believe the court's instructions

24     simply made things worse.  The court in saying,

1    Doctor Rosmarin to be the true guide.  You will find,

2    ladies and gentlemen, that the Commonwealth has failed

3    in its burden of proof.  You will have to conclude

4    that Christopher Ellen at that time lacked criminal

5    responsibility for his acts.

6              Thank you, ladies and gentlemen.

7              THE COURT:  Mr. McAlary.

8

9    CLOSING ARGUMENT

10   BY MR. McALARY:

11             MR. McALARY:  Good morning, once again,

12   ladies and gentlemen of the jury.  For the sixteen of

13   you, twelve of you will be deliberating this case, you

14   may be wondering when you get up to the jury

15   deliberation room how do we proceed, how do we go

16   about this task, this contrivance.

17             I just want to spend a minute on this,

18   because you, the twelve of you who will deliberate

19   this case, are in the same position that juries in the

20   United States have been confronted with for over two

21   hundred and fifty years.

22             And you will have three tools at your

23   disposal when you go upstairs to deliberate.

24   Obviously, the most important one, the most important

25

is the ability to recall what you've heard.  The
testimony you've heard from the witnesses who took the
stand.  Because what I have said and what Mr. McGuire
has said in our opening and closing, and the questions
we asked, that is not evidence.  The evidence all came
from the witnesses who took the stand.

So it's your collective ability to recall
what their testimony was.  They'll be important.  But
in addition to their testimony, it will be your
ability to recall how they answered the questions;
were they forthright, were they hesitant.

And on that particular point, recall when
the defendant took the stand and keep in mind he had
absolutely no obligation to take the stand in this
case, because the burden is on the Commonwealth.

MR. McGUIRE:  Objection.

THE COURT:  Objection sustained.

MR. McALARY:  But when he took the stand,
and when Doctor Rosmarin took the stand on direct
examination by Mr. McGuire, it flowed like a cassette.
Everything was rehearsed, everything was planned.  But
keep in mind on cross-examination and recall how
reluctant they were to answer my questions, how
hesitant they were.  How many times did you hear, I

1    don't recall, or from Doctor Rosmarin when he said, I

2    can't answer that question.

3           So in addition to their testimony, recall

4    what you heard from them on cross-examination, and how

5    reluctant they were to answer.

6           Now, in addition to that, you have your

7    ability to recall what you have seen.  Now, the most

8    obvious example of that is the sixty-something

9    exhibits you will have in the jury deliberation room.

10   It's your ability to look at those photographs and ask

11   yourself, Is this a knot, and is this preparation, or

12   is this restraint placed here like some confused or

13   crazed person?  Or does this show some planning?

14          Now, in addition to the exhibits, you will

15   also have the ability to recall what you have seen

16   here in the courtroom.  You may have had an

17   opportunity to look over to Mr. Ellen or Adair

18   Rowland, or other people who were testifying.  Were

19   his responses in shaking his head either in agreement

20   or disagreement, responsive?

21               MR. McGUIRE:  Objection.

22               THE COURT:  Objection sustained.

23               MR. McALARY:  You have the ability to

24   recall what you have seen.  Was it a logical response

to what was happening on the witness stand?

Now, in addition to those, what you've seen and what you've heard, probably the most useful tool you will have is your common sense. There will be twelve of you. You are all from different walks of life, male, female, some older, some a little younger, some family people, some professional people, all hard working. You all come from a different walk of life and you have different experiences which you can use to reach an agreement on this particular case.

And in using your common sense, ask yourselves, who has got the most to gain in this particular case by not telling the truth? What does Adair Rowland have when she took the stand? What purpose did she have? Did she have any reason not to tell the truth? And I suggest to you that Adair Rowland came before you to tell you what happened on July 25th, 1999.

She told you a story of a woman's worst nightmare of coming home alone to a house and being attacked by an unknown predator in her own house.

And then ask yourselves, what does the defendant have to gain by not telling the truth? And I suggest to you, ladies and gentlemen of the jury,

the defendant, Christopher Ellen, has a great deal to gain by not telling you the truth.

As Mr. McGuire told you, this is not a case of who done it. This is not a who done it mystery. This is a case of why Christopher Ellen did it. And as he pointed out to you, it's the Commonwealth's burden to prove beyond a reasonable doubt that Christopher Ellen knew what he was doing when he entered that house and attacked Adair Rowland on July 25th, 1999.

Now, I want to spend a couple of minutes before I go into the scenario of what happened that night, touching on a couple of subjects that the defendant, the defense needs you to believe in order to prove or disprove that he was sane.

Through this testimony and the testimony of Doctor Rosmarin, he would want you to believe that he had no idea who Adair Rowland was, he had no idea where she lived. And I suggest to you, ladies and gentlemen, that is totally contrary to the evidence in this case.

You've heard lots of descriptions about how close they are to each other in this neighborhood, that he lives two houses down on Carver Street, and

his house faces the back of the Rowland house.  You've
heard that the Rowland house's driveway is in the back
side of the house which is on the Ellen side, and that
she always uses the back door to come and go to her
car or out into the neighborhood.

You will see a picture of the Ellen house
from her bedroom and how close it is.  And I suggest
to you that the defendant, during the ten weeks that
Adair lived there, saw her, he observed her.

MR. McGUIRE:  Objection.

THE COURT:  Objection overruled.

MR. McALARY:  He saw her coming and going.
I suggest to you that when she walked down the street
at approximately five o'clock going to Joan's house
and he was out on the porch, he knew who she was.  He
made a comment to her.  He was attracted to her.  He
wanted her.  He had been thinking about her.  And when
he saw her walking down the street that day, he wanted
her even more.

MR. McGUIRE:  Objection.

THE COURT:  Objection overruled.

MR. McALARY:  I suggest to you, and I will
get more into this later, that he knew exactly where
she lived on July 25th.  And in fact, there is

overwhelming evidence that the defendant had been in her house prior to that occasion.

So ask yourselves, is it believable that he did not know who she was or where she lived? And the answer to that should be, to put it in his own words, absolutely not.

Now, what about the condoms? It is quite clear that when he was taken to the police station, he had two condoms on him. I suggest to you, that was part of his plan. And will get back to this again in a few minutes. But when he was arrested, he clearly had two condoms on him.

He told you during his testimony that on the infrequent occasions when he was intimate with his wife, they used condoms as birth control. But he was no superman, he only needed one for those few and rare occasions that he made love to his wife. But on this occasion he had two. And when one fell on the floor at the police station, the police found the other one. And what did he say? Their presence might be misinterpreted. That's what he told Doctor Rogers.

Now, think of the whole scenario of things. He is at the police station; he is trying to disguise these two condoms because he doesn't want their

presence to be misconstrued.  But he wants you to

believe that he has no idea how he got in this house,

or what his purpose was, or what he was going to do,

or that he put any restraints on the bed in any place.

How could he think that it might be

misconstrued if he doesn't recall what he has done to

lead people to think that, in fact, it is going to be

misconstrued, and the police knew when they found the

condoms and they had seen the restraints exactly what

he was going to go in there for.  The defendant cannot

have it both ways.

So ask yourselves, is his story about

having two condoms which he says, or he wants you to

believe, that he put in his pocket about eight o'clock

in preparation for hopefully going to bed with his

wife some hours later.  And the reason he had two in

his hand, in his pocket, was because when he reached

for the box which was already in the bedroom, he had a

drink in one hand and couldn't separate the two of

them.

Ladies and gentlemen, use your common

sense.  That's a little farfetched.  He couldn't put

down the drink, if that was a true story, and separate

the two condoms.  Ask yourself, ladies and gentlemen

of the jury, is the story he told you or wants you to believe about the condoms believable here?  Absolutely not.

Now, during the course of this trial and Mr. McGuire's closing argument, a great deal was made about this particular item, Exhibit No. 3, the green bow tie.  Now, why is this green bow tie so important? The history of this green bow tie is that when Adair Rowland moved to 72 Highland Street in the middle of May, this green bow tied was in a box of costume clothing.  And when she moved there, she never unpacked it.  It went to a storage room in the attic, third floor attic room of 72 Highland Street.  And there it stayed.  This green sash was in the box on the third floor from the time she moved there until the time the defendant first went into that house.

