# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

_____
                                       )
CHRISTOPHER ELLEN,                     )
                                       )
        Petitioner,                    )
                                       )
v.                                     )        Civil Action No. 05-10538-WGY
                                       )
BERNARD BRADY,                         )
                                       )
        Respondent.                    )
_____)

## RESPONDENT'S MEMORANDUM IN OPPOSITION TO PETITION

Respondent Bernard Brady (the "Respondent") hereby submits this brief in opposition to the Habeas Corpus Petition (the "Petition") filed by Petitioner Christopher Ellen (the "Petitioner"), an inmate at the Old Colony Correctional Center in Bridgewater, Massachusetts. There is no merit to the Petitioner's claim that his silence after being arrested and receiving Miranda warnings[1] was used against him in his state trial in violation of his due process rights. Furthermore, even if any constitutional error had been committed, it would have been harmless. The Petition must thus be denied.

## I.      RELEVANT BACKGROUND

### A.      The Petitioner's Attack Upon His Neighbor

The state judgment challenged in this habeas corpus action arises from a set of events occurring in July 1999.  At that time, the Petitioner was living in Amesbury, Massachusetts, adjacent to the home of a woman named Adair Rowland ("Ms. Rowland").  Her house was, in fact, visible from his, and she would often change clothes in a closet with windows from which

his house could be seen.  (Tr. at VIII:57-61.)[2]  While Ms. Rowland's sons also lived in the home,

they were away at summer camp during that month.  (Id. at V:40-41.)  Thus, on the night of

Friday, July 23, 1999, Ms. Rowland slept in her son's rooms, in order to take advantage of its air

conditioning.  (Id. at V:45-47.)  Then, on the morning of Saturday, July 24, 1999, while cleaning,

Ms. Rowland discovered a green bowtie tied to the drainpipe alongside the radiator in her dining

room.  (Id. at V:48, 133-35.)  The tie was normally stored in a box within a closet in her third-

floor attic.  (Id. at V:48-49.)  At the time, she believed that it simply might have been tied to the

pipe by one of her sons.  (Id. at V:135-36.)  She again spent the night sleeping in her son's

bedroom, using the air conditioning.  (Id. at V:51-52.)

On the evening of Sunday, July 25, 1999, Ms. Rowland left her home to attend a dinner

party at the home of a neighbor named Joan Blankenau ("Ms. Blankenau").  (Id. at V:42, 52-53.)

She closed, but failed to lock her door.  (Id. at VIII:57.)  As she headed down the street with a

bottle of wine in her hand, she passed a group of men, including the Petitioner, who were holding

glasses or bottles.  (Id. at V:42, 53-54.)  The Petitioner called out, "Don't think we didn't see you

walking by with that bottle of wine," to which Ms. Rowland replied, "It looks like you've

already got it covered" and kept walking.  (Id. at V:42, 54-55; VII:165-66.)  The Petitioner and

Ms. Rowland did not know each other at that point.  (Id. at V:41, 55, 76; VII:165-66.)

Upon leaving the dinner party at around 10:00 PM, Ms. Rowland walked home and

entered her house through its back door.  (Id. at V:57-60.)  When she went up the staircase to her

second-floor bedroom, she found the lights were off and neither a lamp on her bureau nor a light

near her been were working.  (Id. at V:58-63.)  She was able to turn on an overhead light using a

---

[1]  See Miranda v. Arizona, 384 U.S. 436, 444-45 (1966) (mandating that arrestees be notified of,
inter alia, their right to remain silent).

pull chain, however.  (Id. at V:64-66.)  Kneeling down to inspect an area of her bedroom that had

been leaking, she noticed under her bed a yellow sweater that she recalled having put in her

bureau that morning.  (Id. at V:66-67.)  It had been tied to the bedpost.  (Id. at V:68.)  Ms.

Rowland then untied the sweater and went downstairs.  (Id. at V:69-70.)

      At that point, she phoned her ex-husband and Ms. Blankenau.  (Id. at V:69-71, 234-35.)

She left an answering machine message for her ex-husband and spoke with Ms. Blankenau.  (Id.)

Ms. Rowland told Ms. Blankenau that something was wrong in her house and agreed that Ms.

Blankenau should come over.  (Id. at V:71, 234-35.)  She then unlocked her back door, opened

it, and turned on the outside light.  (Id. at V:73-74.)  Then light then went back off, perhaps by

way of another light switch at the top of the stairs.  (Id. at V:73.)  She turned it on again, and it

stayed on.  (Id. at V:73-74.)

      Returning to her kitchen, Ms. Rowland heard a very loud noise from the stairway and

then saw the Petitioner entering the kitchen.  (Id. at V:75.)  He was wearing only a pair of shorts,

and a pair of tube socks on his hands.  (Id. at V:75-77.)  He approached her with his arms

extended and then backed her into a corner of the kitchen while hitting her in the face, knocking

off her eyeglasses.  (Id. at V:75-81.)  When she falsely told him that the police were on their way

there, he called her a liar.  (Id. at V:77-80.)   Her claims that her neighbor would be there

momentarily also failed to stop him.  (Id. at V:80.)  Instead, he lifted Ms. Rowland up by her

shoulders and threw her against the counter.  (Id.)  He ran to the back door, and Ms. Rowland

heard its lock click shut.  (Id.)  As he returned to her, she picked up and threw her cordless

telephone at him.  (Id. at V:84.)  She then swung a saucepan at him, striking him barely, if at all.

(Id.)  When she tried hitting him again, he grabbed her, pulled her to another part of the kitchen,

<hr />

[2] Portions of the transcript of the Petitioner's trial in the Essex County, Massachusetts, Superior

and pushed her up against the counter.  (Id. at V:84-85.)  He forcefully pressed his thumbs up under her chin, and she dropped the saucepan.  (Id. at V:85.)  When she attempted to break free, he punched her in the stomach.  (Id. at V:86.)  After she screamed for help and made other attempts to free herself, he placed his hand over her face and threw her to the floor.  (Id.)

The sound of a pan dropping was heard by another neighbor named Mary Reilly ("Ms. Reilly").  (Id. at V:194-96.)  When she looked into the Rowland home, Ms. Reilly saw a dark-haired, bearded man in shorts and blond woman fighting and heard the woman scream for help. (Id. at V:197-200.)  She called 911, reported that she thought she was witnessing a domestic dispute, and continued to watch.  (Id. at V:200-02.)

Around that time, both Ms. Rowland and the Petitioner heard Ms. Blankenau banging on the back door.  (Id. at V:86-87.)  Ms. Blankenau, who was accompanied by a dinner guest named Mary Doyle ("Ms. Doyle") and another dinner guest, found the door locked.  (Id. at V:210-12, 235-38.)  Ms. Blankenau and Ms. Doyle heard Ms. Rowland say, "Please" and a man's voice. (Id. at V:211-12, 236.)  The Petitioner straddled Ms. Rowland and told her to turn off the lights and tell Ms. Blankenau to go home.  (Id. at V:87.)  When Ms. Rowland offered him her wallet and money, he replied, "What, four bucks?"  (Id.)  When she offered him her car, he responded, "Adair, I don't want your car."  (Id.)  Submitting to the Petitioner's demand, Ms. Rowland called out for Ms. Blankenau to leave, but Ms. Blankenau responded that she was calling 911.  (Id. at V:88, 212, 236.)  She then returned home to do so, reporting that she thought a woman was being attacked or hurt by a man in her house.  (Id. at V:237-39.)

Meanwhile, the Petitioner's attack upon Ms. Rowland continued.  He wrapped around her neck a purple sash that she recognized as part of her junior prom dress that she had stored in the

---

Court are cited as follows:  "Tr. at [volume]:[page(s)]."

4

same box in her attic as the aforementioned green bowtie.  (<u>Id.</u> at V:88.)  The Petitioner pulled

the sash tight around her neck multiple times, keeping her on her knees.  (<u>Id.</u> at V:89-90.)  She

had trouble breathing, saw lights flashing, felt lightheaded, and expected to pass out.  (<u>Id.</u> at

V:90-91.)  The Petitioner then suddenly released the sash and said, "This is stupid.  This is

stupid.  I'm a dead man."  (<u>Id.</u>)  He extended his hand to her and offered to help her up.  (<u>Id.</u>)

When she expressed fear and asked who he was, he replied, "Who am I?  Well, I'm an insane

individual and you are a victim and I'm a victim."  (<u>Id.</u> at V:91-92.)  Ms. Rowland again offered

him her car, he asked where he would go, and then noticed that the police had arrived.  (<u>Id.</u> at

V:91-93.)

Sergeant William Scholtz of the Amesbury Police Department ("Sgt. Scholtz")

approached the Ms. Rowland home and saw the Petitioner and Ms. Rowland inside.  (<u>Id.</u> at

VI:19.)  After he asked multiple times that the door be opened, the Petitioner opened it.  (<u>Id.</u> at

VI:19-20.)  When the sergeant asked Ms. Rowland to step outside, the Petitioner stated, "It's her

house, I'll step out."  (<u>Id.</u> at VI:20.)  As he emerged from the house, Sgt. Scholtz and Amesbury

Police Officer Kevin Ouellet ("Officer Ouellet") noticed that he had a white cloth-like item in his

hand.  (<u>Id.</u> at VI:24, 84.)  Ms. Doyle observed that he was barechested, in shorts, sweaty, and

bloody, and that he had something white on his hands.  (<u>Id.</u> at V:217-18.)

Ms. Blankenau found Ms. Rowland at that point to have trouble breathing and speaking,

a swollen face, rings around her neck, a very large bump with a cut over her eye, and marks on

her arms.  (<u>Id.</u> at V:242.)  Ms. Doyle described Ms. Rowland as shaking and in shock.  (<u>Id.</u> at

V:220-23.)  She said Ms. Rowland had swollen arms, a swollen and bloody face, very prominent

red marks on her neck, bruises, and difficulty speaking.  (<u>Id.</u>)  When Sgt. Scholtz spoke with Ms.

Rowland, he found her to be wide-eyed, to have trouble breathing, and to have trouble

swallowing.  (Id. at VI:21.)  She told him that the Petitioner had attacked, tried to kill, and strangled her.  (Id. at VI:23.)  Officer Ouellet, joined by Amesbury Police Officer Mark Valli ("Officer Valli"), spoke with the Petitioner.  (Id. at VI:86-87.)  He admitted hitting Ms. Rowland, but stated that he did not know why he had done so.  (Id.)