That green sash was in the same box as this checkered brown and gold belt.  It was in the same box on the third floor as this brown sash, which was later found knotted and removed from her son's bed on the second floor.  And it was in the same box on the third floor as this purple sash from a gown which was in the same box.

That sash is important because it was found

tied to a steam pipe the day before the incident when

Mr. Ellen was arrested in the house.  And that is

clear and convincing proof that at some time -- and

I'll get to this later and more -- that Mr. Ellen was,

in fact, in that house; he had been to the third

floor, removed these sashes and had a plan in mind

when he removed those four sashes and belts from that

box.

So when you ask yourselves, did he know

about that?  He absolutely did.  I asked him, and

Mr. McGuire asked him when he took the stand,

Mr. Ellen, have you ever seen this before?  Absolutely

not.  Now, again, ask yourselves and use your common

sense, how can he be so adamant that he had never seen

that before if he doesn't recall what went on from the

time he left his house until the time he was arrested

there at the scene?  It makes no sense.

There's the issue about Adair Rowland's

name.  How did -- he says he didn't know Adair, didn't

know where she lived.  But he found himself in her

house.  He wants you to believe that he just wandered

out of his house and did this random act of violence.

How did he get into her house?  Why her house?  Why

not some other neighbor's house?  Why her in

1    particular?  Because he knew who she was and he knew

2    her name.

3         When he went into that house he went

4    through her pocketbook and found out her full name,

5    looked at her business cards and found out she was a

6    consultant.  Went through her pocketbook, likely saw a

7    driver's license and saw that she had only four

8    dollars in her pocketbook.

9         Doctor Rosmarin wants you to believe that

10   he was just parroting her name when Joan called out

11   from outside.  And why is that important?  Because if

12   he was in the state of dissociation and he thought he

13   was strangling some Filipino insurgent or his foster

14   mother or mother or someone who did him ill in the

15   past, why would he say or use the name Adair?  I

16   suggest to you, ladies and gentlemen of the jury, he

17   knew exactly whose house he was in.  He knew exactly

18   where Adair Rowland, and he knew exactly who he

19   planned to attack, rape and murder.

20        So ask yourselves, when Doctor Rosmarin

21   says that he was just parroting and the defendant says

22   he had no idea who she was or where she lived, is it

23   believable?  Absolutely not.

24        And when Mr. Ellen is finally found in the

25

house, when he comes out of this trance he'd like you to believe he was in, this is an important issue, as well. He told you that when he finally realized what was going on, he didn't want to be there. He didn't know how he got there, he didn't know what he had done, but he knew that it wasn't him and he didn't want to be there.

Doctor Rosmarin wants you to believe that this was an alcohol induced dissociative state that he was in. And he just snapped out of it like that and came to the realization that he shouldn't be doing what he was doing.

Now, this is after he had been hit in the side of the head with a telephone. That didn't jog him out of it. This is after he blocked a blow with a sauce pan that fell so loudly to the floor that Mary Reily across the street's attention was drawn to it over her television.

The defendant wants you to believe that when he realized that he was in this place that he shouldn't have been and doing something terrible, he says, Oh, my god, I must be insane. And he helped her up and his demeanor changed. And then he wants you to believe three or four minutes, by his own testimony,

1          later was when the police arrived.

2              Well, we know from Mary Reily's testimony

3          that as soon as she heard this commotion over there,

4          and Adair Rowland saying, Help, help, help me, and the

5          pan crashing to the floor, she looked over and she saw

6          a man and a woman struggling in that kitchen, in the

7          lighted kitchen.  And she immediately called 911.  And

8          immediately, three cruisers were dispatched to that

9          area.  And each of the police officers I asked, how

10         long did it take you to get there?  And the longest

11         period of time it took any of them to get there was

12         approximately one minute.

13             And they all pulled up in front.  Two of

14         them said, No, I didn't have my blue lights on.  But

15         Officer Valli said, Yes, I had my blue light on.  Now,

16         keep in mind, by the time he arrived, the defendant

17         was strangling Adair Rowland and he had turned off the

18         lights in that kitchen.  It is dark in that kitchen.

19         The kitchen, you see all kinds of pictures.  Even the

20         neighbor across the street can see through the

21         windows.

22             And you may have all had the common

23         experience, unfortunately, of seeing blue lights pull

24         up behind you or beside you and how eye-catching that

is.  And when you're in the dark and that blue light comes up anywhere near you, it is going to catch your attention.  And I suggest to you, ladies and gentlemen of the jury, that is when the defendant's demeanor changed.  That is when he realized that he was caught, it was all over.

And the best thing he could do was not harm that innocent victim any longer and surrender to the police, which is what he did.  So when he tries to tell you that he snapped out of this dissociative state, not because of the police lights, but because he suddenly realized he was doing something wrong. Is that believable?  Absolutely not.

Now, as you have been reminded, the defendant's state of mind on July 25th, 1999, is what important in this case.  You've heard from both doctors that they reviewed hospital records from the year 2000, earlier this year.  The defendant was hospitalized for depression; he was crying.  He was hospitalized for an attempted suicide.

The depression and the suicide, ladies and gentlemen, is a reaction to the hopeless situation he found himself in.  It does not have anything to do with his criminality or his criminal responsibility at

the time of this incident. It's a reaction to what has happened to him. So let's take a minute and find out and review what his state of mind was on July 25th, 1999.

We know in mid-July the defendant had been reprimanded at work for an incident which he totally, as usual, blames on somebody else. But he got suspended. He was angry. He was frustrated at work in the first place because was doing all the work and other people were getting the credit. Someone was looking at pornography and he's afraid he might get caught. He was not a happy camper there. He felt he should have got more credit for what was going on and what he did.

And then he got suspended and he was angry. He goes away. He lives with his wife. He has been living on the couch for two to five years. Not living in the bedroom with his wife. It's not a happy marriage. They go away for a week's vacation in New Hampshire. They want you to believe they were intimate.

He returns back at the end of the week. He's got the same state of mind. He does not want to go back to work. He's back in this familiar

surrounding where he's been living on the couch for
two to five years.  He is a little depressed about the
whole situation.  He buys a bottle of Jim Beam,
apparently.  There is no confirmation that he bought
that from his testimony, or how much he drank.  We
have a bottle of Jim Beam.  You will have it in the
jury deliberation room.  It's about one-third full.
They made a big deal about how little was spilled when
the chair was pulled out from under him.

He wants you to believe that he drank every
drop that is missing from that bottle.  That's
undocumented.  That is for you to decide.

But in any case, he has a drink; there's no
question about that.  There's alcohol on his breath
when he's arrested.  And with that drink he goes
outside with his children and his wife and he meets
with the neighbors.  And then about five o'clock he
sees Adair Rowland come walking down the street very
nicely dressed in a full length, loose red dress.

He looks at her, he knows her.  And he
remembers Adair Rowland.  Because prior to that Sunday
evening, she has already caught his eye.  She's an
attractive woman.  And the defendant was sort of
captivated by her.  He decides he is going to return

1    to her house.  Yes, I said return.  Because of the

2    green scarf, we know that he has been in there on some

3    prior occasion.  And I suggest to you the reasonable

4    inference is that he was there two days earlier, that

5    Friday evening, at almost exactly the same time that

6    he went in on Sunday evening, sometime between nine-

7    fifteen, nine-thirty.

8         Adair Rowland, on Friday evening, she was

9    there by herself, her kids were away at camp.  And he

10   had seen her drive off in her car.  She testified she

11   went to the movies at about nine o'clock and did not

12   return home until twelve-thirty, twelve forty-five.

13   And I suggest to you it was that Friday evening that

14   the defendant went up there, based upon his military

15   experience which Mr. McGuire made reference to, from

16   using this training and experience as a forward

17   observer, he went in there and stealthily went into

18   that house through the bulkhead in the cellar.

19        The bulkhead, which Adair Rowland indicated

20   or testified to, there was evidence that it had been

21   pushed open.  There was no locks.  And on that Friday

22   evening, the defendant had a plan.  He was going to

23   attack and rape her then.  He went through the whole

24   house, he scoped it all out.  He went to the third

floor, and I suggest to you that is when he went to

the box on the third floor and found these sashes.