Police officers then inspected Ms. Rowland's home.  (Id. at V:95-105.)  Throughout the house, they found articles of clothing that Ms. Rowland indicated had been stored in her bedroom closet or the aforementioned box in her attic.  (Id..)  Several of them were either knotted, ripped, or tied to furniture.  (Id. at V:95-105, 148; VI:32-33, 151-53.)  Among these were a green bowtie and a pair of pants from her closet that were tied to the bedpost in Ms. Rowland's bedroom.  (Id. at V:95-105, 135; VI:32-33, 177.)  On her kitchen floor, the police found the cordless phone receiver, the saucepan, and the purple sash, as well as a bent pair of her eyeglasses, some blonde hair, and a white bathrobe sash that she had last seen hanging in the closet off her bedroom.  (Id. at V:95-98; VI:154-55, 171-72.)  They also discovered that the phone in her bedroom had been unplugged and the bulkhead at the entrance to the basement had been wedged open.  (Id. at V:47, VI:30.)  Several days later Ms. Rowland additionally found and a scarf tied to the bedpost in her son's room.  (Id. at V:110-12.)

Following the attack, the Petitioner was taken to the Amesbury police station in a police cruiser.  (Id. at VI:89.)  As he was being removed from the car, Officer Valli spotted a pair of white gym socks in its rear seat.  (Id. at VI:84.)  Officers found that the Petitioner was sweating profusely and smelled of alcohol, but did not notice any slurring of his speech or evidence of impairment.  (Id. at VI:20, 66, 74, 91, 95, 134, 146, 161, 166.)  As he was being booked at the police station, Officer Ouellet heard something hit the floor and saw a sealed condom packet at

the Petitioner's feet.  (<u>Id.</u> at VI:119-20.)  He then found another such packet in the Petitioner's

waistband.  (<u>Id.</u>)

      **B.**      <u>**The Petitioner's Trial and Conviction**</u>

On August 11, 1999, the Petitioner was indicted by an Essex County, Massachusetts,

grand jury on the following charges:  assault with intent to murder, in violation of M.G.L. c. 265,

§ 15, assault with intent to rape, in violation of M.G.L. c. 265, § 24; burglary with assault on an

occupant, in violation of M.G.L. c. 266, § 14, and assault and battery with a dangerous weapon,

in violation of M.G.L. c. 265, § 15A(b).  (Super. Ct. Docket Nos. 9977-CR-1647 through 9977-

CR-1650 (collectively, "Super. Ct. Dockets").)  He pled not guilty on all counts at his

arraignment on August 24 of that year.  (Super. Ct. Dockets.)

He was tried in the Essex County Superior Court before the Honorable Nancy Merrick

and a jury between October 2 and 16, 2000.  (<u>Id.</u>)  The prosecution called the following

individuals as fact witnesses:  Ms. Rowland, Ms. Reilly, Mary Doyle, Ms. Blankenau, Sgt.

Scholtz, Officer Valli, Officer Ouellet, Detective David Pare, Detective Robert Wile, and

Investigator Jennifer Skelton.  (Tr. at V; VI.)  Collectively, they testified consistently with the

facts set forth <u>supra</u> Section I.A.  (<u>Id.</u>)

The portion of the trial giving rise to the claim in the Petition occurred during Officer

Ouellet's direct testimony as part of the prosecution's case.  (Pet. ¶ 12.A; Pet'r's Mem. Supp.

Pet.)  Immediately after the prosecution elicited testimony establishing that the Petitioner

understood and was able to answer questions posed to him while being booked, the following

exchange took place:

    Q.      Okay.  As part of the booking process was he given what is known
               as the Miranda warning?

    A.      Yes, he was.

Q.    And where does that fit into the procedure of booking?

A.    Sometimes during booking it can be given at the beginning, the middle, the end, or during.

Q.    On this particular occasion do you recall when you did that?

A.    I can't recall exactly when.

Q.    What procedure did you follow in giving him his Miranda warning?

A.    He was asked to read his Miranda warning on the board in front of him, the wall beside him, and have him read it along with me as I am reading it from a card to him.

Q.    Did he read it out loud?

A.    No.

Q.    Did you read it out loud to him?

A.    Yes.

Q.    After each warning did you ask him if he had any questions?

A.    Yes.

Q.    Did he respond to that?

A.    Yes.

Q.    Did he have any questions?

A.    He had no questions.

Q.    After completing the Miranda warning, did you read off a small green card?

A.    Yes.

Q.    And that is the procedure you use at the Amesbury Police Station?

A.    Correct.

> Q.     At the conclusion of giving him his Miranda warning, what, if anything, did you say or do with him?
>
> A.     On the bottom of the card is, you know, Do you wish to speak to me now, is on the bottom of it.  And on that, when I asked him to sign it, he printed the word no. and signed the card.

(Tr. at VI:94-97.)

At that point, the Petitioner's counsel objected and, at sidebar, requested a mistrial.  (Id. at VI:97; see also Super Ct. Dockets.)  He argued that the prosecution improperly "introduced evidence that the defendant exercised his right to silence" and that "[t]here's no instruction or anything that this court can do to cure it."  (Tr. at VI:97.)  Judge Merrick indicated that she would take up the issue right then, noting that she wanted to hear from the attorneys on the issue, that she would like to be given relevant case citations, and that they were "overdue for a morning break anyway."  (Id. at VI:97-98.)  She told the jurors that the court would be taking their morning recess of between fifteen and twenty minutes and would then resume.  (Id. at VI:98.)

The judge then heard argument from attorneys for the prosecution and the Petitioner.  (Id. at VI:98-105.)  The prosecution reasoned in part as follows:

> The defendants' defense in this particular case is mental impairment.  Clearly, we can offer to the jury all the testimony available to us concerning his understanding, his actions, his voluntariness.
>
> Clearly, I am well aware that you can't go to the limit, that he has every constitutional right not to make a statement to the police.  The fact that he indicated that he understood his rights is admissible, the fact that he signed his Miranda warning and made an intelligent decision, not that I would have asked if he made a statement.  But I only wanted to get in the portion.  And in this context it is appropriate that he understood, he answered the questions, and what his mental state was.

(Id. at VI:99-100.)  The Petitioner's counsel repeated his position and, in response to her inquiry, advised Judge Merrick as to the section of a treatise on evidence that he was referencing.  (Id. at VI:98-99, 103.)  He added that, "[i]f the Commonwealth seeks to put this kind of evidence in, it

can only come in after the defendant raises some sort of an issue and the Commonwealth seeks to have this as impeachment.  This is black letter law and the Commonwealth has violated the defendant's constitutional rights.  There can be no remedy for this but a mistrial." (<u>Id.</u> at VI:103.)

Judge Merrick suggested that the issue should be taken up after the nature of the Petitioner's defense becomes clear, noting that an analogous situation arose in connection with a prior motion concerning fingernail scrapings.  (<u>Id.</u> at VI:100-04.)  However, she indicated that she would like to examine relevant cases and invited counsel to supply some to her.  (<u>Id.</u> at VI:103-05.)  In the meantime, the court would take "another fifteen or twenty minutes," she decided.  (<u>Id.</u> at VI:104.)  "I would like to be satisfied before I entertain a motion with the ramifications that it would have here," she said.  (<u>Id.</u> at VI:105.)

When Judge Merrick and counsel returned, the judge indicated that she had "had an opportunity to look at a few cases," and had received one from the prosecutor.  (<u>Id.</u> at VI:105.)  Defense counsel then called the judge's attention to <u>Commonwealth v. Mahdi</u>, 88 Mass. 679, 694, 448 N.E.2d 704, 713 (1983), and read aloud an excerpt from that case referencing <u>Doyle v. Ohio</u>, 426 U.S. 610, 620 (1976).  (<u>Id.</u> at VI:105-06.)  Judge Merrick indicated that she now saw the issue more as one of admissibility than timing.  (<u>Id.</u> at VI:107.)  The prosecutor then argued that the Petitioner's case was distinguishable from <u>Mahdi</u> because the former involved a claim of only temporary dissociation while in Ms. Rowland's house, while the latter involved a claim of full insanity.  (<u>Id.</u> at VI:107-08.)  He also reasoned that, unlike the situation in <u>Mahdi</u>, there had been no wilful attempt on his part to elicit a comment on the defendant's silence.  (<u>Id.</u> at VI:108-09.)  "I certainly wouldn't have asked him if he wished to remain silent," he asserted.  (<u>Id.</u> at

VI:109.)  In response, defense counsel disputed the prosecutor's claim that <u>Mahdi</u> involved a different type of insanity claim.  (<u>Id.</u> at VI:109-110.)

The judge then referenced the consideration in past cases of harmless error and whether the offensive comment was repeated in the prosecution's closing.  (<u>Id.</u> at VI:110.)  She asked defense counsel, "[W]here there is nothing to suggest that [the prosecutor] was intending to elicit that from the officer, why should – isn't that a drastic remedy?"  (<u>Id.</u>)  Defense counsel maintained that the relief he sought was mandated by <u>Mahdi</u> and that the prosecutor "sought" the comment at issue "in order to show that the defendant was sane by exercising his right to remain silent."  (<u>Id.</u> at VI:111.)

Referencing case law, the judge contended that "'if the judge immediately instructs the jury to disregard the questions, reprimands the prosecutor and explains whey the questions are improper, the error may be found harmless.'"  (<u>Id.</u> at VI:111 (quoting source).)  "[W]hy wouldn't striking that testimony with strong instructions be adequate where this isn't a case that the evidence has been introduced and [the prosecutor] has used that in his closing to kind of hammer the point home?" she asked.  (<u>Id.</u> at VI:111-12.)  While maintaining that the comment strikes at the heart of the Petitioner's defense, his counsel conceded that "[i]mpeaching a defendant who takes the stand with his silence may be a grade of error which can be cured by an instruction."  (<u>Id.</u> at VI:112.)