And as the defendant readily admitted, and

his wife readily admitted, he was wont to do, he

started hiding things.  And he took this green sash

and tied it to the steam pipe in the dining room.  And

he took these other sashes and hid them around.  And

he lay in wait on that particular occasion, but as

time went on he wasn't sure whether Adair was going to

come back that night or not.

And at some point on that Friday evening,

July 23rd, he abandoned his mission and returned home.

But he did not forget about her.  And when he saw her

that Sunday evening walking down the street,

frustrated, upset that he had to go back to work, not

happy with his marital situation, he had a couple of

drinks.

Now, what did these drinks do to him?  Did

this trigger a dissociative reaction?  I suggest to

you that as Doctor Rogers said, it reduced his

inhibitions and increased his courage.  In that state

at about nine o'clock after going in and getting two

condoms, thinking he was going to be double protected

or maybe he thought he was going to be superman, which

1    he couldn't do at home, he left his house.  Keep in

2    mind he lived right next door to the Blankenaus, or

3    just down the street from the Blankenaus.  The house

4    where he'd seen Adair Rowland go.  And when he left

5    the house, it would be reasonable to infer that he

6    checked on the Blankenaus' house.  It's dark out at

7    that time, he looked in through the lighted windows

8    and saw them dining in there, having a good time.  And

9    it was at that stage he knew that Adair's car was at

10    home, she was at the neighbor's and she probably would

11    be returning shortly thereafter.

12          And at that point, again, being a forward

13    observer, trained, stealthily he went up to 72

14    Highland Street and either checked the back door,

15    which was closed but unlocked, or he went back through

16    the bulkhead.  But in either case, it was a breaking

17    into that house when you break through a closed door.

18          And he entered that house.  This particular

19    time he went through and the first room he came to was

20    the office where he saw Adair Rowland's pocketbook and

21    he went through it and noted she only had four

22    dollars.  And at this point he was going to carry out

23    his plan because he had been thinking about it since

24    the Friday night before or even longer than that

25

before.

And he went into the dining room and started looking for the sashes that he had hidden away as he was wont to do.  And on the steam pipe there was no sash.  But across the room on the piano stool in plain view there was a green sash which had been untied at that time which he retied.

He collected the other sashes which he had taken on previous occasions from the third floor, and then went upstairs.  When he got upstairs, he had a well conceived plan.  He went through her bureau and found this nylon sweater, very strong.  And took this yellow nylon sweater and tied it in a knot to the left side of her headboard and then tucked it underneath.

He then went into her closet and found this pair of pants.  And went along the right side in the narrow area between the right side and the wall and tied these to the headboard, and then tucked them down so they wouldn't be noticed.

He then went into the, before he went into the closet, he disabled the two lights so it would be dark in there, dark as he could possibly make it.  And then he went into the closet and continued his plan. He took this teal blouse, ripped it in half, and then

1    put a big knot in the middle of it.  I suggest to you

2    he was going to use this as a gag.

3        When he went into that closet, before he

4    even came to the house, he had thought about his plan.

5    He had the condoms so he wouldn't leave any forensic

6    evidence in the form of DNA.  He obtained a pair of

7    socks because it could cover his fingerprints.

8        Now, we don't know whose socks there are.

9    I suggest to you they could belong to one of his two

10   sons and he had taken them from his own house.  And he

11   had arrived there because he was prepared, he was

12   thinking rationally, and did not want to leave any

13   fingerprints.

14       After disabling the telephone and the two

15   lights, he went into the closet because his plan was

16   that when she came upstairs, he was going to attack

17   her in the closet.  He did not want to attack her in

18   the bedroom, because as Adair Rowland told you, all

19   walls are almost fully windows.  And when the light is

20   on, it would be very clear to anyone who might be

21   passing by what was going on.

22       Even Adair Rowland told you because of the

23   windows in her bedroom, she almost always changed her

24   clothes in the closet.  Did the defendant know that?

25

Possibly.  So that's where he hid with the socks on

his hands and the condoms in his pocket, waiting for

her to come upstairs and either go to bed where he

could have attacked her, or when she came into the

closet, more likely.

That is where he was going to attack her,

gag her with the teal blouse.  He had the other

implements with him.  He was going to take her over to

the bed, tie one arm to each of the restraints on the

headboard and use these other ties to tie her legs

down.  And I suggest to you the remainder of his plan

was to rape her and then murder her.

Why do I argue that he was going to murder

her?  He had the condoms so he wouldn't leave any

evidence.  He had the socks on his hands so he

wouldn't leave any evidence.  But he was not wearing a

mask, was he?  He never, you never heard any evidence

that his facial features were disguised in any way,

except that he had this beard.

Ladies and gentlemen, once he finished his

sexual exploits with Adair Rowland, she was no longer

going to be left as a potential witness in this case.

He hid in there at about ten-fifteen.  He

heard the door open downstairs.  He heard it close,

1    and he heard her lock the door and come almost

2    immediately upstairs.

3              He is hidden in the closet. He can't see

4    anything. But he hears her go into the bathroom, the

5    water running. And she takes off her contact lenses..

6    Then hears her come into the bedroom and try the

7    lights, two of which won't go on. And finally, she

8    turns on the overhead light and he can see some of

9    that light through the louver doors. But he can't

10   seen what she is doing.

11             There was a moment of silence, a minute of

12   silence as she takes her earrings off and her watch

13   off and puts it on the bureau. And then he can't tell

14   what she is doing. She gets down on one knee and

15   starts patting the rug to see if it was wet. And it's

16   at that time she sees the yellow sweater under the

17   bed.

18             She was somewhat suspicious at first,

19   wondering how it got there. She goes over and

20   immediately becomes concerned because she can't remove

21   it. It's tied on one arm at the head of the bed.

22   Almost in a panic stage, she unties that, runs

23   downstairs with it and tries to summons help from her

24   estranged husband. And he is not home. She leaves a

1    message.   And I suggest to you from the evidence as

2    this goes on, the defendant hears these telephone

3    calls.

4            He knows she has not called the police from

5    the one-sided conversation he can hear.  Now, he's

6    still in the closet and she's downstairs.  And she

7    immediately runs back upstairs to get Joan Blankenau's

8    number and then returns downstairs and he hears the

9    second call.  And again, he knows it's not to the

10    police.

11            Now, being a resourceful Marine, he's in

12    that closet, he's got his plan, he's got his

13    intentions, but he needs to improvise at this point

14    because she did not come into the closet and time is

15    fleeting.

16            So with a gag, with a gag and the socks on

17    his hands, these three items, sashes, he goes

18    downstairs.  Keep in mine he is barefoot.  And it's a

19    dark corner going down these stairs.  And as he gets

20    near the bottom in his haste he stumbles and drops the

21    gag where we saw it in the pictures.  And he proceeds

22    immediately into the kitchen and confronts Adair

23    Rowland, this terrified woman who is now confronted by

24    an unknown stranger in her own house.

He goes forward to her with the socks on
his hands and grabs her by the neck and starts hitting
her.  Now, he's training in the martial arts as he
told you and Mr. McGuire reminded you.  He is a
trained military expert.  Ten to twelve years in the
Marine Corps.  He didn't kill her, he could have
easily.  He only wanted to disable her.  He wanted to
take her upstairs, latch her to the restraints and
carry out his plan.

He hits her, he pushes her to the floor and
ultimately he strangles her.  But the important thing
during this very short episode in the kitchen is, what
is his state of mind?  What do we know from the
evidence?

The first thing this terrified woman does
to plead for her life as he 's got her up against the
counter, almost lifting her off the floor with his
thumbs, she says, "I called the police".  And he looks
at her, he processes that information, he cross-
categorizes it with what he's heard on the telephone.
And then he says in a rational voice, "You're lying,
you didn't call the police".

She realizes at that point that he has
heard her and he knows what she's done on the

1   telephone.  So she says "I called Joan, my neighbor,

2   and she's on her way".  He processes that.  He

3   understands the context of what he's heard on the

4   phone.  And he reacts to it.  And he lets her go for a

5   second, runs to the back door because he appreciates

6   what he is doing is wrong and criminal, and locks the

7   door and turns off the light because he does not want

8   to get caught.