Ultimately, the judge concluded that the error was no egregious enough to warrant a mistrial, and that it would be sufficient to strike the comment at issue "together with curative instructions of the strongest form."  (<u>Id.</u> at VI:113-14.)  In explaining her reasoning she noted that, under <u>Mahdi</u>, a court can consider "the relationship between the evidence and the premise of the defense,  . . . the weight and quantum of evidence of guilt, [and] the frequency of the

reference and availability or effect of curative instructions." (<u>Id.</u> at VI:113.)  She further noted

that there were two references to the defendant's silence and no curative instructions in <u>Mahdi</u>,

but "in this case, there was one question, one answer." (<u>Id.</u>)  The Petitioner's counsel again

objected, stating, "I can't see . . . how that is going to assist because you're simply going to be

underlining the error." (<u>Id.</u> at VI:114.)

    The jurors were then called back in and instructed by the judge as follows:

> I just preface the instruction [that I am about to give], again, with the instruction that any instructions that I give, you are required to follow and you promised that you would do that.  So it's important that you do consider all instructions, including these and follow them to the letter.

> Just before we broke, there was a question that was asked by the prosecutor with regard to Mr. Ellen being given his so-called Miranda rights.  And I think most people are familiar with that concept, which are constitutional rights that we all have.  And you will recall at the beginning of this trial before we even began the trial, before we even had you picked, I told you all when you were sitting there as a pool of jurors that there was some very core, basic constitutional principles and protections that we all have as American citizens.  And one of those principles is that we are presumed, should we be charged with a crime, we are presumed to be innocent, and that we cannot be forced to testify against ourselves.

> In other words, we have protection against incrimination, self-incrimination.  And those are very important principles of law that I touched on briefly, will define and discuss in more detail at the end of the case.  But I told you at the beginning of this case about those principles and asked you if you understood and accepted them all.  And these are principles that continue to apply here in this case.

> And so the defendant doesn't have to do anything.  No defendant in a criminal case has to do anything when they're charged.  They don't have to present witnesses, they don't have to present exhibits, they don't have to, they don't have to say anything.  And indeed, once one is arrested, that's really what Miranda, the Miranda case, the guarantees envision is that someone cannot be forced to testify against themselves.  And if they are asked, Do you want to say something?, they have every right in the world to say no, I don't want to.  Because they don't have to do that.  The constitution doesn't make us do that.   It gives us that protection.

And what goes with that is that when someone chooses to avail themselves of that important constitutional right that we all have, and this defendant is no different, that important constitutional right, when you say I'm going to invoke that right and I don't want to talk to you, that should never be used against you. A jury should never say, well, you know, he said he didn't want to talk, that must mean something. That would be wrong. And so that was an improper question that was put to the witness to the extent the witness responded and said, and gave the answer that he did.

So what I'm going to do is strike that answer that you heard from the police officer and tell you and instruct you that you are to disregard that. And I wanted you to understand why, because it is very important and you have promised the Commonwealth and the defendant that you would follow and honor these important constitutional protections that we all have, and that this defendant is entitled to in this case. So please bear that in mind, just it is not something that should be used against him. It should not be considered as evidence and it should be stricken from your minds, as it is now from the record of this trial.

(Id. at VI:114-17.)

At that point, the Petitioner's counsel renewed his motion for a mistrial, arguing as follows:

I believe the court's instructions simply made things worse. The court is saying, instructing the jury about self incrimination, the defendant not having to testify against himself, I think clearly, unfortunately underlined the fact that these jurors will now think that, Well, if no guilty defendant has to say anything, therefore, he is guilty. So I would suggest to the court that the instruction didn't cure the error.

(Id. at VI:117-18; see also Super. Ct. Dockets.) His motion was again denied, and he objected. (Tr. at VI:118.) No further comments on the Petitioner's post-Miranda silence were made at any subsequent point in the trial. (Id. at VI-IX.)

At the close of the prosecution's case, the Petitioner moved for a required finding of not guilty as to all charges. (Super. Ct. Dockets.) It was allowed with respect to the charge of assault and battery with intent to rape only. (Id.)

The defense offered fact testimony from the Petitioner and his wife, Denise Ellen ("Ms. Ellen"), and it recalled Ms. Rowland. (Tr. at VIII.) The Petitioner and Ms. Ellen indicated that,

shortly before the night in question, they resumed having marital relations, which they had had

only sporadically in the preceding five years.  (Id. at VII:30, 36, 38, 45-46, 73-75.)  On the

afternoon of Sunday, July 25, 1999, the Petitioner was depressed, got a bottle of whisky, and had

three glasses of whisky and cola between 4:00 and 9:00 PM.  (Id. at VII:46-50, 54, 161.)  It was

during this period that the Petitioner called out to Ms. Rowland as he was standing outside a

neighbor's house and she was walking past.  (Id. at VII:55-56, 164-66.)  At that time, the

neighbor mentioned that Ms. Rowland was a divorcee who was new to the neighborhood.  (Id. at

VII:165-66.)

The Petitioner claimed that, that evening, he changed into a pair of shorts and picked up

two condoms with the intent of having relations with his wife.  (Id. at VII:63, 169-71.)

According to Ms. Ellen, however, the two had an argument in which she implied that he was a

"bastard" and should sleep on the couch, and he went for a walk.  (Id. at VII:62-67, 82, 172.)

The Petitioner maintained that he did not recall leaving his home, entering Ms. Rowland's home,

going through her purse, tampering with her clothing, disabling any lock or phone, or initiating

his attack.  (Id. at VII:173, 211, 214-18.)

The Petitioner further testified that his next memory was of standing across from Ms.

Rowland with his arms outstretched in her kitchen.  (Id. at VII:172-73.)  Then, without sound

and in slow motion, he saw her strike him with the saucepan, he knocked her to the ground, and

it felt as though he was pulling the reins of a horse, he said.  (Id. at VII:174-76, 181.)  He

"remember[ed] coming out of whatever stupor [he] was in at that point," and realizing that

something real was happening, he testified.  (Id. at VII: 175-76, VIII:29.)  At that point, he said,

he stopped what he was doing.  (Id. at VII: 175-76.)  He insisted that he had not been in Ms.

Rowland's house before that night, and did not recall any exchange of words during the attack. (Id. at VII:177, 183; VIII:18, 22.)

Additionally, the defense offered testimony from expert psychiatrist Dr. David Rosmarin ("Dr. Rosmarin"), and the prosecution offered testimony from expert psychiatrist Dr. Malcolm Rogers ("Dr. Rogers"). (Id. at VIII.) Dr. Rosmarin testified that the Petitioner would be criminally responsible if he had entered Ms. Rowland's home prior to the night in question, because such conduct would demonstrate premeditation and planning inconsistent with having a dissociative episode. (Id. at VIII:140-41.) If not, he stated, then the Petitioner had experienced a dissociative episode and a diminished capacity to appreciate his wrongfulness and conform his conduct. (Id. at VIII:142-45.) The doctor referenced a number of episodes from the Petitioner's past that he believed significant. (Id. at VIII:105-06, 115-16, 124-29, 146-47; VIII:107, 110-13, 116-18.)

Dr. Rogers offered a different view. While acknowledging that the Petitioner could have experienced a dissociative episode if his version of events were true, he did not believe such an episode occurred in light of other evidence. (Id. at VIII:239, 242-45, 251-52.) In particular, he cited evidence that the Petitioner's acts were purposeful and demonstrated an appreciation of his wrongfulness, such as evidence of his prior break-ins. (Id.) He also found significance in the lack of evidence of a persistent and recurring pattern of dissociative episodes. (Id. at VIII:239, 245-47, 277-78.)

Following the prosecution's closing argument, the Petitioner moved for a mistrial. (Id. at IX:62-66.) It was denied, and his counsel objected. (Id. at IX:62-66.) He also moved for a required finding of not guilty, or in the alternative, a new trial. (Super. Ct. Dockets.)

On October 16, 2000, the Petitioner was found guilty on the charges of assault with intent to murder, burglary with assault on an occupant, and assault and battery with a dangerous weapon.  (Super. Ct. Dockets.)  Commonwealth v. Ellen, 59 Mass. App. Ct. 1109, 797 N.E.2d 946 (2003) (unpublished opinion).  He was sentenced that day to serve a term of between eighteen and twenty-five years in the Massachusetts Correctional Institution at Cedar Junction on the burglary conviction, a concurrent prison term of between eight and ten years on the charge of assault and battery with a dangerous weapon, and a term of five years on probation on the assault with intent to murder charge, such term to take effect from and after the completion of his prison terms.  (Super. Ct. Dockets.)  He also was given credit for 448 days of time served, was assessed a $120 victim-witness fee, and was ordered to have no contact with the victim.  (Id.)

The Petitioner that same day filed a notice of appeal and a motion for a stay of execution pending appeal, and the latter was denied.  (Id.)  The next day, he filed a motion to revise and revoke his sentence, on which no action was taken, according to the court docket.  (Id.)

### C.    The Petitioner's Direct Appeal

The Petitioner's appeal was placed on the docket of the Massachusetts Appeals Court (the "Appeals Court") on May 29, 2002.  (App. Ct. Docket No. 2002-P-0803.)  Among the arguments advanced by the Petitioner in that appeal was the argument that he now makes in the instant action, namely, that an improper comment on his refusal to speak after being Mirandized was made at trial.  Commonwealth v. Ellen, 59 Mass. App. Ct. 1109, 797 N.E.2d 946 (2003).  Additionally, the Petitioner alleged that the prosecution made improper statements in its closing argument and that it failed to prove that the incident occurred at nighttime, an element of burglary.  Id.

The Appeals Court affirmed the Petitioner's conviction in a Memorandum and Order

Pursuant to Rule 1:28 on October 28, 2003.  Id.  With respect to the Petitioner's argument

concerning the comment on his post-Miranda silence, the Appeals Court summarized the

relevant exchange in this manner:

> The testifying officer stated that he read the Miranda warnings to the
> defendant from the card.  The prosecutor then asked the officer, "at the
> conclusion of giving him his Miranda warning, what if anything, did you
> say or do with him?"  The officer responded, "On the bottom of the card
> is, you know, 'Do you wish to speak to me now, is on the bottom of it.'
> And on that when, I asked him to sign it he printed the word 'no' and
> signed the card."  After an objection, the judge dismissed the jury and
> heard, at length, argument from counsel.  She then reviewed the law and
> again spoke with counsel.  Upon the jury's return, she sustained the
> objection and provided a lengthy curative instruction.