9        He comes back, he puts both of his hands

10  around her neck and starts lifting her.  You can see

11  the marks on her neck.  She is terrified.  He says to

12  her, she says to him "Take my money, you can get away,

13  take my money".  And he processes that intellectually,

14  and cross-references it with his check of her

15  pocketbook earlier that evening and responds in a

16  rational, coherent way, "You've what, I don't want

17  your money, you only have four dollars".

18       He continues pummeling her.  Within

19  seconds, Joan and the other two women are at the back

20  door.  They knock, Let us in, let us in.  He hears

21  that and he appreciates the situation he's in.  And he

22  tells Adair, "Tell them to go away", because he knows

23  what he's doing is wrong and he does not want to get

24  caught.

25

1    Hesitantly, she says "Go away". And as

2    they do, or as Joan does, as she leaves, she says "I'm

3    calling 911". And again, the defendant processes this

4    and he knows what he's doing is wrong. And then he

5    escalates what is happening in this kitchen, because

6    he fears he may not have time to fulfill his whole

7    plan of raping and murdering her. But she is now the

8    key witness against him.

9        So he knocks her into the floor and puts

10   this purple sash which he has concealed someplace in

11   the kitchen or in his shorts, and wraps it around her

12   neck and starts to strangle her.

13       Now, unbeknownst to him, Mary Reily across

14   the street has already called 911, and the police are

15   on their way. And they respond almost immediately as

16   this strangulation is taking place. As he is doing

17   this, he is tightening this. And then he sees the

18   blue lights come up the street. And that is when his

19   demeanor changed.

20       His demeanor doesn't change, as I

21   reiterated before, because he is coming out of this

22   dissociative state. This is a well planned, well

23   rehearsed plan, and the only thing that has gone awry

24   is now is that the police are there. And he thinks

25

1    and he processes this, and he says, "I'm a dead man, I

2    should give myself up, the police are here".

3         So not to make matters worse, he releases

4    the pressure on her neck, saving her life.  Because

5    it's one thing to be caught in Adair Rowland's

6    kitchen, strangling her, and it's a totally different

7    thing being arrested for murder.  And he realizes this

8    and he processes that.  And he helps her up and says

9    he's sorry.  He wants to do whatever he can.  He even

10   starts formulating a defense at that time by saying

11   "I'm insane, we're both victims".  He wants to blame

12   anyone but himself.

13        He lets the police in, he doesn't give them

14   a hard time because he realizes the situation he's in

15   now, as bad as it may be, it is better that if he got

16   caught if his whole intent had been fulfilled.

17        He's taken out, he is taken to the police

18   station.  They find the condoms and he says, "I didn't

19   want them to be misinterpreted if they found them".

20   But he wants you to believe he doesn't remember any of

21   this.

22        Ladies and gentlemen, do not be deceived.

23   This defendant, Christopher Ellen, had a well

24   conceived, well planned, not very wise plan that he

25

1 wanted to carry out, and he almost did.

2   Now, the two doctors who took the stand

3 during the course of this trial, Doctor Rosmarin for

4 Mr. McGuire on behalf of behalf of the defendant.

5 Good credentials, good background.  But he told you

6 right off the bat that he had two opinions in this

7 case.  And one is that if you find that the defendant

8 was in that house prior to that Sunday evening, then

9 he was responsible for everything he did that Sunday

10 evening because it showed planning and premeditation.

11 And that is why these items on the rail are so key,

12 because they all show planning and premeditation, and

13 the fact that the defendant hid in that house on a

14 prior occasion.

15   As Mr. McGuire told you, Doctor Rosmarin

16 had the opportunity to interview the defendant on

17 three occasions for in excess of ten hours.  And they

18 went over the same thing.  He found him depressed, he

19 found him suicidal this year.  And I suggest to you,

20 he based his analysis of the defendant's behavior

21 almost exclusively on what the defendant told him.

22 The defendant told him, I don't remember this, or I

23 saw this in slow motion.  And he adopted that one

24 hundred percent.  And it is that evaluation of the

1    defendant, the interviews of the defendant, upon which

2    he based his opinion.

3                I asked him, Did you ever look at the

4    pictures from the scene, the clothing tied to the

5    headboard?  No, never saw the pictures.

6                What about the condoms?  Oh, he's got an

7    explanation for those, I believe that.  What about the

8    drinking?  He was drinking to excess, I believe that.

9    And he stood here, and the last question I asked him,

10   he answered that the fact there were restraints tied

11   to the head of Adair Rowland's bed and the fact that

12   he had condoms, two condoms in his pants, had no

13   sexual connotations to it whatsoever.

14                Use your common sense, ladies and gentlemen

15   of the jury, your common experience.  What else could

16   those restraints and condoms infer?  But yet Doctor

17   Rosmarin wants you to believe that it is everyone

18   else's fault but Christopher Ellen's.

19                It was his mother's fault for being

20   abusive; it was his stepmother, I mean foster mother's

21   fault for being abusive, the big bully in high school

22   tried to strangle him, the Marine Corps was not nice

23   to him, he didn't get along with people at work, and

24   his wife was to blame partially.  Everyone but

25

1    himself.  He had an explanation for everything that

2    the defendant told him.

3            Think about the socks.  Why did Doctor

4    Rosmarin say that he had these on his hands, because

5    apparently the defendant told him that when he was

6    three years of age, his mother, his natural mother

7    abandoned him, one time by holding his hand over a hot

8    gas burner and more about somehow that comes up again

9    when he breaks into this house.  Is he afraid of

10   burning his hand?

11           Ask yourselves whether Doctor Rosmarin's

12   explanation makes any sense.  I suggest to you,

13   absolutely not.

14           Everyone is to blame for this episode

15   except for the defendant.  When he had to agree that

16   his diagnosis of dissociative disorder not otherwise

17   specified, sort of a catch all, had to be persistent

18   and recurring, he justified that by saying, Well,

19   back approximately twenty years ago in the

20   Thaidland/Cambodian border, he had a dissociative

21   episode, like shell shock.  I suggest to you that is

22   totally unfounded, except for what the defendant said.

23           He said there may have been one other

24   episode when he found himself in Boston and didn't

25

1    know how he got there.  That's persistent and

2    recurring behavior.  It could have indeed meant the

3    defendant had never sought treatment and never had any

4    treatment for any type of mental illness or mental

5    defect.

6            Doctor Rogers, on the other hand, was hired

7    by the Commonwealth, good credentials,  And as the law

8    allows him, he went and interviewed the defendant

9    himself for approximately an hour and a half.

10   Mr. McGuire is absolutely right.  But different ·in his

11   analysis as opposed to Doctor Rosmarin, whose was that

12   he took what the defendant told him in context, what

13   the physical evidence was at the scene.  He didn't

14   just adopt everything that the defendant told him.

15   He has had a great deal of experience and as he told

16   you, most defendants in that situation, always tells

17   them they don't remember.  What the defendant told

18   him, he put in context what he saw at the scene.

19            He told you that the person who had broken

20   in and carefully tied those restraints and hid in

21   waiting and disabled the lights and telephone had a

22   rational intellect and knew what he was doing, wasn't

23   confused.  Probably used very, very poor judgment, but

24   had the mental ability to understand what he was doing

1 was wrong and to conform his actions to the

2 requirements of the law.

3    He also indicated and based this upon that

4 there was no history of treatment, the fact that he

5 tried to cover up his steps with the condoms and socks

6 and the fact that he rationally talked to Adair

7 Rowland about her pleas of money and the car and such

8 things.

9    He found no evidence of any mental disease

10 or defect that would prevent him from understanding

11 what he was doing was wrong or prevent him from

12 behaving as the law requires.

13    So you may be asking yourselves at this

14 point, Well, what explanation is there from the

15 Commonwealth for his behavior?  The Commonwealth is

16 not, does not have to prove any kind of motive in this

17 particular case.  What they did, why they did this was

18 answered by himself when he took the stand in response

19 to one of the questions that was asked of him.