Id. at n.1.[3]  In light of these facts, the Appeals Court reasoned as follows:

> Commonwealth v. Mahdi and its progeny discuss postarrest post-Miranda
> silence.  "[E]vidence of a criminal defendant's postarrest, post-Miranda
> silence cannot be used for the substantive purpose of permitting an
> inference of guilt. . . ."  In Mahdi, after eliciting from the arresting police
> officer that, after being advised of his Miranda rights, the defendant chose
> "to remain mute," the prosecutor used that testimony to the defendant's
> detriment during closing argument.  In the case at hand, no evidence
> pertaining to the defendant's wish to remain silent was ever admitted.  In
> response to an objection, which was sustained, the trial judge gave a
> curative instruction.  There was no error.

Id. (citations omitted) (quoting Mahdi, 388 Mass. at 694, 448 N.E.2d at 713).[4]

The Petitioner then filed an Application for Leave to Obtain Further Appellate Review

("ALOFAR") with the Massachusetts Supreme Judicial Court (the "SJC") on November 19,

---

[3] Pursuant to 28 U.S.C. § 2254(e)(1), these and other factual determinations by state courts must
"be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of
correctness by clear and convincing evidence."

[4] While the Appeals Court did not directly cite any federal precedent, the Mahdi opinion on
which it relied did cite Doyle and several other federal cases.  Ellen, 59 Mass. App. Ct. 1109,
797 N.E.2d 946 (citing Mahdi, 388 Mass. at 694, 448 N.E.2d at 713 (citing Doyle, 426 U.S. at
617-18)).

2003.  (SJC Docket No. FAR-13793.)  The SJC denied his ALOFAR on December 29, 2003.

(Id.)  Commonwealth v. Ellen, 440 Mass. 1109, 801 N.E.2d 802 (2003) (table decision).

     **D.**    **The instant habeas corpus action**

    On March 18, 2005, the Petitioner commenced the instant habeas corpus action in the

United States District Court, filing both his Petition and his supporting Memorandum.  In such

documents, the Petitioner contended that Officer Ouellet's reference to his post-Miranda silence,

combined with the trial judge's provision of an instruction that the Petitioner claimed was neither

prompt nor proper, had a substantial influence on the jury's verdict and resulted in a deprivation

of his due process rights.  (Pet. ¶ 12.A; Pet'r's Mem. Supp. Pet.)  The Petitioner relied primarily

on the rule announced in Doyle, 426 U.S. at 620.  (Pet. ¶ 12.A; Pet'r's Mem. Supp. Pet.)

**II.**    **ARGUMENT**

    **A.**    **Standard of Review**

    Congress and the Supreme Court have narrowly limited the parameters within which a

federal district court may grant habeas corpus relief to a state prisoner.  Specifically, the

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified at 28 U.S.C. §

2254, provides as follows:

> An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect
> to any claim that was adjudicated on the merits in State court proceedings
> unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the
> Supreme Court of the United States;  or
>
> (2) resulted in a decision that was based on an unreasonable determination
> of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA"), P.L. No. 104-132, Title I, § 104, 110 Stat. 1218 (effective April 24, 1996).[5]

A state court's decision will only be found "contrary to" established federal law where

"the state court applies a rule that contradicts the governing law set forth in" Supreme Court

precedent or "the state court confronts a set of facts that are materially indistinguishable from a

decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme

Court] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000). The decision will be

determined to be "an unreasonable application" of Supreme Court case law "if the state court

identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably

applies it to the facts of the particular state prisoner's case. Id. at 407-09. "[T]he phrase 'clearly

established federal law, ad determined by the Supreme Court of the United States' . . . refers to

the holdings, as opposed to the dicta of [the Supreme] Court's decisions." Id. at 412 (quoting 28

U.S.C. § 2254(d).

"The ultimate question . . . is not how well reasoned the state court decision is, but

whether the outcome is reasonable." Hurtado v. Tucker, 245 F.3d 7, 20 (1st Cir. 2001) (adding

that "even a poorly reasoned state opinion does not mean that the outcome represents an

unreasonable application"). A decision that is incorrect does not necessarily rise to level of

being unreasonable. Williams, 529 U.S. at 365 ("[T]he most important point is that an

unreasonable application of federal law is different from an incorrect application of federal

law."). "Rather, 'for the writ to issue, the state court decision must be so offensive to existing

precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the

---

[5] The Petitioner does not claim that any unreasonable factual determinations were made at the state-court level.

universe of plausible, credible options.'" Sanna v. DiPaolo, 265 F.3d 1, 13 (1st Cir. 2001)

(quoting O'Brien v. Dubois, 145 F.3d 16, 25 (1st Cir. 1998)).

Even where an error of constitutional dimension has occurred, a federal district court

must decline to grant habeas corpus relief where that error is harmless. On habeas corpus

review, an error is considered harmless if it did not have "'a substantial and injurious effect or

influence in determining the jury's verdict.'" Brecht v. Abrahamson, 507 U.S. 619, 623, 627-38

(1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946), and finding standard set

forth in that case appropriate for determining whether habeas corpus relief based on claimed

Doyle error was warranted); accord Sanna, 265 F.3d at 14 (determining that Brecht standard

should be applied in conjunction with standard set forth in AEDPA, though there is disagreement

among courts on whether Brecht was abrogated by AEDPA); see also Petrillo v. O'Neill, 428

F.3d 41, 44-45 (1st Cir. 2005) (stating both that federal habeas corpus court is constrained by

AEDPA standard and that "[a] federal habeas court is bound to uphold a state court judgment as

long as the error did not have a 'substantial, injurious effect on the jury's verdict'" (quoting

Sanna, 386 U.S. at 24)).

Application of these standards compels the conclusion that habeas corpus relief would be

inappropriate here.

**B.  The Appeals Court's ruling was consistent with Supreme Court jurisprudence, as there was no *Doyle* error here.**

The Appeals Court's determination that no error arose from Officer Ouellet's comment

on the Petitioner's post-Miranda silence was consistent with Supreme Court jurisprudence. In

the seminal case on this issue, Doyle v. Ohio, the Supreme Court ruled that "the use for

impeachment purposes of petitioner's silence, at the time of arrest and after receiving Miranda

warnings, violated the Due Process Clause of the Fourteenth Amendment." 426 U.S. at 620. It

reasoned that, because the Miranda warnings contain an implicit assurance that "silence will carry no penalty, . . . it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." Id. at 618; see also Greer v. Miller, 483 U.S. 756, 763 (1987) (observing that Supreme Court decisions applying Doyle "confirm that 'Doyle rests on 'the fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial'" (quoting Wainright v. Greenfield, 474 U.S. 284, 291 (1986) (quoting South Dakota v. Neville, 459 U.S. 553, 565 (1983)))).  The Doyle Court further noted that "every post-arrest silence is insolubly ambiguous because of what the state is required to advise the person arrested."  426 U.S. at 617.  As the State did not claim that the use of the petitioner's silence constituted harmless error under the circumstances in that case, the Supreme Court reversed the petitioner's convictions.  Id. at 619-20.

The Supreme Court in Greer v. Miller clarified the Doyle rule in a manner directly relevant to the instant case by expounding on what it means for a defendant's silence to be impermissibly "used" at trial.  483 U.S. 756.  The essence of the Court's decision there was that no Doyle error arises where a comment on a defendant's post-Miranda silence is not admitted in evidence or otherwise taken advantage of by the prosecution.  Id. at 761-65; cf. Wainright, 474 U.S. at 295 (stating that "[w]hat is impermissible is the evidentiary use of an individual's exercise of his constitutional rights . . ." (emphasis added)).  The Greer Court noted that Doyle stands for the proposition that the Due Process Clause is violated where the prosecution "'use[s] for impeachment purposes'" and is "'permit[ted] . . . to call attention to'" a defendant's post-Miranda silence.  Id. at 763-64 (quoting, with emphasis, Doyle, 426 U.S. at 619).  "It is significant that in each of the cases in which this Court has applied Doyle, the trial court has

permitted specific inquiry or argument respecting the defendant's post-Miranda silence," the

Court added.  Id. at 764.  The Greer Court found the case before it distinguishable from Doyle

and its progeny, because the comment on the defendant's silence had not been admitted in

evidence or highlighted by the prosecution.  Id. at 764-65.  The Court explained as follows:

> In contrast to these cases [applying Doyle], the trial court in this case did not permit the
> inquiry that Doyle forbids.  Instead, the court explicitly sustained an objection to the only
> question that touched upon [the defendant's] postarrest silence.  No further questioning or
> argument with respect to [the defendant's] silence occurred, and the court specifically
> advised the jury that it should disregard any questions to which an objection was
> sustained.  Unlike the prosecutor in Doyle, the prosecutor in this case was not "allowed to
> undertake impeachment on," or "permit[ted] . . . to call attention to," [the defendant's]
> silence.  The fact of [the defendant's] post-arrest silence was not submitted to the jury as
> evidence from which it was allowed to draw any permissible inference, and thus no
> Doyle violation occurred in this case.

Id. (citation and footnotes omitted) (fourth and fifth alterations in original) (quoting Doyle, 426

U.S. at 619 & n.10).  Accordingly, the Court found that "no Doyle violation occurred in [the]

case."  Id. at 765 & n.6.

Accordingly, a number of federal courts have applied Greer to find no Doyle error where

the comments at issue were stricken from the record and/or a curative instruction was provided.

See, e.g., Tinsley v. Million, 399 F.3d 796, 814-15 (6th Cir. 2005) (concluding that state court

did not violate clearly established Supreme Court precedent in responding to two comments on

defendant's invocation of right to counsel at questioning, where the two comments were short,

there was no evidence that they were planned, and the court sustained objections without a

request from the defense attorney for limiting instructions, and citing Greer for the proposition

that "[i]n sustaining the objection, the trial court's action alone may have sufficed to cure the

improper answer"); United States v. Johnson, 302 F.3d 139, 147-48 & n.9 (3d Cir. 2002)

(finding no Doyle violation, based on Greer, because the comment on the defendant's post-arrest

silence was limited to one question and answer and defendant's "counsel promptly objected to

the question, the [trial court] immediately sustained the objection and issued a detailed curative

instruction, and the prosecutor never mentioned [the defendant's] post-arrest silence again,"

noting that, as in Greer, the post-arrest silence was not submitted to the jury as evidence from

which it could draw inferences); United States v. Oliver, 278 F.3d 1035, 1039-40 (10th Cir.