20    He responded, If a man can think it, a man

21 can do it.  If a man can think it, a man can do it.

22 The defendant thought about Adair Rowland, he had seen

23 her, he was infatuated with her.  She was single, she

24 was alone, she was attractive, he wanted her in the

state he was in, depressed, upset at work, not a happy

marriage.  She was something he wanted.  On that

Friday he put his plan into action, went down there,

but the mission was not accomplished.

He thought about it, perfected his plan on

Saturday and Sunday, thinking, I'm going to do this.

Then when he saw her, he started putting his plan into

action.  A few drinks to color his inhibitions by

drinking to increase his courage.  Then he left his

house with his condoms and put his plan into action.

He was going to do it.

Only the resourcefulness of Adair Rowland

and her alertness and alertness of neighbors who

called 911, and quick response of the Amesbury Police

prevented the defendant from carrying out his plan.

If a man can think it, a man can do it.

Now he is thinking he can trick you into believing

that he was insane at the time of this incident.  Use

your tools at your disposal, what you've seen, what

you've heard and particularly, your common sense.

Don't let him do it.

I suggest to you that the Commonwealth has

proven beyond any doubt based upon the facts and

circumstances, the evidence in this case, that the

1  defendant knew beyond a reasonable doubt what he was

2  doing; that he had no dissociation or mental defect to

3  prevent him from conforming his actions to the

4  requirements of the law; that he knew what he was

5  doing was wrong.

6          I want to thank you in advance for what I'm

7  sure will be a difficult task in front of you.  And

8  when you go upstairs to your palatial quarters, I ask

9  you to use your common sense, listen to each other and

10  reach a just verdict.

11          Thank you very much.

12  BENCH CONFERENCE:

13          MR. McGUIRE:  I'm going to ask for a

14  mistrial based on the Commonwealth's very improper

15  final argument.  The Commonwealth improperly referred

16  to the defendant's actions during the trial, to infer

17  guilt and his mental state.  So I object to that and

18  move for a mistrial based on that.

19          The Commonwealth shifted the burden of

20  proof by indicating at one point that what the

21  defendant needs to prove is so and so.  Because the

22  Commonwealth has shifted the burden of proof, I ask

23  for a mistrial based on that.

24          The Commonwealth relied very heavily on

25

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT
NO. 02 P 803

COMMONWEALTH,
Appellee

V.

CHRISTOPHER ELLEN,
Appellant

ON APPEAL FROM A CONVICTION
OF THE SUPERIOR COURT

BRIEF AND SUPPLEMENTAL RECORD APPENDIX
FOR THE COMMONWEALTH

ESSEX, SS.

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

ESSEX ss.                                    NO. 02-P-803


COMMONWEALTH

v.

CHRISTOPHER ELLEN

---

REPLY BRIEF FOR THE DEFENDANT
ON APPEAL FROM ESSEX COUNTY SUPERIOR COURT

---


DAVID J. BAREND

ATTORNEY FOR DEFENDANT

2 Stonewood Circle
North Attleboro, MA 02760
(508) 316-1171
BBO #564032


February, 2003

<u>TABLE OF CONTENTS</u>

TABLE OF CASES. . . . . . . . . . . . . . . . .ii

ARGUMENTS . . . . . . . . . . . . . . . . . . . 1

I.    <u>OFFICER OUELLET'S TESTIMONY CONCERNING MR.</u>
<u>ELLEN'S INVOCATION OF HIS RIGHT TO REMIAN</u>
<u>SILENT STRUCK AT THE HEART OF THE DEFENSE.</u> . 1

II.   <u>JUDGE MERRICK DID NOT PROVIDE A "CURATIVE"</u>
<u>INSTRUCTION.</u> . . . . . . . . . . . . . . . 4

III.  <u>THE COMMONWEALTH'S BREIF OVERSTATED THE</u>
<u>STRENGTH OF ITS CASE TO DIMINISH THE EFFECT OF</u>
<u>OFFICER OUELLET'S TESTIMONY.</u> . . . . . . . .7

IV.   <u>THE PROSECUTOR ASSERTED THAT OFFICER OUELLET'S</u>
<u>TESTIMONY WAS ADMISSIBLE.</u> . . . . . . . . . 10

V.    <u>THE COMMONWEALTH MISINTERPRETED THE</u>
<u>PROSECUTOR'S STTEMENTS IN HIS CLOSING</u>
<u>REGARDING THE COURTROOM BEHAVIOR OF MS.</u>
<u>ROWALND AND OTHERS.</u> . . . . . . . . . . . 10

VI.   <u>THE PROSECUTOR BLATANTLY MISTATED THE EVIDECNE</u>
<u>BY CLAIMING IN HIS CLOSING THAT MR. ELLEN</u>
<u>OBSERVED MS. ROWLAND AND WAS INFATUATED WITH</u>
<u>HER.</u> . . . . . . . . . . . . . . . . . . .12

VII. <u>THE PROSECUTOR'S COMMENTS IN HIS CLOSING</u>
<u>CONCERNING MR. ELLENS' REACTION TO THE</u>
<u>PORNORPHY CREATED SEVERE PREJUDICE TO THE</u>
<u>DEFENSE.</u> . . . . . . . . . . . . . . . . .15

VIII.<u>DR. ROSEMARIN NEVER IMPLICITY TESTIFIED THAT</u>
<u>DISSOCIATIONS MUST BE PERSISTENT AND</u>
<u>RECURRENT.</u> . . . . . . . . . . . . . . . .18

IX.   <u>NO RATIONAL TRIER OF FACT COULD FIND THAT MR.</u>
<u>ELLEN ENTERED MS ROWLAND'S HOME IN THE</u>
<u>NIGHTTIME.</u> . . . . . . . . . . . . . . . .19

CONCLUSION.......................................20

i

## TABLE OF CASES

1.   Commonwealth v. Bennett, 424 Mass. 64 (1997)
. . . . . . . . . . . . . . . . . . . . .  20

2.   Commonwealth v. Cobb, 374 Mass. 519 (1978). .3

3.   Commonwealth v. Coren, 437 Mass. 723 (2002)
. . . . . . . . . . . . . . . . . . . . . . . .14

4.   Commonwealth v. Depace, 433 Mass. 379, 385
(2001). . . . . . . . . . . . . . . . . . . . . .10

5.   Commonwealth v. Downs, 53 Mass. App. Ct. 195
(2001) . . . . . . . . . . . . . . . . . . . . .6

6.   Commonwealth v. Hoppin, 387 Mass. 25 (1982). 7

7.   Commonwealth v. Kelley, 359 Mass. 77 (1971).19

8.   Commonwealth v. King, 33 Mass. App. Ct. 905
(1992). . . . . . . . . . . . . . . . . . . . . .11

9.   Commonwealth v. Kozec, 399 Mass. 514 (1987)
. . . . . . . . . . . . . . . . . . . . . . . 13

10.  Commonwealth v. Mahdi, 388 Mass. 679 (1983)
. . . . . . . . . . . . . . . . . . . . . . . 2

11.  Commonwealth v. Martinez, 431 Mass. 168
(2000). . . . . . . . . . . . . . . . . . . . . 6

12.  Commonwealth v. Rodriguez, 49 Mass. App. Ct.
370 (2000). . . . . . . . . . . . . . . . . . . 7

13.  Commonwealth v. Smith, 387 Mass. 900 (1983).12

14.  Commonwealth v. Zevitas, 418 Mass. 677, 681
(1994) . . . . . . . . . . . . . . . . . . . . .4

ARGUMENTS

I.   OFFICER OUELLET'S TESTIMONY CONCERNING MR.
ELEN'S INVOCATION OF HIS RIGHT TO REMIAN SILENT
STRUCK AT THE HEART OF THE DEFENSE.

Based on a severe distortion of the facts, the
Commonwealth argued that Officer Ouellet's improper
testimony did not strike at the heart of the
defense.  (CB.31).[1]  Not only did the testimony
strike at the heart of the defense it did so in
multiple ways.