2001) (finding that, under Greer, no Doyle violation occurred because the fact of the defendant's

silence was not submitted to the jury as evidence from which it could draw inferences).[6]

The situation in the instant case is remarkably similar to that in Greer and its progeny

cited above.  Here, as in that precedential case, the single offensive comment made at trial was

not admitted in evidence.  (Tr. at VI:114-17.)  The jury was instructed to disregard the remark

and draw no inferences from it in a strong curative instruction, and "no further questioning or

argument with respect to [the defendant's] silence occurred," Greer, 483 U.S. at 764-65.  (Tr. at

VI:114-17.)[7]  Even the question itself did not refer to his invocation of his right to remain silent

or otherwise highlight the significance of that fact for the jury.  (Id. at VI:97.)  Thus, "no Doyle

violation occurred" in the Petitioner's case.  Greer, 483 U.S. at 765 & n.6.

In light of the foregoing, the decisions of the state courts in the Petitioner's case was

neither contrary to nor an unreasonable application of Supreme Court law.  Rather, they were in

perfect harmony with such law.  Like the Greer Court, the Appeals Court here concluded that no

error arose from the single comment on the Petitioner's post-Miranda silence, because "no

evidence pertaining to the defendant's wish to remain silent was ever admitted" and "[i]n

response to an objection, which was sustained, the trial judge gave a curative instruction."  Ellen,

---

[6] While the Petitioner cites Morgan v. Hall for the proposition that the provision of instructions is insufficient (Pet'r's Mem. Supp. Pet. at 34), that case was decided prior to Greer.  569 F.2d 1161.

[7] Even the Petitioner's trial counsel seemed to concede at one point that a curative instruction would be sufficient in certain situations.  (Tr. at VI:112 ("Impeaching a defendant who takes the stand with his silence may be a grade of error which can be cured by an instruction.").)

59 Mass. App. Ct. 1109, 797 N.E.2d 946.  The Appeals Court further suggested that the

Petitioner's case was distinguishable from Commonwealth v. Mahdi, a Massachusetts precedent

on which he relied, because there the prosecution had "used that testimony to the defendant's

detriment during closing argument."  Ellen, 59 Mass. App. Ct. 1109, 797 N.E.2d 946 (citing

Mahdi, 388 Mass. 679 (1983)).  This same line of reasoning had been employed by the trial

court.  Specifically, after hearing thorough argumentation on the point and analyzing relevant

case law, the trial judge concluded that any error would be cured by striking the comment at

issue, instructing the jury to disregard it, explaining why it is improper, and ensuring that the

comment was not referred to in closing argument.  (Tr. at VII:110-12 ("[W]hy wouldn't striking

that testimony with strong instructions be adequate where this isn't a case that the evidence has

been introduced and [the prosecutor] has used that in his closing to kind of hammer the point

home?").)  Thus, the Appeals Court's affirmance of the Petitioner's conviction on the grounds

that no error had occurred was consistent with Supreme Court law and cannot be disturbed on

habeas corpus review.

> **C.    The Petitioner invalidly interprets and attempts to distinguish _Greer v. Miller_.**

Curiously, the Petitioner relies heavily on Greer himself.  (Pet'r's Mem. Supp. Pet. at 26-

37.)  He does so by ignoring that opinion's principal conclusion that a statement stricken from

the record and never referred to by the prosecution does not give rise to a Doyle violation.  (Id.)

Instead, he focuses on certain factors from the Greer petitioner's trial that were referred to by the

High Court.  (Id. (citing Greer, 483 U.S. at 764 n.5).)  These factors include the following:  the

offensive portion of the trial was limited to a single comment; the action taken by the court was

"'proper and immediate'"; defense counsel failed to request more specific instructions; the

question at issue was never answered by the witness; and the question at issue was posed during

cross-examination, as opposed to direct examination. (Id. (citing Greer, 483 U.S. at 764 n.5).) The Petitioner contends that his case distinguishable from Greer with respect to each of these factors, thus entitling him to a more favorable outcome. (Id.)

At the outset, it must be made clear that there is no justification for the emphasis placed on such factors by the Petitioner. The Petitioner's discussion of the first three is based on the Greer Court's reference to them in a footnote devoted to responding to a single point made by the dissent. 483 U.S. at 764 n.5. The remaining two facts were not highlighted in any respect by the Greer Court. Id. Contrary to the Petitioner's assertions, nowhere did the Court in that case provide any basis for transforming these facts into "mandates" (Pet'r's Mem. Supp. Pet. at 34, 37), indicate that it was "limit[ing] its holding to the specific sequence of events at the trial in that case" (id. at 29-30), or suggest that it was announcing a "limited exception" to the Doyle rule (id. at 27). Greer, 483 U.S. 756. Indeed, the Court made abundantly clear that it was not announcing a new rule, but merely applying Doyle, which held that a due process violation arose upon "use" of a defendant's post-Miranda silence. Id. at 763 ("But the holding of Doyle is that the Due Process Clause bars '*the use* for impeachment purposes' of a defendant's postarrest silence." (quoting, with emphasis, Doyle, 426 U.S. at 619)).

Even if the facts cited by the Petitioner are given weight, however, his claim for habeas corpus relief would be made no stronger. With respect to the first factor, the commentary on the Petitioner's post-Miranda silence at his trial was, contrary to his contention, limited to a single comment. (Tr. at VI:94-97.) The Petitioner's attempt to tie in a group of questions and answers preceding that comment in order to paint a picture of a more serious violation is simply unsound. None of the preceding questions and answers included any comment on the Petitioner's post-Miranda silence, a fact emphasized by the prosecution in argumentation on this issue. (Id. at

VI:94-116.)  Rather, they were limited to the procedures used for administering the <u>Miranda</u>

rights, and whether the Petitioner had any questions.  (<u>Id.</u> at VI:94-97.)  Indeed, had the

prosecutor's examination of Officer Ouellet concluded immediately before he made the

comment at issue, the jury would have been left unaware of whether or not the Petitioner had

chosen to remain silent.  While the prosecutor argued to the court that some were relevant to the

Petitioner's level of awareness at the time, even this fact would not have been obvious to the jury

from the nature of the questions and answers.  (<u>Id.</u> at VI:94-116.)  It is thus not surprising that

none of these preceding questions and answers was objected to by the Petitioner's counsel.  (Tr.

at VI:94-97.)  These non-offensive questions and answers could not somehow retroactively be

made offensive by a subsequent comment on the Petitioner's post-<u>Miranda</u> silence.[8]

        As to the second factor identified by the Petitioner, the action taken by the trial court was

both proper and immediate.  While the Petitioner contends that the curative instruction provided

by the trial judge "was far from 'proper,'" he nowhere offers any basis for this statement.

(Pet'r's Mem. Supp. Pet. at 31-35; <u>see also</u> Pet.)  To the extent that his argument is based on a

belief that the instruction called excessive attention to Officer Ouellet's comment, as his trial

counsel suggested, the argument must fail.  The Supreme Court in <u>Lakeside v. Oregon</u> rejected a

similar argument in the analogous context of an instruction pertaining to a defendant's right not

to testify.  435 U.S. 333, 337-42 (1978).[9]  In that case, the trial judge instructed jurors that they

---

[8] The Petitioner's citation to <u>Morgan</u> to support his argument on this point is unavailing.  (Pet'r's
Mem. Supp. Pet. at 28 (citing <u>Morgan</u>, 569 F.2d at 1166).)  The <u>Morgan</u> court did not indicate
that the asking of an improper question could turn a series of proper preceding questions into
improper ones.  569 F.2d at 1166.  Rather, the court was intimating that the prosecutor appeared
to ask the preceding set of proper questions in order to create a false justification for asking an
ultimate question about the defendant's post-arrest silence.  <u>Id.</u>
[9] <u>Lakeside</u> has previously been found applicable to the <u>Doyle</u> context and related contexts.
<u>United States v. Dunbar</u>, 767 F.2d 72, 76 (3rd Cir. 1985) (citing <u>Lakeside</u>, 435 U.S. at 338, in
rejecting claim of <u>Doyle</u> violation); <u>cf.</u> <u>Greer</u>, 483 U.S. 756, 773 (Brennan, J., joined by

must not consider or draw any adverse inference from the defendant's failure to testify in his

own behalf. Id. at 335. Defense counsel objected to the instruction both before and after it was

given on the grounds that it was "'like waving a red flag in front of the jury'" concerning the

defendant's failure to take the stand. Id. On appeal, he maintained that the trial court's provision

of such an instruction over his objection violated his right against self-incrimination. Id. at 337.

Specifically, he first argued that the instruction itself constituted an impermissible comment on

his refusal to testify in violation of Griffin v. California, in which the Supreme Court "held that

the Constitution 'forbids either comment by the prosecution on the accused's silence or

instructions by the court that such silence is evidence of guilt.'" Id. at 337 (quoting Griffin v.

California, 380 U.S. 609 (1965)). The High Court disagreed, observing that the Griffin Court

was concerned only with "adverse comment [that] amounted to 'a penalty imposed by courts for

exercising a constitutional privilege.'" Id. at 338-39. "[A] judge's instruction that the jury must

draw *no* adverse inferences of any kind from the defendant's exercise of his privilege not to

testify is 'comment' of an entirely different order" and does not constitute the type of

compulsory self-incrimination with which the Griffin opinion was concerned, the Lakeside Court

---

Blackmun and Marshall, JJ., dissenting) (drawing on Justice Stevens' dissent in Lakeside, involving the "related context [of] a prosecutor's statement calling attention to the defendant's decision not to testify at trial"); Melgoza v. Peters, 932 F.2d 676, 677 (7th Cir. 1991) (applying Lakeside in rejecting argument that instruction impaired fairness of trial in violation of Due Process Clause, stating that "[a] trial court's decision to issue a jury instruction that constitutes a correct statement of the law does not violate due process"). Courts evaluating Doyle issues have also drawn on other cases involving comments on a defendant's right not to testify, recognizing that such situations are analogous. See Doyle, 426 U.S. at 618 n.9 (discussing case involving "analogous situation" of prosecutorial comment on defendant's refusal to answer certain questions on cross-examination by successfully invoking his privilege against self-incrimination); Charles v. Anderson, 610 F.2d 417, 422 (6th Cir. 1980) (discussing commentary on harmlessness in "related context" of case involving comment on right not to testify), rev'd on other grounds, 447 U.S. 404 (1980); United States v. Brooks, 915 F.2d 1573, 1990 WL 152545, at **6 (6th Cir. 1990) (unpublished opinion) (discussing "similar situation" involved in case concerning comment on right not to testify).

reasoned.  Id. at 339 (emphasis in original).  "On the contrary, its very purpose is to remove from the jury's deliberations any influence of unspoken adverse influences," the Court maintained.  Id.