Officer Ouellet's statement allowed the jury
to believe that Mr. Ellen had the wherewithal to
avoid speaking to the police.  A juror could have
found this inconsistent with Mr. Ellen's claim of
having been intoxicated and his diminished capacity
defense.  This same reasoning applies to Mr.
Ellen's assertion of lack of criminal
responsibility.  A juror would have difficulty
reconciling Mr. Ellen's contention that he had been
in a dissociative state a very short while before
he exhibited sound decision making abilities at the
police station.

The Commonwealth contended that this evidence
of Mr. Ellen's lucidity had no bearing on his
insanity defense since he asserted that his
dissociation ended while at Ms. Rowland's home.

(CB.31). The time lapse between the alleged termination of the dissociation and when Mr. Ellen declined to speak with Officer Ouellet could not have been much more than one hour. (Tr.VI.89,96). In Commonwealth v. Mahdi, 388 Mass. 679, 688 (1983) the Supreme Judicial Court found harmful error even though the defendant's dissociation ended an entire day before he invoked his right to remain silent. The substantially shorter period of time in this case provides stronger support for the contention that the improper testimony struck at the heart of his insanity defense.

Another solid basis supporting the argument that the inadmissible evidence caused severe damage to the defense centers on Mr. Ellen's memory loss. Dr. Rosemarin testified that a hallmark of dissociation is a lack of memory. (Tr.VIII.8). Hearing that Mr. Ellen invoked his right to remain silent may, however, have prompted the jurors to find that he did, in fact, recall what had happened and had not actually experienced dissociation. The Commonwealth asserted that any effect that the testimony had on the jurors as to Mr. Ellen's memory was harmless. According to the Commonwealth

---

[1] The trial transcript will be cited by volume as (Tr.   ), the record appendix as (R.   ) and the Commonwealth's brief as (CB. ).

Mr. Ellen remembered most of the offense.  (CB.31).
This was a blatant misstatement of the testimony.

On direct examination, Mr. Ellen testified
that he had a memory lapse that commenced after his
wife's comment about setting his clock.
(Tr.VII.172).  His next memory was coming into a
light in a kitchen.  (Tr.VII.173).  On cross-
examination the prosecutor asked a series of
questions attempting to elicit any memory that Mr.
Ellen had concerning the alleged offense.
(Tr.VII.214-218, VIII.4-31).  This inquiry, which
encompassed over thirty pages of the transcript and
spanned two days of the trial, clearly revealed
that Mr. Ellen repeatedly stated that he had no
recollection.  Thus, by allowing the jury to find
that Mr. Ellen had a memory of the events, the
testimony of Officer Ouellet struck at the heart of
the defense.

In addition to arguing diminished capacity
and lack of criminal responsibility, Mr. Ellen also
maintained that he did not commit the crimes for
which he was accused.  The jury could have found,
however, that his refusal to speak with the police
was equivalent to an admission of guilt.  It would
not be unreasonable to believe that a juror might
think that an innocent person would have nothing to
hide from the police.  See Commonwealth v. Cobb,

374 Mass. 519, 521 (1978).  In contending that Mr.
Ellen's invocation of his right to remain silent
had no bearing on his innocence defense, the
Commonwealth, actually claimed in its brief that
"the defendant has essentially admitted committing
the offense[s]."  (CB.31).  Mr. Ellen never made
any such admission.

Mr. Ellen testified that he had no intention
of entering Ms. Rowland's home or carrying out any
plan.  (Tr.VIII.25).  He specifically stated that
he did not intend to murder Ms. Rowland.
(Tr.VIII.26).  At numerous points, Mr. Ellen
testified that he did not know how he obtained
entry into Ms. Rowland's home and, therefore, never
admitted "breaking" into her house.  (Tr.VII.214-
215).  Mr. Ellen also never admitted that he used a
sash or any other object as a dangerous weapon on
Ms. Rowland. (Tr.VII.175).  Thus, by hearing that
Mr. Ellen had invoked his right to remain silent,
the jury may have been less inclined to believe his
assertions of innocence.  The improper testimony,
therefore, struck at the heart of Mr. Ellen's
innocence defense.

II.  THE JUDGE'S INSTRUCTION WAS NOT "CURATIVE".

In Commonwealth v. Zevitas, 418 Mass. 677, 681
(1994), the Court held that the jury instruction
mandated by G.L. c.90 §24(1)(e), admonishing

4

against speculation and inferences based upon a lack of evidence of a blood alcohol test, violated a defendant's privilege against self-incrimination. "To inform a jury of the possible reasons for the absence of breathalyzer test results is to invite speculation that the lack of such evidence was due to a defendant's refusal to submit to testing because he believed or suspected that he had had too much to drink." Commonwealth v. Downs, 53 Mass. App. Ct. 195, 199 (2001) citing to Commonwealth v. Zevitas, 418 Mass. at 684.

As with the instruction in G.L. c.90 §24(1)(e), Judge Merrick's instruction infringed on the right to remain silent. In fact, the instruction in this case was even more egregious. As opposed to generally informing the jury that there were a number of reasons why one would invoke their right to remain silent, Judge Merrick specifically stated that Mr. Ellen had the right not to testify against himself. (Tr.VI.116). A juror could definitely believe that that right would have no bearing on an innocent person.

In Commonwealth v. Downs, 53 Mass. Ct. at 200, the Court found no error when a judge simply instructed the jury not to think about the breathalyzer. The Court held that the instruction did not violate the defendant's rights due to the

5

fact that the judge made no mention of the legal right to refuse to take the breathalyzer or the possible reasons for a refusal. Id. Judge Merrick's prolonged instruction contrasted sharply with that in Commonwealth v. Downs, 53 Mass. App. Ct. at 200. In addition to stating that Mr. Ellen might have decided not to speak so as not to incriminate himself, the judge referred to the right to remain silent multiple times. (Tr.VI.114-117). The Commonwealth's contention that the instruction did not exacerbate the error is, therefore, wrong.

Moreover, defense counsel specifically asked that the judge refrain from giving her instruction. (Tr.VI.114). The Commonwealth asserted in their brief that based on Commonwealth v. Martinez, 431 Mass. 168, 174 (2000), the judge had no obligation to comply with that request. (CB.29). Commonwealth v. Martinez, 431 Mass. at 174 is completely irrelevant. At no point in that case did defense counsel ask the judge not to provide a curative instruction. Id. In Commonwealth v. Downs, 53 Mass. App. Ct. at 200, however, the Court found no error when the judge instructed the jury over defense counsel's objection. The Court based its decision in part on the possible prejudice that the Commonwealth would face in the absence of such

6

an instruction.  <u>Id</u>.  Here, the lack of an instruction could not have harmed the Commonwealth's case in any way.  Judge Merrick, therefore, erred by refusing to defer to defense counsel's sound strategic decision not to have the jury instructed.

Even if this Court disagrees with the above arguments concerning the judge's instruction, it should still find that her failure to act immediately resulted in an ineffectual instruction. According to <u>Commonwealth v. Rodriguez</u>, 49 Mass. App. Ct. 370, 379 (2000), a delay in giving a curative instruction vitiates the curative effect. See also <u>Commonwealth v. Hoppin</u>, 387 Mass. 25 (1982).

### III. <u>THE COMMONWEALTH'S BREIF OVERSTATED THE STRENGTH OF ITS CASE.</u>

The Commonwealth claimed that Officer Ouellet's improper testimony constituted harmless error because of the "substantial evidence to support the opinion of Dr. Rogers that the defendant was not lacking in criminal responsibility due to a dissociative state." (CB.30).  The Commonwealth, however, acknowledged that there was conflicting expert testimony as to the defendant's dissociative state.  (CB.30).  It was this conflicting expert testimony that, according to <u>Commonwealth v. Mahdi</u>, 388 Mass. at

7

698, prohibits a finding that there was strong evidence of guilt.

To support its harmless error contention, the Commonwealth cited to Dr. Rosemarin's testimony when he conceded that Mr. Ellen could be found criminally responsible if the jury determined that he had been in Ms. Rowland's home prior to July 25, 1999. (CB.30). The Commonwealth then asserted that there was "strong circumstantial evidence" that Mr. Ellen had been in the house prior to the night of the attack. (CB.30). Nine pages later, the Commonwealth increased its assessment of that evidence to "nearly undeniable." (CB.39). Neither description applies to the actual facts.