The second contention of the defendant-petitioner in Lakeside was that such an instruction may nevertheless "encourage the jury to draw adverse inferences" and thus cannot be permitted over a defendant's objection.  Id. at 339.  The Supreme Court rejected this reasoning as well, finding the argument "that the jurors will totally disregard the instruction, and affirmatively given weight to what they have been told not to consider at all" to be a "dubious" and "speculative assumption[]."  Id. at 340.  "The very purpose of a jury charge is to flag the jurors' attention to concepts that must not be misunderstood," the Court maintained.  Id. at 340.  While stating that "[i]t may be wise for a trial judge not to give such a cautionary instruction over a defendant's objection" and that a state is "free to forbid its trial judges from doing so as a matter of state law," the Court held that "the giving of such an instruction over the defendant's objection does not violation the privilege against compulsory self-incrimination guaranteed by the Fifth and Fourteenth Amendments."  Id. at 340-41.

The sound reasoning in Lakeside applies here.  In the Petitioner's case, the trial judge did not comment adversely on his invocation of his right to silence.  On the contrary, she insisted in strong and unmistakable language that no adverse inferences be drawn.  (Tr. at VI:114-17.)  Thus, just as the instruction in Lakeside did not involve the compulsory self-incrimination that Griffin sought to prevent, the instruction here did not involve the unfair penalty for silence that Doyle sought to prevent.  Cf. United States v. Dunbar, 767 F.2d 72, 76 (3rd Cir. 1985) (citing Lakeside for the proposition that the law only proscribes "*adverse* comment on [a] defendant's silence" in reasoning that a law enforcement witness's comment on a defendant's post-Miranda silence did not constitute a Doyle violation in part because "the prosecutor did not elicit the

statement about his asking for counsel to persuade the jury to draw any adverse inferences"). For the same reasons, the instruction also cannot be found to have led jurors to draw any adverse inferences. Any conclusion to the contrary would necessarily rest on the dubious and speculative assumption that the jurors did the exact opposite of what they were instructed in unmistakable terms to do.[10]  The provision of an instruction over the Petitioner's objection did not violate any constitutional right.

To the extent that the Petitioner's claim of impropriety in the trial judge's instruction is based on her statement that "'we have protection against incrimination, self-incrimination'" – a comment highlighted in the Petition – he still cannot succeed.  (Pet. ¶ 12.A. supp. (quoting Tr. at VI:115).)  A challenge to similar language within an instruction concerning a defendant's failure to testify was rejected by the First Circuit Court of Appeals in United States v. Flaherty.  668 F.2d 566, 599-600 (1st Cir. 1981).  There the trial judge provided jurors with a printed set of instructions that in part stated, "'The privilege against self-incrimination is constitutional.  Jury may not make inference of guilt from decision of defendant not to testify.'"  Id. at 599.  The defendants reasoned that, by linking the right to remain silent to the privilege against self-incrimination, the trial court led the jury to infer that a "failure to testify was an indication of guilt."  Id.  The Court of Appeals explained that the test for determining whether a comment by the trial court or prosecution is improper is "whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify."  Id.  Though the instruction "suggest[ed] that there [was] a

_____

[10] The defendant-petitioner in Lakeside also argued that the trial court violated his constitutional right to counsel by "refus[ing] his lawyer's request not to give the instruction in question, thus interfering with counsel's trial strategy."  435 U.S. at 341.  The Petitioner here does not appear to be advancing such an argument.  (Pet'r's Mem. Supp. Pet.)  Even if he were, however, it would not succeed.  This line of reasoning was sternly rejected by the Lakeside Court.  Id. at 341-42.

connection between the privilege against self-incrimination and a defendant's decision not to testify," the court observed, its very terms indicated that "the jury was forbidden to draw an inference of guilt from a defendant's failure to testify." Id. at 600. These terms were also reinforced by other instructions. Id. at 600. Thus, while recommending that the trial judge divorce the privilege against self-incrimination from the right not to testify in the future, the Court of Appeals concluded that the instruction was not intended as a comment on the defendants' failure to testify and could not "'naturally and necessarily'" be taken as such by the jury. Id. at 599-600 & n.24 (doubting that it would have found reversible error even if it had applied the "high standard" of careful scrutiny for visually-emphasized instructions that it adopted subsequent to the defendants' trial).

In the Petitioner's case, as in Flaherty and Carr, the trial judge's instruction could not be viewed as intending to comment adversely on the Petitioner's silence or as giving the jury that impression. As emphasized above, the instruction's very terms indicated that no inference was to be drawn from his exercise of his right to remain silent. (Tr. at VI: 114-17.) The trial judge's choice of words thus cannot be found improper.

The trial judge's instruction was also given promptly. Assuming the trial judge confined the court's breaks to the amount of time intended, the delay between Officer Ouellet's questionable comment and the judge's instruction to the jury was likely no more than one hour and may have been as short as thirty-five minutes. (Id. at VI: 98-114.) This was not excessive. Cf. United States v. Muniz, 684 F.2d 634, 637-38 (9th Cir. 1982) (holding that question about defendant's post-arrest silence was rendered harmless beyond a reasonable doubt by trial court's provision of instruction following lunch recess, during which time the "[c]ourt and counsel held a lengthy discussion," noting that incident was not referred to in prosecution's closing, though

also taking into account fact that question was never answered).  Perhaps more importantly, the instruction was "immediate" in the sense that it was the next substantive statement that the jurors heard after Officer Ouellet's questionable comment.  (Tr. at VI:97-114.)  There was no intervening testimony or questioning, and the prosecution was not able to use or call any attention to Officer Ouellet's comment before the jury was ordered to disregard it.  (Id.)[11]

Moreover, the time delay in administering the curative instruction resulted from the trial judge's desire to hear argument and analyze case law before issuing its ruling.  As the transcript reveals, she reviewed case law, entertained extensive argumentation from both sides, distinguished precedential cases from the Petitioner's case based on specific factors, and refined her own reasoning on the subject.  (Tr. at VI:98-114.)  As she explained, she wanted "to be satisfied before [she] entertain[ed] a motion with the ramifications that it would have [there]." (Id. at VI:105.)  This process was not improper, but commendable.  Notably, it also was not objected to, but involved the participation of, the Petitioner's trial counsel.  (Id. at VI:98-114.) Adoption of the line of reasoning now advanced by the Petitioner would discourage judges from engaging in such practices and would place them and prosecutors in the untenable position of having to choose between potential reversal due to a hasty and incorrect decision, and potential reversal due to a correct decision made after argumentation and reflection.  The trial judge's approach was not erroneous and certainly not a violation of the Petitioner's constitutional rights. Cf. United States v. Simonelli, 237 F.3d 19, 23-24 (2001) (concluding, in context of direct appeal from federal conviction, that federal district court did not abuse discretion by declining to interrupt testimony to give instruction, where instruction was given at the beginning of trial and

---

[11] The Petitioner's citation to United States v. Kallin in support of his untimeliness argument does not strengthen his argument.  (Pet'r's Mem. Supp. Pet. at 31 (citing United States v. Kallin,

the close of evidence, noting that "[t]his is largely a judgment call by the trial judge"); United

States v. Palmer, 203 F.3d 55, 59 (1st Cir. 2000) (stating, in context of direct appeal from federal

conviction, that a federal "district court has considerable leeway as to the phrasing and timing of

a curative instruction").

　　　　With regard to the third factor, even the Petitioner himself admits that his trial counsel

did not in fact request a more specific instruction from the trial court.  (Pet'r's Mem. Supp. Pet.

at 35.)  While the Petitioner notes his trial counsel's expression of discontent to the trial court

(id. at 35-36), such expression is not the same as a proposal for a different instruction.  The

former approach merely constitutes a vague statement of dissatisfaction, but the latter approach

provides guidance to the court as to the precise area of objection and offers the court an

alternative method of curing the error.  As the Greer court recognized:

> [The habeas corpus petitioner] argues that the curative instructions should
> have been more specific.  But [his] trial counsel bore primary
> responsibility for ensuring that the error was cured in the manner most
> advantageous to his client.  Once it became apparent that the judge was
> not going to grant a mistrial, it was the duty of counsel to determine what
> strategy was in his client's best interest.

483 U.S. 756, 766 n.8.  Indeed, if the Petitioner's view were accepted, it would seemingly be too

easy for a criminal defendant to offer a vague objection at trial and then claim error on appeal or

collateral review by asserting that the trial court did not cure the error exactly as the defendant

would have hoped.  Cf. Hunter v. Clark, 906 F.2d 302, 308 (7th Cir. 1990) (rejecting claim that

habeas corpus petitioner was improperly denied an instruction that no adverse inference was to

be drawn from his failure to testify, in part because the petitioner's counsel apparently "was

---

50 F.3d 689 (9th Cir. 1995).)  The instruction at issue in that case was provided the day after the
offensive comments were made.  Kallin, 50 F.3d at 694.

trying to manipulate the trial court into committing reversible error in order to obtain a new trial"
by refusing an alternate and satisfactory curative method offered by the court).