The Commonwealth theorized that Mr. Ellen placed the scarf on Ms. Rowland's drainpipe, which she noticed on the morning of July 24, 1999, based on the discovery of other knotted clothing found on the night of the arrest. (Tr.IX.34). The Commonwealth, however, entered no evidence that Mr. Ellen's fingerprints had been found on the scarf or on the drainpipe. In addition, Mr. Ellen denied having ever been in Ms. Rowland's house prior to the night of July 25, 1999. (Tr.VII.153). Both he and his wife also testified that he did not leave their home on the evening of July 23, 1999. (Tr.VII.38,154).

8

The only evidence supporting the Commonwealth's theory was Ms. Rowland's testimony. No other person testified as to having seen the scarf on the drainpipe and Ms. Rowland never testified that she told anyone about the scarf prior to the alleged attack. Although Ms. Rowland initially suspected that one of her sons might have tied the scarf to the pipe, no evidence was entered as to whether the children were ever questioned. Similarly, the Commonwealth submitted no evidence concerning any inquiry of Ms. Lopez who had cleaned Ms. Rowland's house on July 21, 1999. Granted, Ms. Rowland found the scarf three days after Ms. Lopez had left, as opposed to the Commonwealth's statement in its brief, the pipe was far from "readily visible." (CB.4, Tr.V.134).

Further, it can easily be inferred that Ms. Rowland knew that Mr. Ellen had decided to advance a lack of criminal responsibility defense. She also more than likely knew that testimony indicating that he had premeditated his attack would diminish that defense. The evidence, therefore, allowed for the conclusion that Ms. Rowland lied in order to prevent her assailant from being released on a claim of insanity. Thus, the evidence that Mr. Ellen entered her house on a

9

prior date can not be labeled strong, much less
undeniable.

## IV. THE PROSECUTOR ASSERTED THAT OFFICER OUELLET'S TESTIMONY WAS ADMISSIBLE.

In an attempt to enhance its argument that the
prosecutor did not intend to elicit the improper
testimony from Officer Ouellet, the Commonwealth's
brief avers that he never tried to persuade the
judge that the testimony was admissible.  After the
judge excused the jury, defense counsel asserted
that the "cases are clear that such evidence is
impermissible . . .".  (Tr.VI.99).  The judge
subsequently asked the prosecutor, "So what you're
suggesting is that point what you've asked is
relevant to the lack of criminal responsibility?"
Mr. McAlary replied, "That's correct."
(Tr.VI.101).  Therefore, as opposed to the
Commonwealth's position, the prosecutor was not
merely arguing that the general view of his
question was appropriate.  He clearly advocated the
testimony was admissible.  Thus, just as in
Commonwealth v. Depace, 433 Mass. 379, 385 (2001),
the improper evidence was entered deliberately.

## V. THE COMMONWEALTH MISINTERPRETED THE PROSECUTOR'S STTEMENTS IN HIS CLOSING REGARDING THE COURTROOM BEHAVIOR OF MS. ROWALND AND OTHERS.

The Commonwealth claims that the prosecutor
"clearly" referred in his closing to "the

defendant's response to the witnesses and not to the conduct of the witnesses as spectators at trial." (CB.35). Mr. McAlary said, "You may have had an opportunity to look over to Mr. Ellen or Adair Rowland, or other people who were testifying." (Tr.IX.30). Thus, the prosecutor "clearly" referred not only to Mr. Ellen, but Adair Rowland and other people as well. Mr. McAlary then stated, "Were his responses in shaking his head either in agreement or disagreement, responsive?" (Tr.IX.30). The jury could have found that the prosecutor used the pronoun "his" to contrast Mr. Ellen's responses with those of the other spectators.

The prosecutor concluded this portion of his argument by saying, "You have the ability to recall what you have seen. Was it a logical response to what was happening on the witness stand?" (Tr.IX.30-31). The fact that Mr. McAlary did not specifically mention Mr. Ellen further buttresses the position that he was additionally referring to the conduct of other people in the courtroom.

At a minimum this Court must find that the Commonwealth's interpretation of the prosecutor's statements was not apparent on the record as required by <u>Commonwealth v. King</u>, 33 Mass. App. Ct. 905, 907 (1992). It has long since been decided

11

that a prosecutor's closing can properly include references to a defendant's reactions to witness testimony. See <u>Commonwealth v. Smith</u>, 387 Mass. 900, 907 (1983). A determination that the prosecutor "clearly" made such an argument here would, therefore, require a finding that Mr. McGuire did not know of this precedent when he objected. More importantly, it would require a finding that Judge Merrick misunderstood the law when she sustained the objection. The Commonwealth provided no support for this highly unlikely scenario.

## VI.  THE PROSECUTOR BLATANTLY MISTATED THE EVIDECNE BY CLAIMING IN HIS CLOSING THAT MR. ELLEN OBSERVED MS. ROWLAND AND WAS INFATUATED WITH HER.

According to the Commonwealth's brief, "the prosecutor laid out a web" of evidence supporting the inference in his closing that Mr. Ellen had "observed" and "wanted" Ms. Rowland. (CB.39). No such web of evidence existed. To show that Mr. Ellen had "observed" Ms. Rowland, the prosecutor pointed to the proximity of their homes. (Tr.IX.32). This at most indicates that Mr. Ellen had the opportunity to have seen Ms. Rowland, but by no means allowed for the conclusion that he "observed" her. The prosecutor also claimed that Mr. Ellen might have "observed" Ms. Rowland while she dressed in her closet. (Tr.IX.33). Ms.

12

Rowland's testimony belied this assertion.  She
stated that she undressed in a portion of her
closet beyond the window.  (Tr.VIII.58).  The only
evidence that the Commonwealth had that Mr. Ellen
actually saw Ms. Rowland was the testimony
concerning their exchange as she walked to Ms.
Blankenau's party.  (Tr.V.54).  The facts were,
therefore, insufficient to support an inference
that Mr. Ellen had been observing Ms. Rowland.  See
Commonwealth v. Kozec, 399 Mass. 514, 522 (1987).

The Commonwealth conceded that "the prosecutor
may have gone too far afield when he suggested that
the defendant peeped into Joan Blankenau's house"
before going to Ms. Rowland's house.  (CB.40).  It
claimed, however, that this comment was not
inconsistent with the defense.  (CB.40).  Whether
some creative interpretation exists to fit the
prosecutor's blatantly unsupportable statement with
the defense is irrelevant.  Mr. McAlary wanted the
jury to believe that Mr. Ellen initially looked
through Ms. Blankenau's window to confirm Ms.
Rowland's presence there.  This thought process,
attributed by the prosecutor to Mr. Ellen, caused
severe harm to the defense.  Simply put, Mr.
McAlary concocted evidence to attack a central
premise of the defense: Mr. Ellen had no control
over his actions.  This cannot be considered

harmless error.  See <u>Commonwealth v. Coren</u>, 437
Mass. 723, 731 (2002).

To support the prosecutor's claim that Mr.
Ellen "wanted" Ms. Rowland, the Commonwealth cited
to Officer Ouellet's discovery of two condoms in
his possession.  (CB.39).  Even discounting Mr.
Ellen's testimony that he had obtained the condoms
in hopes of having relations with his wife, the
evidence, at best, allowed the inference that he
anticipated the possibility of having sexual
intercourse when he left his house that evening.
In no way do the condoms permit an inference that
Mr. Ellen had any type of feelings toward Ms.
Rowland at any other time.  Therefore, assuming
that the jury could have found that Mr. Ellen
"wanted" Ms. Rowland on the evening of July 25,
1999, the question remained as to why.

The prosecutor attempted to answer this
question by asserting that Mr. Ellen had been
"infatuated" with Ms. Rowland.  (IX.60).  The
Commonwealth's brief does not even attempt to
address this baseless claim.  Not only had no
evidence of an infatuation been entered, but the
Commonwealth's own theory of the case contradicted
the contention.  According to the Commonwealth, Mr.
Ellen discovered Ms. Rowland's name when he looked
through her purse on the night of the July 25,

14

1999. (Tr.VIII.244). It would be hard to imagine that Mr. Ellen could have been infatuated with Ms. Rowland without even having found out her name.