The Petitioner's arguments with respect to the fourth and fifth factors that he cites are
based on statements made in a single opinion by the Fifth Circuit Court of Appeals, United
States v. Moreno.  (Pet'r's Mem. Supp. at 29-30 (citing United States v. Moreno, 185 F.3d 465,
473-74 (5th Cir. 1999)).)[12]  His arguments are not grounded in any reasoning found in Greer or
in any other Supreme Court precedent.  (Id.)  Moreover, Moreno is an outlier.  It has not been
cited in a single court opinion for either of the two aforementioned factors.  In fact, its
interpretation of Greer was specifically rejected in a case cited by the Petitioner.  See United
States v. Johnson, 302 F.3d 139, 147-48 & n.9 (3d Cir. 2002) (stating that the Greer Court "held
that 'no Doyle violation occurred' because the defendant's post-arrest silence 'was not submitted
to the jury as evidence from which it was allowed to draw any permissible inference'" and
concluding that Greer was not made distinguishable by the fact that the question in Greer had not
been answered, because in Greer the prosecutor's question itself indicated that the defendant had
remained silent (quoting Greer, 483 U.S. at 759)).  As AEDPA and Williams make clear, a state
court decision will not be found contrary to "clearly established Federal law" and set aside on
habeas corpus review based on the views of a single federal appellate court that have not been
adopted by the Supreme Court nor even recognized widely as a correct interpretation of Supreme
Court law.  28 U.S.C. § 2254 (providing that a writ of habeas corpus arising from a state court
judgment shall not be granted with respect to a claim adjudicated in state court unless the
adjudication "resulted in a decision that was contrary to, or involved an unreasonable application

---

[12] Specifically, the Moreno court indicated that "Greer is limited to situations in which no answer
is given to the improper question" and suggested that a comment on the defendant's post-

of, clearly established Federal law, as determined by the Supreme Court of the United States" or

resulted in an unreasonable factual determination); Williams, 529 U.S. at 405-06; see also

Williams v. Matesanz, 230 F.3d 421, 426 (stating that where reasoned application of clearly

established Supreme Court precedent to a particular set of facts can lead to more than one

plausible outcome, the state's choice among those outcomes, even if wrong, cannot give rise to

habeas relief).

        **D.**      **Even if a Doyle error occurred, it was harmless.**

Even if this Court were to conclude that a Doyle error did indeed occur in the Petitioner's

trial, it must find that such error was harmless under the standard set forth in Brecht. As a result

of several factors, the error could not be found to have had a "substantial and injurious effect or

influence in determining the jury's verdict." Brecht, 507 U.S. at 623 (quoting Kotteakos, 328

U.S. at 776).[13]

---

Miranda silence during direct examination places the defendant in a particularly difficult situation. 185 F.3d at 473-74.

[13] Notably, the factors that the Petitioner urges this Court to take into account in analyzing harmlessness are nearly identical to a set of factors taken into account by the trial judge. Of further relevance, she stated, were factors such as "the relationship between the evidence and the premise of the defense, . . . the weight and quantum of evidence of guilt, [and] the frequency of the reference and availability or effect of curative instructions." (Compare Tr. at VI:113 (noting relevance of "the relationship between the evidence and the premise of the defense, . . . the weight and quantum of evidence of guilt, [and] the frequency of the reference and availability or effect of curative instructions") with Pet'r's Mem. Supp. Pet. at 37-38 ("[T]he United States Supreme Court assessed the following three factors: (1) the frequency of the references, (2) whether the references were cumulative of other evidence, and (3) whether the State had entered weighty evidence of guilt on the principal issue before the jury."); compare also Tr. at VII:110-13 (noting the lack of any suggestion that the prosecutor intended to elicit the comment and the fact that the questionable testimony was limited to one comment) with Pet'r's Mem. Supp. Pet. at 42-44 (attempting to argue that the prosecutor intentionally elicited a comment on the Petitioner's post-Miranda silence).) All of these factors were, of course, evaluated from her "superior vantage point" with which to view the comment's impact on the trial. Brecht, 507 U.S. at 636.

     1.    <u>The comment on the Petitioner's silence was limited, was not admitted or used, and was addressed by a thorough curative instruction.</u>

First, the comment on the Petitioner's post-<u>Miranda</u> silence was rather limited and innocuous.  This fact has significance to a harmless-error analysis.  <u>E.g.</u>, <u>Brecht</u>, 507 U.S. at 639 (finding harmlessness in part because "[t]he State's references to petitioner's post-Miranda silence were infrequent . . . ."); <u>United States v. Ruz-Salaza</u>r, 764 F.2d 1433, 1437 (11th Cir. 1985) (finding Doyle error harmless beyond a reasonable doubt in part because "there was but a single reference at trial to the fact of defendant's silence and it was not 'linked with defendant's exculpatory story.'").  The comment at issue here was confined to a single remark by one witness that was not admitted in evidence and was not repeated or used by the prosecution or their witnesses at any subsequent point in the trial.  (Tr. at VI: 97.)  Significantly, "there was no comment (direct or indirect) on this point by the prosecutor."  <u>Booton v. Hanauer</u>, 541 F.2d 296, 299 (1st Cir. 1976) (taking into account prosecutor's lack of comment as one of several factors giving rise to conclusion that comment on petitioner's post-arrest silence was harmless beyond a reasonable doubt).  Additionally, neither the question preceding the comment at issue nor the comment itself suggested that there was any significance to the Petitioner's writing "No" on his <u>Miranda</u> card.  (<u>Id.</u>)  Indeed, the question did not even elicit the comment that the officer made. (<u>Id.</u>)  As discussed above, the Petitioner's attempt to incorporate a group of questions and answers preceding that comment is unavailing, as none of those preceding questions and answers included any comment on the Petitioner's post-<u>Miranda</u> silence, and none would have necessarily alerted the jury that such silence had any significance.  (<u>Id.</u> at VI: 94-97.)

Second, the curative instruction offered by the trial judge was not only proper and prompt, but was particularly thorough and strongly emphasized the importance of protecting the Petitioner's constitutional rights.  (<u>Id.</u> at VI:114-17.)  The judge did not simply advise the jurors

to disregard the comment at issue or cursorily note that arrestees have the right to remain silent. (Id.)  Rather, she provided an instruction that consumed approximately three pages of the trial transcript.  (Id.)  It began by noting that the jurors were required and had promised to follow "to the letter" the instruction that she was about to give.  (Id. at VI:114-15.)  She then described the right to remain silent upon arrest and correctly placed it within the larger context of the right to the presumption of innocence and the right not to be compelled to testify against one's self.  (Id. at VI:114-17.)  These the judge described as "very core, basic constitutional principles and protections that we all have as American citizens."  (Id. at VI:115.)  As a result of these "very important principles of law," she explained, an arrestee who is asked if he would like to speak has "every right in the world to say no, I don't want to" because "[t]the Constitution doesn't make us do that.  It gives us that protection."  (Id. at VI:115-16.)  The judge then explained that "when someone chooses to avail themselves of that important constitutional right that we all have," it should "never be used against" them and should never give rise to an inference by jurors that his silence "must mean something."  (Id. at VI:116.)  "That would be wrong," she admonished.  (Id.)  She continued by asserting that Officer Ouellet's comment was improper, that it was being stricken from the trial record, that it should not be considered evidence, that it should not be used against the Petitioner, and that the jurors were to disregard it and strike it from their minds.  (Id. at VI:117.)  The judge further reminded the jurors compliance with its instructions was consistent with their "promise[ to] the Commonwealth and the defendant that [they] would follow and honor these important constitutional protections that we all have, and that this defendant is entitled to in this case."  (Id. at VI:117.)

This instruction was, in fact, much more comprehensive than those found "proper" in Greer.  483 U.S. at 764 n.5; cf. Johnson, 302 F.3d at 148 (observing that "there was a stronger

argument for a <u>Doyle</u> violation in <u>Greer</u> [than in the case before the court], where the trial court never explicitly instructed the jury that it could not consider the defendant's post-arrest silence"). There the trial court merely instructed the jury to "'ignore [the] question for the time being'" after sustaining defense counsel's objection, and then reminded them before they began to deliberate that they should "'disregard questions . . . to which objections were sustained.'"  <u>Id.</u> at 766 n.8 (alterations in original) (noting, however, that defense counsel did not request more extensive instruction).  Indeed, it would be difficult to imagine a more strong and thorough instruction on post-<u>Miranda</u> silence than the one provided at the Petitioner's trial.

Furthermore, the trial judge's instruction must be presumed to have been followed.  It is "normally presume[d] that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an 'overwhelming probability' that the jury will be unable to follow the court's instructions and strong likelihood that the effect of the evidence would be 'devastating to the defendant.'"  <u>Greer</u>, 483 U.S. at 766 n.8 (citations omitted) (quoting <u>Richardson v. Marsh</u>, 481 U.S. 200, 208 (1987), in the first instance, and <u>Bruton v. United States</u>, 391 U.S. 123, 136 (1968), in the second instance, and seeing no reason to believe that jury was incapable of obeying instructions in that case).  The Petitioner has not offered any reason, much less an "overwhelming" reason, to conclude that the jury was unable to follow the judge's instructions.  (Pet; Pet'r's Mem. Supp. Pet.)  Furthermore, as discussed in greater depth below, there is very little likelihood that Officer Ouellet's comment had any significant effect on the defense, much less a "devastating" effect.  The <u>Greer</u> Court found the accusatory question "'Why didn't you tell this story to anybody when you got arrested?'" to be "far from 'devastating'" and "at most 'insolubly ambiguous.'"  483 U.S. at 759, 766 n.8 (quoting trial transcript in first instance and <u>Doyle</u>, 426 U.S. at 617, in last instance).  Surely, Officer Ouellet's

comment that the Petitioner wrote "no" on his <u>Miranda</u> card can be seen as no less ambiguous and harmless.  Clearly, the trial judge's strong charge to the jury militates in favor of a finding harmlessness.  <u>See, e.g.</u>, <u>Booton</u>, 541 F.2d at 299 (noting trial judge's strong jury charge as one of several factors giving rise to conclusion that comment on petitioner's post-arrest silence was harmless beyond a reasonable doubt).

Even the <u>Moreno</u> opinion relied upon by the Petitioner found this combination of factors to be highly relevant in determining that a comment on a defendant's silence was harmless beyond a reasonable doubt.  185 F.3d at 475 (relying in part on facts that "the reference was minor, especially since the district court took immediate corrective action and effectively precluded any further references," and that "[t]he court directed the jury to disregard the reference," which instruction was presumed to be followed, noting that "sustained objections with curative instructions prevent the violation from falling into [the] category that automatically requires reversal").