More importantly, by suggesting that an infatuation was inferable, the prosecutor presented the jury with a motive for Mr. Ellen's behavior. Without the claim that Mr. Ellen had become infatuated with Ms. Rowland, the Commonwealth had no explanation for Mr. Ellen's actions. The lack of motive constituted the core of Mr. Ellen's defense. He testified that he acted unconsciously. (Tr.VII.174,181). His expert testified that this was consistent with dissociation. (Tr.VIII.130). Thus, the prosecutor's utter speculation that Mr. Ellen had been infatuated with Ms. Rowland, struck at the heart of the defense.[2]  Judge Merrick's instruction failed to specifically address this statement and did not render the error harmless. Id. at 733.

VII. THE PROSECUTOR'S COMMENTS IN HIS CLOSING CONCERNING MR. ELLENS' REACTION TO THE PORNORPHY CREATED SEVERE PREJUDICE TO THE DEFEENSE.

---

[2] Similarly, the prosecutor used the allegation of Mr. Ellen's infatuation to prove that he had been in Ms. Rowland's house on the night of July 23, 1999. Whether Mr. Ellen had been in her house at that time was a pivotal point. The prosecutor obviously believed that even in light of the supposedly "strong" evidence, he needed to present the jury with a reason why Mr. Ellen would have entered Ms. Rowland's house that night. He, therefore, concocted the infatuation to provide a motive for Mr. Ellen.

The prosecutor misstated the facts concerning the pornography incident at Mr. Ellen's place of employment when he claimed in his closing, "Someone was looking at pornography and [Mr. Ellen's] afraid he might get caught." (Tr.IX.42). The Commonwealth's brief avers that the error created no prejudice "where the record disclosed that the defendant had other reasons for reporting the incident, namely that he felt generally unappreciated at work relative to his co-workers." (CB.42). The record disclosed nothing of the kind.

In fact, during his cross-examination of Dr. Rosemarin, the prosecutor asked, "Would it be fair to say that [Mr. Ellen] may have reported that person because he was doing, the other person was wasting time looking at the internet and Mr. Ellen was doing the job and this person got credit for it?" (Tr.VIII.167). The judge immediately sustained Mr. McGuire's objection. (Tr.VIII.167). The prosecutor then inquired, "Would it be fair to say that another reason for him reporting was that he was working and the other person wasn't." (Tr.VIII.167-168). Once again, Judge Merrick sustained Mr. McGuire's prompt objection. (Tr.VIII.168). Thus, the liberties taken by the Commonwealth with the facts of the record have not ceased with Mr. McAlaray's closing.

16

The Commonwealth also tried to diminish the harmful effect of the prosecutor's incorrect statement concerning the pornography by asserting that "the issue as to "sexual sadism" was somewhat nullified by the directing out of the charge of assault with intent to rape. (CB.42). The dismissal of the assault with intent to rape charge did not, however, dampen the prosecutor's efforts to convince the jury that Mr. Ellen entered Ms. Rowland's home with the intent of tying her up and raping her. Not only did he pursue this issue during the cross-examination of Mr. Ellen and Dr. Rosemarin, but the prosecutor also alleged that Mr. Ellen planned on raping Ms. Rowland at numerous points throughout his closing. (Tr.VII.12,13,177-180; IX.34,37,38,45,48,49). The Commonwealth's "sexual sadism" contention obviously had not been nullified.

The defense countered this theory of an alleged intent to rape with the testimony pertaining to the pornography. The facts reveal that Mr. Ellen reported the actions of his co-worker due to his disgust with pornography. (Tr.VIII.167). Dr. Rosemarin testified that Mr. Ellen's virulent anti-pornography beliefs provided strong evidence against the notion that he entered Ms. Rowland's home with the intention of raping

her.  (Tr.VIII.117).  Therefore, by presenting the jury with incorrect facts about Mr. Ellen's reaction to the pornography, the prosecutor may have damaged the defense.  See Id.

## VIII. DR. ROSEMARIN NEVER IMPLICITY TESTIFIED THAT DISSOCIATIONS MUST BE PERSISTENT AND RECURRENT.

The Commonwealth does not dispute that the prosecutor's statement in his closing that Dr. Rosemarin asserted that dissociative disorders had to be "persistent and recurring" was a potentially damaging misrepresentation.  (CB.43).  It contends, however, that the "persistent and recurring" element of the disorder was not in dispute.  (CB.43).  That is untrue.

The defense entered testimony that Mr. Ellen experienced two prior dissociations.  The Commonwealth's expert testified that this evidence was insufficient to support that Mr. Ellen suffered a dissociation on January 25, 1999 due to his belief that dissociation disorders are persistent and recurring.  (Tr.VIII.228,239).  Dr. Rosemarin, however, contended that Mr. Ellen could have experienced dissociation while at Ms. Rowland's house even though the first of his only two prior dissociations occurred over 20 years before.  (Tr.VIII.110).  Thus, Dr. Rosemarin never even implicitly testified that dissociations must be persistent and recurring.  The prosecutor's

18

misstatement of the facts, therefore, allowed the jury to find Mr. Ellen guilty based on an incorrect interpretation of the defense expert's testimony.

IX.   NO RATIONAL TRIER OF FACT COULD FIND THAT MR. ELLEN ENTERED MS ROWLAND'S HOME IN THE NIGHTTIME.

The Commonwealth's brief listed evidence that it alleged supported the contention that Mr. Ellen entered Ms. Rowland's house "under the cover of darkness". (CB.49). A review of those facts reveals, however, that the jury would have had to impermissibly rely on surmise, conjecture or guesswork in order to come to that conclusion. See Commonwealth v. Kelley, 359 Mass. 77, 88 (1971).

The Commonwealth cited to the fact that Ms. Rowland lived in a residential area "where people were out and about". (CB.49). The record contains no evidence of anyone in the outside confines of the neighborhood past the point when Ms. Rowland walked to Ms. Blankenau's party. The jury definitely could not find that "people were out and about" until darkness set in. The Commonwealth next contended that the evidence indicated that Mr. Ellen entered through the bulkhead. (CB.49). According to the Commonwealth, entering through the bulkhead "may have drawn neighbors' attention" during the daytime hours. (CB.49). Absolutely no evidence was entered pertaining to the position of

19

the bulkhead that would allow for such a
conclusion.

More importantly, even if this Court could
find sufficient evidence that Mr. Ellen entered Ms.
Rowland's home on July 25, 1999 "under the cover of
darkness", it must still hold that the judge erred
by failing to enter a directed verdict.  The
Commonwealth needed to prove beyond a reasonable
doubt that Mr. Ellen entered in the nighttime, not
simply during darkness.  See <u>Commonwealth v.
Bennett</u>, 424 Mass. 64, 65 (1997).  It is common
knowledge that darkness occurs well within one hour
after sunset.  Therefore, a determination that Mr.
Ellen entered Ms. Rowland's house while it was dark
would not be sufficient for a rational trier of
fact to conclude that he entered in the nighttime.

<u>CONCLUSION</u>

For the reasons set forth above, the
Defendant's convictions should be overturned and a
not guilty verdict should be entered for the charge
of burglary - assault on occupant.

Respectfully submitted,

DAVID J. BAREND
ATTORNEY FOR DEFENDANT
2 Stonewood Circle
North Attleboro, MA 02760
(508) 316-1171
BBO #564032

February, 2003

20

<u>CERTIFICATE OF SERVICE</u>

Date:  February 18, 2003

Ashley Brown Ahearn, Clerk
Appeals Court
15th Floor, New Court House
Pemberton Square
Boston, MA  02108

Dear Madam:

Herewith are seven copies of the reply brief

in No. 02-P-803,


COMMONWEALTH

v.

CHRISTOPHER ELLEN


I certify that I have made service by
depositing in the post office, with first-class
postage prepaid, two copies of the reply brief for
the above referenced case to the office of the
District Attorney of Essex County One East India
Square, Salem, Massachusetts 01970.


DAVID J. BAREND
Attorney for Christopher Ellen