      2.     <u>The evidence of guilt was overwhelming, and the comment on the Petitioner's silence likely had no impact on his defense in light of the particular facts of the case.</u>

It is also clear that the evidence against the Petitioner in this case was overwhelming. This, too, weighs in favor of a finding of harmlessness.  <u>See, e.g.</u>, <u>Brecht</u>, 507 U.S. at 639 (finding harmlessness in part because "the State's evidence of guilt was, if not overwhelming, certainly weighty"); <u>Moreno</u>, 185 F.3d at 475 (finding comment on silence harmless beyond a reasonable doubt in part because there was evidence of overwhelming guilt and the defendant had offered inconsistent and implausible explanations); <u>United States v. Wiley</u>, 29 F.3d 345, 349-50 (8th Cir. 1994) (finding <u>Doyle</u> error harmless beyond a reasonable doubt in part based on overwhelming evidence of guilt); <u>Ruz-Salazar</u>, 764 F.2d at 1437 (same).  Ms. Rowland provided

a lengthy and detailed account of the Petitioner's attack upon her.  (Tr. at V:75-93.)  Three

neighbors testified that they saw and/or heard portions of that attack and corroborated certain

details from her account.  (Id. at V:71, 86-88, 194-202, 210-12, 217-23, 234-42.)  Further

corroborating her account were the findings of the police upon arriving at and searching her

home following the attack.  On Ms. Rowland's kitchen floor, police found a cordless phone

receiver, a saucepan, a purple sash, as well as a bent pair of her eyeglasses, some blonde hair,

and a white bathrobe sash.  (Id. at V:95-98; VI:154-55, 171-72.)  They also uncovered articles of

clothing that had been knotted, torn, and/or tied to furniture, and they noticed that the phone in

her bedroom had been unplugged and the bulkhead at the entrance to the basement had been

wedged open.  (Id. at V:47, 95-105, 135; VI:30-33, 177.)

        Neighbors and police also found Ms. Rowland to be shaking, in shock, wide-eyed, to

have trouble breathing and speaking, and to have trouble swallowing.  (Id. at VI:21.)  They

observed that she had a swollen and bloody face, rings and red marks on her neck, a very large

bump with a cut over her eye, swollen arms with marks, and bruises.  (Id. at V:220-23, 242.)

They also encountered the Petitioner on the scene, with a white cloth-like item in his hand.  (Id.

at V:217-18; VI:19-24, 94.)  He admitted hitting Ms. Rowland at that time.  (Id. at VI:86-87.)

Additionally, police also found a pair of white gym socks in the rear seat of the police cruiser

used to transport the Petitioner to the police station, and condom packets were on his person.  (Id.

at VI:84, 119-20.)  The Petitioner, in fact, did not dispute at trial that he was in Ms. Rowland's

home and was violent toward her on the night in question.  (Id. at VII:99-VIII:51.)

        The Petitioner's claims in his own defense could have been easily discounted by the jury.

In particular, he claimed that he had not manipulated articles of clothing or otherwise been in

Ms. Rowland's home before that night, and that he was experiencing at dissociative episode that

night and thus lacked criminal responsibility. To begin, the Petitioner's expert witness was countered by an expert for the prosecution. Additionally, there was ample evidence of planning, deliberation, and awareness on the Petitioner's part. The fact that at least one lock, at least one phone, and at least two lights had been disabled suggested that he was trying to prevent her from escaping or getting help. Evidence that he wore socks on his hands, locked her back door, knew she had not called the police, and told her to tell Ms. Blankenau to leave revealed an intent to avoid leaving fingerprints or being apprehended. Evidence of articles of clothing tied to the bedpost in her bedroom and the bedpost in her son's bedroom, in which she had recently slept, suggested a knowledge of her habits and a plan to tie her to a bed. The fact that he knew her name and how much money she had in her wallet suggested efforts to obtain information about her and the extent of her valuables and an awareness of whom he was attacking. His ability to respond to her offers of money and her car, and to react to Ms. Blankenau at the door, reveal a presence of mind. Further, evidence demonstrating that the Petitioner used an article of Ms. Rowland's clothing as a weapon in his attack suggests that he was behind the manipulation of similar articles of clothing previously discovered by Ms. Rowland and had thus broken in on prior occasions. Given that the Petitioner's own expert testified that evidence of prior break-ins would be consistent with planning and premeditation and inconsistent with dissociation, the jury could easily have rejected the Petitioner's claims that he had not previously been in her home and had experienced dissociation.

Added to the above is the fact that any testimony that the Petitioner exercised his right to remain silent upon arrest would likely have had little or no impact on his defense, in light of the facts of the case. This, too, is an appropriate consideration to be taken into account in evaluating harmlessness. See Booton, 541 F.2d at 299 (taking into account, as among factors giving rise to

conclusion that comment on petitioner's post-arrest silence in her manslaughter trial was harmless beyond a reasonable doubt, the fact that her statements had already placed her alone with the victim and holding gun when it was fired and thus testimony about her eventual silence would not have tended to impeach any more detailed story offered at trial and "was not calculated to damage a point upon which a defense was being constructed"). In particular, it would have had no bearing on his defense of lack of criminal responsibility or diminished capacity. At the most, it would have been relevant to establishing his presence of mind at the time that he was booked at the police station. Even the Petitioner, however, did not maintain that was in a dissociative state at that time. Instead, he claimed that that condition ended shortly before he emerged from Ms. Rowland's home. (Tr. at VIII:29 (testifying that he "remember[ed] coming out of whatever stupor [he] was in" around the time that that he told Ms. Rowland he was "insane").) Thus, Officer Ouellet's comment would not have detracted from the defense that the Petitioner offered at trial.[14]

   It is also unlikely that the jury would have interpreted the Petitioner's silence upon arrest as an indication of his knowledge of his own criminal responsibility. This is not a case where the jury heard a defense of mistaken identity and might have doubted the defendant's claim that he had no involvement in the alleged acts as a result of his silence. Here, there was no question that the Petitioner had been in Ms. Rowland's home and had been violent toward her. There thus would have been plenty of reason for him to have remained silent even if he in fact lacked criminal responsibility, and the jury could have so concluded. It is far less likely that the jury

---

[14] The fact that the prosecution sought to demonstrate that the Petitioner had presence of mind at the time of his booking does not detract from the soundness of this analysis. At the time that the prosecution was conducting its direct examination of Officer Ouellet, it could have known exactly how the Petitioner would testify.

would have interpreted the Petitioner's post-arrest silence specifically as an expression of his intent to commit the charged crimes or his knowledge of his own criminal responsibility.

        3.       <u>The prosecutor did not deliberately elicit a comment on the Petitioner's post-Miranda silence.</u>

In addition to the foregoing, there is no validity to the Petitioner's assertions that the prosecution deliberately sought to introduce evidence of the Petitioner's post-<u>Miranda</u> silence. (Pet'r's Mem. Supp. Pet. at 31, 41-44 (arguing that the prosecutor intended to elicit a comment on the Petitioner's post-<u>Miranda</u> silence as part of a "'calculated' plan").) Not one of the questions preceding Officer Ouellet's questionable comment elicited information regarding whether the Petitioner had exercised his right to remain silent. (Tr. at VI:94-97.) Furthermore, contrary to the Petitioner's claim, the prosecutor did not argue in the conferences following Officer Ouellet's comment that evidence of the Petitioner's post-<u>Miranda</u> silence should be admitted. (<u>Id.</u> at VI:97-114.) Rather, he argued against the motion that was then before the court, namely, the Petitioner's motion for a mistrial. (<u>Id.</u>) In fact, in doing so, he drew a distinction between testimony concerning the Petitioner's apparent ability to understand what was happening at the time, and testimony concerning whether he invoked his right to remain silent. (<u>Id.</u>) He then made clear more than once that he was not attempting to elicit from the officer and was not seeking to introduce such information. "I certainly wouldn't have asked him if he wished to remain silent," he asserted. (<u>Id.</u> at VI:109; <u>see also</u> <u>id.</u> at VI:99-100 (stating that he was "well aware that you can't go to the limit" and that he would not "have asked if he made a statement").) The trial judge shared this view, asking the Petitioner's counsel, "[W]here there is nothing to suggest that [the prosecutor] was intending to elicit that from the officer, why should – isn't that a drastic remedy?" (<u>Id.</u> at VI:110.)

These facts on this point are easily distinguishable from those in Morgan v. Hall and

United States v. Kallin, two cases relied on by the Petitioner.  (Pet'r's Mem. Supp. Pet. at 44

(citing Morgan v. Hall, 569 F.2d 1161, 1167 (1st Cir. 1978), and United States v. Kallin, 50 F.3d

689, 694 (9th Cir. 1995).)[15]  In Morgan, the prosecutor "conceded to the court he knew that [the

defendant] was under no obligation to say anything, yet continued to pursue the matter after one

objection by defense counsel was sustained," and clearly "tried to use [the defendant's] silence to

undermine [his] story."  569 F.2d at 1164-68.  Also, the justification he offered for his line of

questioning did not appear legitimate.  Id.  In Kallin, the prosecutor repeatedly elicited comments

on the defendant's silence during questioning and then, even after a curative instruction was

administered, referred to the defendant's silence again in closing.  50 F.3d at 692-94.  He also

advanced an argument to the court demonstrating that his purpose was to create exactly the kind

of inference that Doyle forbids.  Id. at 694.  That is, he "did not simply bring [the defendant's]

silence and retention of counsel to the attention of the jury, but actively encouraged the jury to

draw an inference of guilt."  Id.  In start contrast to these cases, the prosecutor in the Petitioner's

trial obtained a single comment on the Petitioner's silence that did not flow naturally from his

question.  (Tr. at VI:94-97.)  He asked no further questions along such lines, and explained

multiple times that he had not been seeking to elicit any comments on the Petitioner's silence.

(Id. at VI:97-114.)

In light of all of the foregoing, there can be no doubt that any error that may have

occurred with respect to Officer Ouellet's comment would have been harmless.

---

[15] Morgan was also decided before Greer and employed a "harmless beyond a reasonable doubt"
standard in assessing harmless error.  569 F.2d 1161.

## III.    <u>CONCLUSION</u>

For the foregoing reasons, the Petition should be denied and judgment should be entered

in favor of the Respondent.


Dated:  December 28, 2005                              Respectfully submitted,

                                                      THOMAS F. REILLY
                                                      Attorney General


                                                       /s/ Randall E. Ravitz
                                                      Randall E. Ravitz (BBO # 643381)
                                                      Assistant Attorney General
                                                      Criminal Bureau
                                                      One Ashburton Place
                                                      Boston, Massachusetts  02108
                                                      (617) 727-2200, ext. 2852